DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
MOLLY J. ALARCON, SBN 315244
Deputy City Attorney
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
Telephone:    (415) 554-3894
Facsimile:    (415) 437-4644
E-Mail:    molly.alarcon@sfcityatty.org

WILLKIE FARR & GALLAGHER LLP
BENEDICT Y. HUR, SBN 224018
bhur@willkie.com
SIMONA AGNOLUCCI, SBN 246943
sagnolucci@willkie.com
EDUARDO E. SANTACANA, SBN 281668
esantacana@willkie.com
STEPHEN HENRICK, SBN 310539)
shenrick@willkie.com
ALYXANDRA VERNON, SBN 327699
avernon@willkie.com
MICHAEL MORIZONO, SBN 359395
mmorizono@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Telephone:    (415) 858-7400

Attorneys for Plaintiff
SAN FRANCISCO UNIFIED SCHOOL DISTRICT

*[Additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO UNIFIED SCHOOL DISTRICT; CITY OF SANTA FE,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICORPS (a.k.a. the CORPORATION FOR NATIONAL AND COMMUNITY SERVICE); JENNIFER BASTRESS TAHMASEBI in her official capacity as Interim Agency Head of AmeriCorps,<br><br>Defendants. | Case No. 3:25-cv-02425<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1.      AmeriCorps grants are awarded to fund activities "designed to help the poor, the disadvantaged, the vulnerable, and the elderly." 42 U.S.C. § 4950(b). Plaintiffs in this case—the San Francisco Unified School District and the City of Santa Fe—use their AmeriCorps grants to fund support services for vulnerable students, seniors, and other residents.

2.      When Plaintiffs applied for their grants, they were expressly told to verify their commitment to diversity, equity, inclusion, and accessibility in their applications. After reviewing their applications, AmeriCorps approved Plaintiffs' requested grants to support climate change initiatives and provide culturally sensitive programs to children and seniors.

3.      Last month, however, the federal AmeriCorps agency did an about-face and announced that grant recipients could only continue using grant funds for their approved purposes if they agreed to implement President Trump's anti-equity, anti-LGBTQ+, and anti-environmental policy preferences in their programs. Specifically, AmeriCorps gave recipients, including Plaintiffs, just a few days to either change their programs to eliminate any activities that promote DEI, promote "gender ideology," or address climate change or other environmental issues—without explaining what that means—or lose their AmeriCorps grant funding entirely.

4.      Conditioning ongoing funding designed to help vulnerable populations on new policy-driven conditions is not only unconscionable, but also unlawful.

5.      Under the Spending Clause of the United States Constitution, grant conditions must be set forth unambiguously before a recipient enters into the grant agreement with the federal government, and must be related to the subject matter of the grant program. But AmeriCorps' new conditions fail this standard in three ways. The conditions are so vague that it is impossible for Plaintiffs to know the full range of activities the federal government would consider prohibited. AmeriCorps is seeking to impose the conditions in the middle of grant terms, thus surprising recipients with post-acceptance retroactive conditions. And the conditions not only lack a nexus with the purpose of the implicated funds, but in fact undermine the purpose of the funds Congress appropriated here, which includes an intent to expand educational and civic opportunities for underserved and disadvantaged populations, including racial minority populations.

6.    AmeriCorps' actions also violate the Administrative Procedure Act because they violate the Constitution, contravene AmeriCorps' statutory authority by adding conditions that conflict with Congress's stated purpose in providing the funds, and arbitrarily fail to consider the reasonable and inevitable reliance by Plaintiffs on now-suddenly jeopardized funding and the need for clarity about whether and how they can provide day-to-day services relied on by staff, students, and residents.

7.    For all of these reasons, the Court should invalidate AmeriCorps' actions and allow Plaintiffs to continue using their allocated grant funds for their intended and approved purposes to help their local communities.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq*.

9.    Venue properly lies within the Northern District of California because Plaintiff the San Francisco Unified School District resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. §1391(e)(1).

## INTRADISTRICT ASSIGNMENT

10.    Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions giving rise to this action occurred in the City and County of San Francisco.

## PARTIES

11.    Plaintiff the San Francisco Unified School District ("SFUSD" or the "District") is the unified school district serving the City and County of San Francisco and operating under the laws of the State of California.

12.    Plaintiff the City of Santa Fe, New Mexico ("Santa Fe") is a municipal corporation organized and existing under and by virtue of the laws of the State of New Mexico. It is a home rule charter city, and the state capital of the State of New Mexico.

13.    Defendant AmeriCorps, also known as the Corporation for National and Community Service, is an independent federal agency of the United States federal government. 42 U.S.C. § 12651. AmeriCorps is responsible for enacting the governmental actions at issue in this lawsuit.

14.     Defendant Jennifer Bastress Tahmasebi is the Interim Agency Head of AmeriCorps, the highest ranking official in AmeriCorps, and is therefore responsible for the decisions of AmeriCorps. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

## I.     Plaintiffs' AmeriCorps Grants Fund Important Local Work

15.     AmeriCorps is a federal agency that works with communities and supports a variety of public-private partnerships and governmental collaborations to address local challenges through service.

16.     Congress established AmeriCorps to "foster and expand voluntary citizen service in communities throughout the Nation in activities designed to help the poor, the disadvantaged, the vulnerable, and the elderly." 42 U.S.C. § 4950(b). To that effect, Congress authorized AmeriCorps to "make grants to States [and] subdivisions of states . . . to carry out full- or part-time national service programs." *Id.* § 12571(a).

17.     Congress envisioned an AmeriCorps-funded program that "identifies and meets unmet educational needs within communities." 42 U.S.C. § 12572(a)(1)(A). Congress explicitly approved of programs that "carry out activities" like "mentoring students, including adult or peer mentoring," *id.* § 12572(a)(1)(B), or that seek "to expand the number of mentors for disadvantaged youths and other youths" through "direct mentoring services" and "supporting mentoring partnerships," *id.* § 12572(b)(2)(C). Similarly, Congress explicitly endorsed programs "that meet[] unmet . . . health, veteran, and other human, educational, environmental, or public safety needs and promote[] greater community unity through the use of organized teams of participants of varied social and economic backgrounds, skill levels, physical and developmental capabilities, ages, ethnic backgrounds, or genders." *Id.* § 12572(c)(1)(A).

18.     Congress also tasked AmeriCorps with "foster[ing] the tradition of volunteerism through greater involvement on the part of individuals of all ages and backgrounds." 42 U.S.C. § 4950(a). The individuals who participate in the diverse AmeriCorps "voluntary citizen service" are called AmeriCorps participants or members ("Members"). Members are adults usually between the

ages of eighteen and twenty-four. *See id*. § 12613(b); *see also* 45 C.F.R. § 2522.200 (2025) (member eligibility requirements).

A. **AmeriCorps Funding Supports SFUSD's Successful Healthy Choices Program**

1. **SFUSD and Its Students Face Significant Challenges**

19. Plaintiff SFUSD educates, supports, and enriches over 50,000 students across 122 schools. SFUSD is the only public school district serving the City and County of San Francisco, and is the seventh-largest school district in California.

20. The District's students reflect the rich diversity and varied needs of San Francisco communities. Eighty-seven percent of SFUSD students are students of color: they are Latino, Asian, Black, Filipino, Pacific Islander, multi-racial, and more. Over half of SFUSD students are socioeconomically disadvantaged, meaning they receive free or reduced-price meals at school, or their parents did not graduate from high school. One in four SFUSD students is an English language learner, and 14% of them are children with disabilities enrolled in special education. Some SFUSD students are experiencing homelessness or living in foster care.[1]

21. Every day, SFUSD endeavors to provide each and every one of its students with the quality instruction and support they need to thrive in the 21st century. But many SFUSD students face significant challenges, which can impede their learning and social development. Among other factors influencing their learning, many SFUSD students lack a sense of connectedness or belonging at school. Students who feel disconnected from their schools are less likely to attend, although other factors also influence attendance.[2] Vulnerable students often feel the most disengaged. For example, nearly 50% of Black SFUSD students (compared to 34% of White SFUSD students) do not feel safe at school, and 35% of Black SFUSD students (compared to 20% of White SFUSD students) do not feel a sense of belonging.[3] As a result of these and other factors, vulnerable SFUSD students are missing

---

[1] SFUSD, *Facts About SFUSD At A Glance* (2025), https://www.sfusd.edu/about-sfusd/facts-about-sfusd-glance (last visited Mar. 7, 2025).

[2] U.S. Dep't of Educ., *Chronic Absenteeism* (Jan. 20, 2025), https://www.ed.gov/teaching-and-administration/supporting-students/chronic-absenteeism (last visited Mar. 7, 2025), saved permanently at https://perma.cc/GU4V-PDVG.

[3] *See* Exhibit 1, PDF p. 23 (narrative portion of SFUSD AmeriCorps grant agreement).

more and more days of school. Some end up missing ten percent or more of instructional days, and thus are considered chronically absent.[4] Within the District, over half of Black and Pacific Islander students; around one-third of Latino students, students with disabilities, students experiencing homelessness, and students living in foster care; and around one-quarter of socioeconomically disadvantaged students and English language learners are chronically absent.[5]

22.     Student disengagement also affects students inside the classroom, where disengaged students may demonstrate lower test scores and reduced social-emotional learning development.[6] Students who are chronically absent for multiple years between preschool and second grade are much less likely to read at grade level by the third grade, and four times more likely to not graduate from high school.[7]

23.     Outside the classroom, disengagement and absenteeism can further distance students from their peers and other caring adults.[8] It can be even harder for students to connect with adults at school when teachers and staff are leaving SFUSD schools at record-high rates.[9] Between 2017 and

---

[4] U.S. Dep't of Educ., *Chronic Absenteeism* (Jan. 20, 2025), https://www.ed.gov/teaching-and-administration/supporting-students/chronic-absenteeism (last visited Mar. 7, 2025), saved permanently at https://perma.cc/GU4V-PDVG.

[5] California Dep't of Educ., *Academic Engagement in San Francisco Unified School District*, California Sch. Dashboard (2024), https://www.caschooldashboard.org/reports/38684780000000/2024/academic-engagement#chronic-absenteeism (last visited Mar. 7, 2025).

[6] Lucrecia Santibañez & Cassandra Guarino, *The Effects of Absenteeism on Academic and Social-Emotional Outcomes: Lessons for COVID-19*, UCLA Sch. Of Educ. & Info. Stud. (Oct. 13, 2021), https://seis.ucla.edu/news/the-effects-of-absenteeism-on-academic-and-social-emotional/ (last visited Mar. 3, 2025); Jennifer A. Fredricks, *Getting Students Engaged in Learning*, National Association of State Boards of Education (Sept. 2023), https://link.springer.com/article/10.1007/s10212-020-00500-6 (last visited Mar. 7, 2025)

[7] U.S. Dep't of Educ., *Chronic Absenteeism* (Jan. 20, 2025), https://www.ed.gov/teaching-and-administration/supporting-students/chronic-absenteeism (last visited Mar. 7, 2025), saved permanently at https://perma.cc/GU4V-PDVG.

[8] *Id.*

[9] *See* American University School of Education, *Teacher Retention: Preventing Teacher Turnover* (Oct. 13, 2022), https://soeonline.american.edu/blog/teacher-retention/ (last visited Mar. 7, 2025) (generally discussing loss of student engagement and academic impacts that result from teacher turnover)

---

2019, for example, one in four SFUSD teachers left their schools.[10] More recently, to address a $113 million deficit for the 2025-26 school year, SFUSD issued preliminary layoff notices for over 500 certificated and classified positions. These factors, combined with structural, family, socioeconomic, health, and other challenges facing SFUSD students and their families, create a need for various forms of student support.

**2.      The Healthy Choices Program Helps Address These Challenges**

24.     To help address these challenges, SFUSD has applied for and received AmeriCorps grant funds for approximately the last ten years to operate Healthy Choices AmeriCorps ("Healthy Choices"). Among other things, Healthy Choices provides mentoring services to vulnerable students across dozens of SFUSD schools, all in an effort to increase these students' school attendance and wellbeing.

25.     Most recently, SFUSD received a $667,194 grant from AmeriCorps to fund Healthy Choices for the 2024-25 school year. A copy SFUSD's grant agreement is attached hereto as **Exhibit 1**. The grant accounts for about half of the program's budget.

26.     Currently, the District runs Healthy Choices in thirty-eight schools. It employs seventeen full-time Members and around twenty part-time Members (funded by the AmeriCorps grant) who support SFUSD students daily. Their work complements the work performed by the District's teachers, social workers, mental health professionals, and other staff members. The mentoring, positive school culture efforts, and other services provided by Members supplement students' learning inside the classroom by offering holistic support to students so they feel safe, supported, and engaged at school. In this way, Healthy Choices enables the District to combat chronic absenteeism and promote academic success and student belonging across its diverse student body.

27.     AmeriCorps Members provide a variety of different services and supports for students as part of Healthy Choices. Their primary role is to oversee and implement "Mentoring for Success," a school-based mentoring program pairing vulnerable SFUSD students with caring, supportive adults.

---

[10] Pivot Learning, *District Readiness Ratings for San Francisco Unified School District*, Dist. Readiness Index (2025), https://districtreadiness.org/district/san-francisco-unified/#tab-personnel (last visited Mar. 3, 2025).

Mentoring for Success aims to assist vulnerable students—most of whom are economically disadvantaged, live in low-income neighborhoods, and are students of color—who benefit from one-on-one or small group support to thrive at school. Full-time and part-time Members serve as mentors to around ninety participating students each year and help students feel safe and included at school.

28.    Healthy Choices also provides services to a smaller number of students who require further assistance—those who benefit from tailored interventions to promote their wellbeing. These additional interventions are provided by part-time Members who are master's students in mental health, social work, and school counseling degree programs. Relying on their technical expertise, these Members offer in-depth case management, mentoring, and counseling for vulnerable students.

29.    Members also provide services that are available to all students at a given school. For example, Members may facilitate lunch-time activities and clubs for students, including those related to students' identities and overall well-being. Members also support school-wide events and initiatives, such as heritage month celebrations or a school "store" that rewards students for good behavior and academic achievement. These activities promote a positive school culture and climate.

30.    Additionally, some full-time Members provide "push-in" support on an as-needed basis, where they intervene to help students quickly handle problems and return to learning. Where needed, Members may join a classroom and sit with one or more students to provide support, foster accountability in attendance, and ensure students complete their schoolwork. These targeted interventions reduce absenteeism and help students stay focused and engaged in class.

31.    Now operating in its tenth year, Healthy Choices has exceeded the District's expectations and impacted the lives of hundreds of SFUSD students. Between 2022 and 2023, for example, twenty-two Members provided 2,438 services (like mentoring) to 381 students across twenty SFUSD schools. Ex. 1 (SFUSD AmeriCorps grant agreement) at PDF p. 24. Students met with their mentors for an average of one hour per week. This regularity of contact with a supportive, caring adult produced measurable results.

32.    Healthy Choices has contributed to students' success at school. Most participating secondary school students (84%) feel their mentor helps them perform better in school. Ex. 1 at PDF p. 26. In just one year, the number of middle school students in small-group mentoring who feel like

there is a teacher or other caring adult at school who notices them drastically rose from 47.5% to 73.7%. *Id.* Studies have also shown that programs like Healthy Choices causally increase students' grade point averages and graduation rates, reduce suspensions and bullying, improve students' feelings of safety and belonging at school, and enhance students' social-emotional learning and pro-social behaviors. *Id.* at PDF pp. 24–26.

33.     Students greatly value Healthy Choices. Nearly all students (95.8%) attend their Mentoring for Success sessions. Ex. 1 at PDF p. 25. An overwhelming majority of elementary (93%) and secondary (78%) school students said the time they spend with their mentors is "meaningful." *Id.* Among secondary school students who receive one-on-one mentoring, 92% feel heard and respected by their mentor, and among elementary school students who receive the same, 93% like to meet with their mentor. *Id.* Most students who participate in small group mentoring (88%) enjoy going to monthly group activities with their mentor. *Id.* at PDF p. 26.

34.     Healthy Choices has even improved student well-being outside the classroom. For example, three in four secondary school students who received one-on-one mentoring report that they learned ways to improve their health through the program and take steps to improve it. Ex. 1 at PDF p. 26.

35.     The program has also empowered Members to start careers as teachers, social workers, school counselors, mental health professionals, and school leaders. That Healthy Choices has served as a pipeline into these fields is an important benefit for the District, which desperately needs qualified educators, social workers, and other mental health professionals to best support students.

36.     SFUSD's AmeriCorps grant funding provides crucial support for all of these activities.

**B.     AmeriCorps Funding Supports Santa Fe's Programming Related to Elder Care, Child Mentoring and Development, Retiree Community Building, and Community Well-Being**

37.     Santa Fe has been a grantee of AmeriCorps for nearly twenty-five years. These grants have supported Santa Fe in providing programming for its residents related to elder care, child mentoring and development, retiree community-building, and overall community wellbeing.

38.     Santa Fe administers three programs funded in part by AmeriCorps grants. The first is its Foster Grandparent Program. The AmeriCorps grant funding this program consists of at least

$38,013 for the period of July 1, 2024 through June 30, 2025. A copy of that grant agreement is attached hereto as **Exhibit 2**.

39.     AmeriCorps' website explains that the Foster Grandparent Program "connects" senior volunteers "to young people with exceptional needs." Senior volunteers serve as "role models" who "guide students to higher academic achievement," "[c]are for premature infants or children with disabilities," "[m]entor teenagers and young mothers," and "provide the kind of comfort and love that sets a child on a path to a successful future." Meanwhile, senior volunteers "[e]nrich [their lives] while enriching the lives of others," with senior volunteers reporting "better health and longevity having served their community."[11]

40.     In Santa Fe's Foster Grandparent program, AmeriCorps volunteers serve as "Foster Grandparents" for at-risk children with special and/or exceptional needs. Foster Grandparents are placed in schools, Head Start programs, and daycare centers. Foster Grandparents act as mentors and tutors and help assigned "grandchildren" with developmental tasks and learning skills such as reading and arithmetic.

41.     The program is designed with the goal that personal attention each child receives from a volunteer Foster Grandparents assists with the self-confidence and self-value needed for the child to eventually become a productive citizen of society. Santa Fe has administered this program with support from AmeriCorps grants for nearly 25 years.

42.     Santa Fe also administers the Senior Companion Program. The AmeriCorps grant funding for this program consists of $2,500 as a one-time grant. A copy of that grant agreement is attached hereto as **Exhibit 3**.

43.     AmeriCorps' website explains that the Senior Companion Program "focuses on providing assistance and companionship to older adults who have difficulty with daily living tasks, such as shopping or paying bills. Through this program, AmeriCorps Seniors volunteers keep seniors

---

[11] AmeriCorps, *AmeriCorps Seniors Foster Grandparent Program*, https://americorps.gov/serve/americorps-seniors/americorps-seniors-foster-grandparent-program (last accessed Mar. 7, 2025), permanently saved at https://perma.cc/NMN4-Y5K3.

independent longer and provide respite to family caregivers."[12]

44.    In Santa Fe's Senior Companion Program, AmeriCorps volunteers serve as "Senior Companions" that assist senior citizen clients with day-to-day tasks. These may include paying bills, completing grocery shopping, running errands, providing transportation to medical appointments, completing light housekeeping, and providing respite care for primary caregivers.

45.    Senior Companions offer companionship and develop friendships with their senior citizen clients. The assistance Senior Companions provide to senior citizen clients often allows clients to stay in their homes rather than being institutionalized, alleviates client loneliness, and helps clients maintain a connection to their community. As a result, the program results in major cost-savings for seniors, their families, and communities. Santa Fe has administered this program with support from AmeriCorps grants for nearly 25 years.

46.    Santa Fe administers these programs rigorously. Foster Grandparents and Senior Companions must be 55 and older, with limited income, and must pass a background check to qualify as volunteers. Grant funding covers the cost of recruiting, onboarding, and training new volunteers. Additionally, the AmeriCorps grants allow Santa Fe to offer volunteers a modest tax-free stipend ($4.00/hour); transportation reimbursement ($.45/mile up to 120 miles/week); meal reimbursement, largely for Foster Grandparents who take brown bag lunch or purchase lunch at school ($1.50/meal); and uniforms to wear to school.

47.    The AmeriCorps grants also allow city staff to conduct ongoing monthly training materials for volunteers and cover the supplemental liability insurance for each volunteer.

48.    The AmeriCorps grant funding allows the city to hold an annual recognition event with token recognition gifts for volunteers to thank them for their service. All volunteers must submit timesheets to the city detailing their work with each program, and the city then prepares bi-weekly stipends accordingly.

---

[12] AmeriCorps, *AmeriCorps Seniors Senior Companion Program*, https://americorps.gov/serve/americorps-seniors/americorps-seniors-senior-companion-program (last accessed Mar. 7, 2025), permanently saved at https://perma.cc/NSP5-2J49.

49.     Finally, Santa Fe also administers the Retired & Senior Volunteer Program (RSVP). The AmeriCorps grant funding for this program consists of at least $52,500 from April 1, 2024 to March 31, 2025. A copy of that grant agreement is attached hereto as **Exhibit 4**. The grant accounts for a significant portion of the program's budget.

50.     The RSVP program pairs approximately 300 volunteers ages 55 and older with community organizations across Santa Fe. Volunteers choose how, where, and when they want to serve, with commitments ranging from a few hours to 40 hours per week.

51.     Santa Fe deploys volunteers across more than 50 different volunteer sites throughout the city. The AmeriCorps grant allows Santa Fe to offer volunteers mileage reimbursement, dependent on budget, and covers the supplemental liability insurance for each volunteer. It also allows the city to hold an annual recognition event with token recognition gifts for volunteers to thank them for their service. Santa Fe has administered this program with support from AmeriCorps grants for nearly 25 years.

## II.     Defendants Impose New and Coercive Conditions on AmeriCorps Grant Funds

52.     On February 13, 2025, AmeriCorps issued a directive to all grant recipients entitled "Executive Order Compliance Instructions" ("AmeriCorps Directive"), attached hereto as **Exhibit 5**.

53.     The AmeriCorps Directive announced that the agency was "continuing to review all applicable executive orders, memoranda and corresponding guidance issued since January 20, 2025, by President Trump, the Office of Management and Budget and the Office of Personnel Management." Ex. 5 at 1. As part of its review, AmeriCorps said it was verifying that "all current AmeriCorps grant awards" complied "with these directives and administration priorities." *Id.*

54.     To do so, the AmeriCorps Directive required all grant recipients immediately to self-certify their compliance by February 19, 2025. Specifically, grant recipients had to attest to the following statement: "I certify that [Program Name], [application ID] complies with all administration Executive Orders and does not include any activities that promote DEI activities." *Id.* at 3. The AmeriCorps Directive does not identify "activities that promote DEI activities" or define the acronym "DEI."

55.     The AmeriCorps Directive further specified that "[a]ll aspects of AmeriCorps grants/awards must comply with President Trump's executive orders, including, but not limited to: Grant applications for AmeriCorps resources[;] Activities performed by AmeriCorps members/volunteers[;] Training provided to members/volunteers[; and] Program materials, such as volunteer/member applications, enrollment forms, service opportunity listings, and handbooks." *Id.* at 1.

56.     If a grant recipient could not certify its compliance but wanted to retain its grant funding, the recipient was required to "cease [all noncompliant] activities immediately, initiate an amendment to [the] most recent grant award and remove or update any language related to out of compliance activities." *Id.* at 3. If a non-compliant recipient did not want to change its programming and amend its grant, it was required to relinquish the grant by emailing the regional AmeriCorps office by February 19.

57.     Finally, the AmeriCorps Directive warned grant recipients that "[n]onresponse" by the February 19 deadline "may result in the termination of your awards." *Id.* at 5. Thus, it forced recipients to pick one of the three options or risk the loss of its grant funding.

58.     The AmeriCorps Directive also required state commissions (state agencies that pass through AmeriCorps funding) to send the directive to grant recipients within their state. *Id.* at 5.

59.     The AmeriCorps Directive specifies that "AmeriCorps Grantee/Sponsors awards must comply with all executive orders, including but not limited to," the following:

- Exec. Order No. 14,168, *Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government*, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ("Anti-Gender Order"),[13] which includes a provision stating that "[f]ederal funds shall not be used to promote gender ideology," and directing federal agencies to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." Ex. 5. at 8; Anti-Gender Order § 3(g).

---

[13] https://perma.cc/RWR4-9Q8C

- Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("Jan. 20 Anti-DEI Order"),[14] which directs federal agencies to "terminate … 'equity-related grants'" – without defining "equity-related" or even "equity." Ex. 5 at 8; Jan. 20 Anti-DEI Order § 2(b)(1).

- Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("Jan. 21 Anti-DEI Order"),[15] which directs federal agencies to insert terms in every grant award requiring the recipient to certify that it does not operate any programs promoting DEI "that violate any applicable Federal anti-discrimination laws." Jan. 21 Anti-DEI Order § 3(b)(iv)(A). Again, the Jan. 21 Anti-DEI Order does not define operative terms, such as "DEI" or "promoting DEI," nor does it identify "any programs" that the Administration believes would "violate any applicable Federal anti-discrimination laws.

- Exec. Order No. 14,154, *Unleashing American Energy*, 90 Fed. Reg. 8,353 (Jan. 20, 2025) ("Unleashing American Energy"),[16] which directs federal agencies to review their "processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." Unleashing American Energy § 7.

60.    Notably, none of these executive orders purport to impose any requirements directly on Plaintiffs. The AmeriCorps Directive admits as much in explaining that executive orders "order the [federal] government"—not grant recipients—"to take specific actions to ensure 'the laws be faithfully executed.'" Ex. 5 at 7. According to Defendants, "AmeriCorps, as part of the Executive branch of government, must comply with all applicable executive orders." *Id.*

61.    Moreover, the Directive goes beyond what the Anti-DEI Orders would require had the Administration written them to place direct requirements on grant recipients. The most applicable language from any of the executive orders comes from the Jan. 21 Anti-DEI Order, which directs agency heads to include a term in every grant requiring the "recipient to certify that it does not operate

---

[14] https://perma.cc/YBY7-265U
[15] https://perma.cc/UJ3M-NFLY
[16] https://perma.cc/VHA5-RBUM

any programs promoting DEI *that violate any applicable Federal anti-discrimination laws*."
(Emphasis added.) But the new anti-DEI condition imposed by AmeriCorps excludes the italicized
phrase and requires recipients to certify that they do not use the funds for "*any* activities that promote
DEI activities" (emphasis added), regardless of whether the activities comply with or violate federal
anti-discrimination laws. Ex. 5 at 3, 5.

62.     In short, the AmeriCorps Directive seeks to impose two new conditions on grant
recipients—that grant funded programs (a) "compl[y] with all administrative executive orders" (even
though the executive orders impose no conditions directly on recipients), and (b) do not "promote DEI
activities" (which goes beyond what is required by any executive order).

63.     Upon information and belief, AmeriCorps flagged potentially non-compliant grants for
follow-up by searching grant narratives for such verboten terms as "diversity," "equity," "DEI,"
"racial equity," "environmental justice," "climate change," "clean energy," "nonbinary," "gender
expression," and "gender identity," indicating its view that any program that involves any of these
aspects should not be funded.

64.     This action caught Plaintiffs by surprise. Nothing in AmeriCorps' grant agreements or
other materials prohibited recipients from using their awards on activities that promote gender
ideology, DEI activities, or environmental action.

65.     To the contrary, as detailed in the Notice of Funding Opportunity, attached hereto as
**Exhibit 6**, consistent with its implementing statutes, AmeriCorps required applicants when applying
for funding to verify their "Commitment to Diversity, Equity, Inclusion, and Accessibility" in a
section of the application worth four percentage points in the review process. Ex. 6 at 21. Specifically,
applicants had to explain how their "leadership and staff . . . have similar lived experience as the
beneficiary population and/or community being served," *id.* at 25, how their "definitions of diversity,
equity, inclusion, and accessibility is demonstrated by the organization" (e.g., "diversity on the Board
of Directors, agency staff and leadership, and/or volunteers"), *id.* at 26, and how they "uphold[] a
supportive and safe environment for individuals of diverse backgrounds," *id.* The notice also specified
that the agency would "prioritize investment in the most critical issues of our time," including "climate
and the environment" (*id.* at 4) and listed "environmental stewardship" among its focus areas. *Id.* at 36

("Supporting communities to become more resilient through measures that reduce greenhouse gas emissions . . .  especially in underserved households and communities.").

66.    As a result, Plaintiffs provided information on their "Commitment to Diversity, Equity, Inclusion, and Accessibility" in their applications.

67.    This language is consistent with the General Terms and Conditions governing AmeriCorps grants when AmeriCorps issued the grants that are at issue here. Those Terms and Conditions stated:

> The recipient must include information on civil rights requirements, complaint procedures and the rights of beneficiaries in member or volunteer service agreements, handbooks, manuals, pamphlets, and post in prominent locations, as appropriate. The recipient must also notify the public in recruitment material and application forms that it operates its program or activity subject to the nondiscrimination requirements. Sample language, in bold print, is: **This program is available to all, without regard to race, color, national origin, gender, age, religion, sexual orientation, disability, *gender identity* or expression, political affiliation, marital or parental status, genetic information and military service**. Ex. 1 at PDF p. 123 (SFUSD grant agreement) (italics added).

**A.    Implementation of the New Grant Conditions on SFUSD**

68.    Pursuant to the AmeriCorps Directive—and communication from AmeriCorps flagging SFUSD's use of the words "diversity," "equity," and "racial equity," in its grant narrative—the California state administrator of AmeriCorps funds ("California Volunteers") sent notice to SFUSD regarding its federal grant for Healthy Choices on February 19, 2025.

69.    Replicating the language of the AmeriCorps Directive, the notice informed SFUSD that it had "to certify compliance" with "all applicable executive orders, memoranda, and corresponding guidance issued since January 20, 2025, by President Trump, the Office of Management and Budget, and the Office of Personnel Management." *See* Ex. 5 at 1.

70.    The notice then gave SFUSD three options, requiring SFUSD, by 5pm on February 20, 2025 to either: (1) certify that its program complies "with all administration Executive Orders and does not include any activities that promote DEI activities," (2) stop providing all "noncompliant" activities and seek an amended grant agreement excising those activities (which it was told it needed to execute by February 21) and including the new certification conditions, or (3) relinquish the grant award.

71.    SFUSD was given less than a day to respond before "adverse action up to and including termination of awards by the AmeriCorps federal agency [could] begin."

72.    Defendants' actions subjected SFUSD to a Hobson's choice: relinquish funds for an essential program or submit to an unlawful demand to stop pursuing critical aspects of the program because they would be viewed by the federal government as violating an executive order or "promoting DEI."

73.    Due to the notice's sudden one-day turnaround and the magnitude of this programmatic and financial consequences of this decision, SFUSD sought and obtained a one-day extension to respond to AmeriCorps's Directive.

74.    Because SFUSD could not risk losing the funding altogether, on February 21, 2025, SFUSD selected the second option under protest while it considered its legal options. As part of selecting that option, SFUSD notified California Volunteers via email that, in SFUSD's view, the AmeriCorps Directive is unlawful and unconstitutional, and so, SFUSD was initiating the grant amendment process under duress and in protest. That email is attached hereto as **Exhibit 7**. In addition, SFUSD made clear that it reserved its right to seek legal recourse to challenge Defendants' unlawful and unconstitutional actions. Ex. 7.

75.    After submitting its response under duress and in protest, SFUSD reviewed its already executed grant agreement per the AmeriCorps Directive's instructions, *see* Ex. 5 at 4–5, for any "activities that" might be considered to "promote DEI activities." Without clarity on what that material phrase means, SFUSD tried its best to anticipate what Defendants would deem "noncompliant" about Healthy Choices and remove those aspects from the grant agreement. After doing so, SFUSD uploaded a proposed revised grant agreement to the online grant portal and emailed California Volunteers again to reiterate SFUSD's submission under duress and in protest and its reservation of rights. That second email is attached hereto as **Exhibit 8**. Even so, SFUSD is unclear how it can implement the Healthy Choices program to serve students without running afoul of the AmeriCorps Directive's instructions given the ambiguity of "DEI activities."

76.    SFUSD is waiting for Defendants to return a revised grant agreement for SFUSD's signature at any moment. SFUSD has not yet received a revised grant agreement from Defendants, and

SFUSD has not signed or executed a revised grant agreement. Nor does SFUSD wish to sign and execute a revised grant agreement containing unlawful and unconstitutional new grant conditions. Yet, once the revised grant agreement is returned, SFUSD may be forced to sign the agreement under duress within a matter of days if it wants to retain its funding.

77.    As discussed further below, as SFUSD awaits the revised grant agreement and relief from this Court, it has been required, to the detriment of its students, to cease program activities that are inconsistent with executive orders or that could be seen to "promote DEI activities." Because it is unclear how Defendants define "DEI activities," or how they interpret the executive orders in question to impose requirements on SFUSD, the vagueness of these directives leaves SFUSD in the impossible position of guessing as to how Defendants might seek to enforce these directives against it.

**B.    Implementation of the New Grant Conditions on Santa Fe**

78.    Pursuant to the AmeriCorps Directive, the Mountain Region Portfolio Manager of AmeriCorps sent notices to Santa Fe regarding its three AmeriCorps grants on February 14, 2025. The notices demanded that Santa Fe select one of the three pre-written response options regarding its AmeriCorps grant funding and respond to the agency by February 19, 2025.

79.    On February 19, 2025 Santa Fe requested via email a formal extension to respond to the AmeriCorps notice. The extension followed a call with the Mountain Region Portfolio Manager that same day.

80.    Santa Fe requested the extension because the new Santa Fe City Manager, who oversees the staff administering the relevant city grants and funds, started his time in office on February 17, 2025, and was actively onboarding during the requested response window. Additionally, Santa Fe was determining whether any response to AmeriCorps required involvement by the Santa Fe Governing Body.

81.    The next Governing Body meeting with the opportunity to add an agenda item was scheduled for March 12, 2025.

82.    Santa Fe made its request for an extension in accordance with the AmeriCorps Directive, which stated that extensions could be granted for extenuating circumstances, including scheduled leave or internal approval processes requiring additional time. Ex. 5 at 5-6.

83.     AmeriCorps rejected Santa Fe's requested extension. The agency instead extended the deadline to respond to February 24, 2025 at noon mountain time.

84.     Subsequently, AmeriCorps accelerated the deadline to February 21, 2025.

85.     On February 21, 2025, Santa Fe submitted amended grant applications for all three grants. In doing so, the city registered "profound disagreement with what Santa Fe understood to be the intent, philosophy and legal authority of this Executive Order." A copy of that email (which includes related correspondence) is attached hereto as **Exhibit 9**.

86.     AmeriCorps acknowledged receipt that same day. Ex. 9 at 1.

87.     Santa Fe submitted its response under duress and in protest.

**III.     Plaintiffs Face Serious Irreparable Harm from the Unlawful Directive**

88.     Defendants' actions put Plaintiffs to a Hobson's choice: relinquish critical funding or submit to the federal government's coercive and unlawful tactics and eliminate essential aspects of their AmeriCorps-funded programs. Though the details differ for each plaintiff entity, the illegality of Defendants' actions and the magnitude of harm those actions will cause is consistent across jurisdictions.

### A.     SFUSD's Hobson's Choice: Lose Critical Funding or Cut Services for Vulnerable Students That Are (or Could Be Considered) "Noncompliant"

89.     Because the AmeriCorps Directive required grant recipients to immediately cease all program activities that purportedly violate an executive order or "promote DEI activities," SFUSD has already had to begin making a variety of unwarranted changes to Healthy Choices.

90.     For example, AmeriCorps Members provide primary support for groups known as "Rainbow" or Genders/Sexualities Alliance clubs. These clubs are an opportunity for students to gather to discuss issues and plan activities related to making their schools inclusive and welcoming to all students, with a focus on LGBTQ+ students. Defendants would likely consider these clubs to violate both the Anti-Gender Order and the prohibition on activities that "promote DEI." Accordingly, SFUSD is in the process of identifying clubs that may need to be terminated because the Members that facilitate them may no longer be permitted to do so.

91.     SFUSD has also had to begin altering its training for AmeriCorps Members who, for years, have been trained to—among other things—recognize and respond to implicit bias and use students' preferred pronouns and chosen names. This training helps Members interact with SFUSD's diverse student body and has been an important part of the Healthy Choices program's success.

92.     SFUSD is also having to revamp how it pairs students with mentors who work closely with students to support their learning, literacy, and attendance. One important consideration for such programs is to find mentors that look like and reflect the values of the student, which means considering students' and mentors' racial or ethnic background, gender identity, or sexual orientation. But Defendants would likely consider this, too, to violate both the Anti-Gender Order and the prohibition on activities that "promote DEI." As a result, SFUSD likely cannot use best practices to assign mentors that help students succeed.

93.     In the near future, SFUSD will have to choose to either make these changes permanent or relinquish $667,194.

94.     Relinquishing funds that are used to support some of San Francisco's most vulnerable students is not tenable. SFUSD is experiencing a significant budget deficit due to declining enrollment trends, reduced state funding, and rising expenditures, and the District must implement $113 million in reductions for 2025-26 to balance its budget. As a result, SFUSD recently issued preliminary layoff notices for over 500 certificated and classified positions.

95.     Accordingly, if SFUSD loses $667,194—half the program budget—for being "noncompliant," it will have no choice but to substantially downsize Healthy Choices and drastically cut the number of mentors at its schools. These program reductions would negate all that Healthy Choices has achieved in meaningfully improving student well-being and empowering Members to continue serving their communities as teachers and mental health professionals. The reductions would also precipitate rises in absences and learning loss, particularly among vulnerable students.

96.     It is also not in the best interests of students for SFUSD to allow itself to be coerced into compromising its core values of "stand[ing] with those most vulnerable in our community," "respect[ing] and seek[ing] to understand each person," and being "an inclusive and anti-racist district" by making permanent the changes discussed above. Without these services, SFUSD's ability

to effectively and equitably support its diverse student body will be hindered. In consequence, student social and emotional well-being will decline, and suspensions and bullying will increase. SFUSD's AmeriCorps Members would also miss out on the critical training opportunities needed for future careers in education, mental health, and social work.

97.     Moreover, because there is no clarity on what it means to "promote gender ideology" or "promote DEI," even these changes may not be enough. SFUSD's AmeriCorps Members and staff are worried that their conversations, questions, best intentions, and efforts to support students may jeopardize the entire Healthy Choices program.

98.     Students paired with Members for mentoring and support often want to discuss facets of their identity—including their race, ethnicity, nationality, culture, gender, and sexuality—with their mentors. Members therefore regularly engage in student-initiated conversations that touch on these topics. If Defendants consider these conversations to be "activities that promote DEI activities," SFUSD's AmeriCorps Members would have to abruptly end all such conversations with students, inhibiting Members' ability to provide mentoring and guidance and thus impeding the purpose and success of Healthy Choices.

99.     Similarly, Healthy Choices provides students a vital forum to process serious life events and trauma. Many SFUSD students witness or experience violence, oppression, poverty, drug use and much more, sometimes even as they make their way to school. Students understandably want to talk through these significant challenges with caring adult Members. Many of these student-initiated conversations touch on race. If Defendants consider these conversations to be "activities that promote DEI activities," Members would have to abruptly end all such conversations with students, ultimately harming students' sense of safety and belonging, attendance rates and academic success, and overall well-being.

100.     As a result, SFUSD has no real choice but to seek the intervention of this Court to ensure that its rights, mission, and students are protected.

**B.     Santa Fe's Hobson's Choice: Lose Critical Funding or Cut Services for Children and Seniors That Are (or Could Be Considered) "Noncompliant"**

101.     Losing Santa Fe's AmeriCorps grants would have serious consequences for Santa Fe

residents, particularly seniors and children who rely on city-run mentorship and support programs. Without this funding, critical services that help seniors remain independent, provide one-on-one mentoring for at-risk youth, and support community well-being would be drastically reduced or eliminated, leaving many vulnerable residents without essential support systems.

102.    But the ambiguous language of the new AmeriCorps requirements creates uncertainty about what aspects of Santa Fe's programs may be deemed "noncompliant." Several program activities can be understood as promoting DEI.

103.    Santa Fe's Foster Grandparent program supports diverse student populations through a targeted population of volunteers from a particular age. Many children in the program are Latino, Native American, or bilingual learners, while others come from economically disadvantaged backgrounds. The one-on-one mentorship provided by Foster Grandparents inherently works to engage older adults to close opportunity gaps for children across differences in identity.

104.    RSVP volunteers support culturally inclusive initiatives. Volunteer placements include food security programs, literacy projects, and community engagement initiatives tailored to meet the needs of underrepresented groups. The new conditions could require the elimination of bilingual outreach, cultural competency training, and targeted services.

105.    Senior Companions provide care for homebound individuals, many of whom belong to historically underserved populations. If the new conditions prohibit services tailored to specific demographics, the program may no longer be able to prioritize clients facing systemic barriers or serve them as effectively.

**CAUSES OF ACTION**

**COUNT ONE**

**SEPARATION OF POWERS**

106.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

107.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and the spending power, *see* U.S. Const. art. 1, § 8, cl. 1. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

108.    Congress has not enacted the new conditions by statute nor delegated authority to Defendants to impose the AmeriCorps Directive or new conditions.

109.    The AmeriCorps Directive and new conditions unlawfully and unconstitutionally intrude upon and usurp powers that have been assigned to Congress, violating principles of separation of powers.

**COUNT TWO**

**SPENDING CLAUSE**

110.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

111.    Defendants' actions, including the AmeriCorps Directive and the new AmeriCorps conditions, violate the Spending Clause of the U.S. Constitution by:

      a.    imposing new conditions after Plaintiffs entered into their grant agreements, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) ("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post-acceptance or 'retroactive' conditions.");

      b.    imposing conditions that are ambiguous and fail to provide clear notice to Plaintiffs, *id.* ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously . . . The legitimacy of Congress's power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions] … There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."); and

      c.    imposing conditions that are not germane to Congress's stated purpose in providing Plaintiffs' AmeriCorps funds and thus, that even Congress itself could not attach, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'").

**COUNT THREE**

**SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(A)**

(ARBITRARY AND CAPRICIOUS)

112.    Plaintiffs repeats and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

113.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114.    A reviewing court "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency falls short of this requirement when it "entirely fail[s] to consider an important aspect of the problem" or "relies on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

115.    Defendant AmeriCorps is an "agency" as defined in the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1), and the Directive constitutes final agency action subject to review under the APA.

116.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

117.    The AmeriCorps Directive is a final agency action because it announces a final decision to require AmeriCorps grant recipients to comply with new grant conditions as a condition of continued receipt of funds.

118.    As described above and below, the AmeriCorps Directive and the new AmeriCorps conditions are an abuse of discretion and not in accordance with law because they are unsupported by constitutional or statutory authority.

119.    The AmeriCorps Directive is arbitrary and capricious because it fails entirely to offer a reasonable explanation for withholding funds already appropriated, and fails entirely to consider the reasonable and inevitable reliance by Plaintiffs on now-suddenly jeopardized funding, the expectation of reimbursement from already appropriated funds, and the need for clarity by Plaintiffs about funding streams to provide day-to-day services relied on by Plaintiffs' staff, students, and residents.

120.    Additionally, the AmeriCorps Directive does not explain the reversal of course, and Defendants should not be permitted to now require totally contradictory actions by Plaintiffs. As detailed in the Notice of Funding Opportunity, Ex. 6, consistent with the implementing statutes, AmeriCorps required grantees to verify their "Commitment to Diversity, Equity, Inclusion, and Accessibility" in a section of its application worth four percentage points in the review process." *Id.* at 21. Now, however, SFUSD is required to certify that grant funds are *not* used for DEI activities.

121.    All the while, the AmeriCorps Directive fails to address—let alone ameliorate—the far-reaching and catastrophic consequences the new conditions will have on AmeriCorps funded programs around the country. For SFUSD, for example, compliance will require it to alter Healthy Choices in ways that make the program less impactful to the diverse student body it is meant to serve. AmeriCorps actions completely fail to consider direct and obvious consequences, which is arbitrary and capricious.

122.    The Directive also entirely fails to "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union Ctr. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486, 1511 (D.C. Cir. 1984); *see also State v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) (obligation to consider alternatives is "well settled").

123.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Demand Letter and the new AmeriCorps conditions violate the APA because they are arbitrary and capricious; vacate the AmeriCorps Directive under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the AmeriCorps Directive or taking any similar action to enforce the new AmeriCorps conditions.

**COUNT FOUR**

**SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(B)**

(CONTRARY TO CONSTITUTION)

124.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

125.    Under the APA, a court must "set aside" agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

126.    As described above, the AmeriCorps Directive and the new AmeriCorps conditions violate the Spending Clause, a bedrock constitutional provision. Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the AmeriCorps Directive and the new AmeriCorps conditions violate the APA because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the Directive under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Directive or taking any similar action to enforce the new AmeriCorps conditions.

**COUNT FIVE**

**SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(C)**

(IN EXCESS OF STATUTORY AUTHORITY)

127.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

128.    Under the APA, a court must "set aside" agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

129.    Because Defendants are "creatures of statutes" and "possess only the authority that Congress has provided," they may exercise only authority granted to them by statute. *See Nat'l Fed'n of Indep. Bus v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022).

130.    No law or provision of the Constitution authorizes AmeriCorps to withdraw properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress. Indeed,

nothing in AmeriCorps' enabling statutes, 42 U.S.C. § 4950 *et seq.* and 42 U.S.C. § 12501 *et seq.*, confers authority on the agency to command a full stop of AmeriCorps funding that "promote[s] DEI activities," including promoting gender ideology or "equity" actions, initiatives, or programs.

131.    Defendants have no authority to withhold funding from Plaintiffs without considering the statutes, regulations, and terms governing each source of funding. Nor can Defendants—months after the grant agreements were executed—impose new grant conditions.

132.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the AmeriCorps Directive and the new AmeriCorps conditions violate the APA because they are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; vacate the AmeriCorps Directive under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Directive or taking any similar action to enforce the new AmeriCorps conditions.

## COUNT SIX

## DECLARATORY JUDGMENT (28 U.S.C. § 2201)

133.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

134.    Defendants are coercing Plaintiffs to agree to comply with executive orders issued on January 20, 2025 or after. There is a real and ongoing controversy because the AmeriCorps Directive purports to require Plaintiffs to certify that they comply with these executive orders, thus indicating that Defendants believe the orders impose direct obligations on Plaintiffs.

135.    However, nothing in President Trump's executive orders requires Plaintiffs to do anything, as the executive orders contain general policy pronouncements and/or directions to federal agencies.

136.    Plaintiffs therefore ask the Court to declare under 28 U.S.C. § 2201 that President Trump's executive orders, including the Anti-Gender Order, the Jan. 20 Anti-DEI Order, the Jan. 21 Anti-DEI Order, and Unleashing American Energy, do not impose any legal obligations on Plaintiffs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.    A declaration that the AmeriCorps Directive is unconstitutional and invalid;

2.    A declaration that Defendants cannot withhold Plaintiffs' AmeriCorps funds on the basis of the AmeriCorps Directive, any executive order signed after the execution date of Plaintiffs' grant agreements, or any grant amendments purporting to incorporate those executive orders;

3.    A declaration that the Anti-Gender Order, the Jan. 20 Anti-DEI Order, the Jan. 21 Anti-DEI Order, and Unleashing American Energy do not impose any obligations on Plaintiffs because they are directed solely to executive agencies and officials;

4.    An order vacating the AmeriCorps Directive under 5 U.S.C. § 706;

5.    An order directing Defendants to restore the original grant conditions for Plaintiffs' AmeriCorps grants;

6.    A preliminary and permanent injunction enjoining Defendants from taking any steps to implement or enforce AmeriCorps Directive;

7.    A preliminary and permanent injunction enjoining Defendants from taking any steps to implement or enforce the new grant conditions;

8.    Award the Plaintiffs reasonable costs and attorneys' fees; and

9.    Grant any other further relief that the Court deems fit and proper.

///
///
///
///
///
///
///
///
///
///

Dated: March 10, 2025

DAVID CHIU
City Attorney, City and County of San Francisco
YVONNE R. MERÉ,
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
MOLLY J. ALARCON
Deputy City Attorney

By: _/s/ David Chiu_____
DAVID CHIU

WILLKIE FARR & GALLAGHER LLP
Benedict Hur
Simona Agnolucci
Eduardo Santacana
Stephen Henrick
Alyxandra Vernon
Michael Morizono

Attorneys for Plaintiff
SAN FRANCISCO UNIFIED SCHOOL DISTRICT


By: _/s/ Erin K. McSherry_____
ERIN K. MCSHERRY*
City Attorney
City of Santa Fe, New Mexico
200 Lincoln Ave
Santa Fe, NM 87501
505-955-6512
ekmcsherry@santafenm.gov


Jill Habig, SBN 268770
Jonathan B. Miller*
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
jon@publicrightsproject.org

Attorneys for Plaintiff
CITY OF SANTA FE, NEW MEXICO

* Application for admission pro hac vice forthcoming

1

**FILER'S ATTESTATION**

2          I, DAVID CHIU, am the ECF user whose identification and password are being used to file

3    this COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local

4    Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28