UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al., | Case No.  25-cv-02425-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |
| AMERICORPS, A.K.A. THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, et al., | |
| Defendants. | Docket No. 18 |

## I.     INTRODUCTION

Plaintiffs, the San Francisco Unified School District ("SFUSD") and the City of Santa Fe ("Santa Fe"), filed a lawsuit against Defendants Corporation for National and Community Service ("AmeriCorps") and its Interim Agency Head Jennifer Bastress Tahmasebi in her official capacity, seeking declaratory and injunctive relief.  The complaint alleges, in part, violations of the United States Constitution and the Administrative Procedure Act ("APA").  Currently pending before the Court is Plaintiffs' motion for a temporary restraining order ("TRO") in which they seek to enjoin Defendants from imposing and enforcing new conditions on Plaintiffs' AmeriCorps grants.

## II.     BACKGROUND

### A.     Factual Background

AmeriCorps is an agency of the federal government.  42 U.S.C. § 12651.  The purpose of AmeriCorps includes "meet[ing] unmet human…needs" and supporting "diverse communities." 42 U.S.C. § 12501(b).  To achieve its purpose, AmeriCorps "may make grants…"  42 U.S.C. § 12571(a).  AmeriCorps grants are designed, in part, to support programs that "meet[] unmet health, veteran, and other human, educational, environmental, or public safety needs and

United States District Court
Northern District of California

promote[] greater community unity through the use of organized teams of participants of varied social and economic backgrounds, skill levels, physical and developmental capabilities, ages, ethnic backgrounds, or genders."  42 U.S.C. § 12572(c)(1)(A).

SFUSD has received AmeriCorps grant funding for ten years to operate its Healthy Choices AmeriCorps program.  Dkt. 1 at 7 (Compl. ¶ 24).  SFUSD's Healthy Choices AmeriCorps Program ("Healthy Choices") "provides mentoring services to vulnerable students across dozens of SFUSD schools…to increase these students' school attendance and wellbeing."  *Id.*  On August 23, 2024, SFUSD received a $667,194 AmeriCorps grant to run Healthy Choices for the 2024-25 academic year, representing half of the entire program's budget.  *Id.*; Dkt. 18-3 at 5 (Vargas-Zeuschner Decl. ¶ 17 (SFUSD Wellness Counselor & District Coordinator for Healthy Choices)).  The grant provides funding for 44 AmeriCorps members ("Members") to mentor, counsel, and manage cases for at-risk students.  Dkt. 1-1 at 6 (Ex. 1, SFUSD Healthy Choices Grant Agreement).  These Members serve 38 schools in San Francisco, specifically targeting youth with high rates of truancy and low rates of academic engagement.  *Id.* at 5.

Santa Fe has been an AmeriCorps grant recipient for 25 years.  *Id.* at 9 (¶ 37).  In particular, AmeriCorps funding has allowed Santa Fe to operate the Foster Grandparent Program, the Senior Companion Program, and the Retired & Senior Volunteer Program ("RSVP") for 25 years each.  *Id.* at 10-11 (¶¶ 41, 45, 49).  These grants support programming "related to elder care, child mentoring and development, retiree community-building, and overall community wellbeing."  *Id.* at 9 (¶ 37).  Santa Fe received its AmeriCorps grants for these programs in 2024.  Dkts. 1-2, 1-3, 1-4 (Santa Fe's AmeriCorps Grant Agreements).

The new grant conditions at issue here come from AmeriCorps' February 13, 2025 "Executive Order Compliance Instructions" ("AmeriCorps Directive").  The AmeriCorps Directive states: "All aspects of AmeriCorps grants/awards must comply with President Trump's executive orders…"  Dkt. 18-2 at 8 (AmeriCorps Directive, Overview).  In particular, the AmeriCorps Directive requires compliance with the following executive orders:

- "Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government," which requires that "[f]ederal funds…not be used to promote

2

1   gender ideology." *Id.* at 15.

2   • "Ending Radical And Wasteful Government DEI Programs And Preferencing" ("Anti-DEI

3       EO 1"), which requires in part the "terminat[ion of]…all 'equity-related' grants or

4       contracts." *Id.*

5   • "Ending Illegal Discrimination And Restoring Merit-Based Opportunity" ("Anti-DEI EO

6       2"), which requires that agencies include a term in grant awards requiring recipients "to

7       certify that…[they] do not operate any programs promoting DEI that violate any applicable

8       Federal anti-discrimination laws." *Id.* at 16.

9   • "Unleashing American Energy," which requires the immediate termination of "[a]ll

10      activities, programs, and operations associated with the American Climate Corps." *Id.*

11      The AmeriCorps Directive goes beyond the executive orders in that it requires cessation of

12  DEI activities *without* reference to the requirement that the activity violate any applicable Federal

13  anti-discrimination laws.  Specifically, Anti-DEI EO 2 requires that agencies include "in every

14  contract or grant award":

15          A term requiring the contractual counterparty or grant recipient to
            agree that its compliance in all respects with all applicable Federal
16          anti-discrimination laws is material to the government's payment
            decisions for purposes of section 3729(b)(4) of title 31, United
17          States Code

18  Exec. Order No. 14173 (2025).  As the Directive's self-certification statement below illustrates,

19  the Directive requires that grant recipients seeking to maintain their funding certify that their

20  program "does not include any activities that promote DEI activities."  Dkt. 18-2 at 10.

21      The Directive requires that grantees respond in one of three ways:

22  1)  Self-certify compliance by submitting a completed statement: "I certify that [Program

23      Name], [application ID] complies with all administration Executive Orders and does not

24      include any activities that promote DEI activities." *Id.* at 10.

25  2)  Amend awards to "move into full compliance." *Id.* at 11.  Those amending "must cease"

26      all "noncompliant activities…immediately, initiate an amendment," and "remove or update

27      any language related to out of compliance activities." *Id.* at 9.

28  3)  Relinquish awards, should grantees' projects conduct "noncompliant activities." *Id.*

3

**B.    Procedural Background**

On March 10, 2025, Plaintiffs filed their complaint against Defendants.  Dkt. 1.  On March 11, 2025, Plaintiffs filed the instant motion for a temporary restraining order and order to show cause.  Dkt. 18.

On March 28, 2025, the Court heard Plaintiffs' motion for a temporary restraining order and order to show cause.  Upon review of the parties' briefs and their oral arguments, the Court ruled from the bench that 1) it had subject matter jurisdiction over the Plaintiffs' claims, and that 2) Plaintiffs had demonstrated a likelihood of success on the merits.  Regarding subject matter jurisdiction, the Court so held because Plaintiffs' claims fell under federal question jurisdiction under 28 U.S.C. § 1331, the waiver of sovereign immunity under 5 U.S.C. § 702 applied, and the exception to the waiver in 5 U.S.C. § 701(a)(2) did not apply because the agency action at issue was not "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Moreover, the Court found that the Tucker Act did not bar its jurisdiction.  A more complete written order articulating the Court's jurisdictional analysis will follow.  Regarding Plaintiffs' demonstration of a likelihood of success on the merits of their claims, Defendants challenged Plaintiffs' likelihood of success on the merits at this TRO stage solely on a lack of subject matter jurisdiction.  Dkt. 30 (Opposition).  Defendants did not brief the substantive merits of Plaintiff's APA and constitutional claims.  Because the Court found that it had subject matter jurisdiction over Plaintiffs' claims and Defendants did not oppose Plaintiffs' substantive arguments, the Court held that Plaintiffs demonstrated a likelihood of success on the merits for the purposes of a TRO.

### III.    LEGAL STANDARD

For temporary injunctive relief, a plaintiff must show that:

> (1) they are likely to succeed on the merits,
> (2) they are likely to suffer irreparable harm absent preliminary relief,
> (3) the balance of equities tips in their favor, and
> (4) an injunction is in the public interest.

> [A court] employ[s] a "sliding scale test," which allows a strong showing on the balance of hardships to compensate for a lesser showing of likelihood of success. Thus, when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public

United States District Court
Northern District of California

4

interest, they need only show "serious questions" on the merits.

*Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 859 (9th Cir. 2022) (spacing added); *see*

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

As noted above, Plaintiffs have demonstrated a likelihood of success on the merits at this

juncture, the merits thus far having been focused solely on jurisdiction.

### B.    Irreparable Harm

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of

damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Because

intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as

irreparable harm.'" *Id.* (quoting *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*.,

944 F.2d 597, 603 (9th Cir. 1991)).

Plaintiffs have made an adequate showing that they would likely suffer irreparable harm

absent preliminary relief on three bases. These include: 1) current and ongoing harm, 2) harm

from loss of funding for non-compliance, and 3) a constitutional violation.

#### 1.    Current and Ongoing Harm

First, to maintain their AmeriCorps funding, Plaintiffs have had to make "actual,

substantive programmatic changes" with consequences that money cannot remedy. Dkt. 31 at 18.[1]

For example, SFUSD hosts weekly trainings for AmeriCorps Members that "usually involve

principles of diversity, equity, and inclusion." Dkt. 18-3 at 8 (Vargas Decl. ¶ 26). In these weekly

sessions, SFUSD trains Members in "evidence-based practices related to diversity, equity, and

inclusion," including "trauma-informed care, Youth Mental Health First-Aid," and "social-

emotional learning." Dkt. 31 at 14-15; *see* Dkt. 18-3 at 8-9 (Vargas-Zeuschner Decl. ¶¶ 26-28).

The ultimate purpose of these trainings is to support and improve "student learning and

---

[1] The AmeriCorps Directive instructed that those seeking "to remain an AmeriCorps grantee…must cease ['non-compliant activities'] immediately, initiate an amendment," and "remove or update any language related to out of compliance activities." Dkt. 18-2 at 9 (quoting *Id.*).

United States District Court
Northern District of California

wellbeing." *Id.* at 8 (¶ 24).  To attempt to comply with the AmeriCorps Directive, SFUSD has begun "to remove diversity, equity, and inclusion-related materials from [their] trainings."  Dkt. 18-3 at 8 (¶ 26).  SFUSD hosted one such training, stripped of potentially 'non-compliant activities,' on "Monday, March 10, 2025."  *Id.* ("We have already been forced to spend time and resources to remove diversity, equity, and inclusion-related materials from our trainings, including one that occurred on Monday, March 10, 2025").[2]

Further, SFUSD is modifying its mentorship program, which exists to "support [students'] learning, literacy, and attendance."  *Id.* at 9 (¶ 27).  Specifically, if forced to comply, SFUSD would stop matching students with mentors "that look like and reflect the values of the student" because this may entail "matching students and mentors of the same racial or ethnic background, gender identity, or sexual orientation."  *Id.*

Plaintiffs allege that "[r]emoving these aspects…harms both students' wellbeing and [AmeriCorps] Members' ability to effectively perform their jobs."  *Id.*  More specifically, "program reductions" may cause a "decrease" in "students' social-emotional functioning and pro-social behaviors" and an "increase" in "suspensions and bullying."  *Id.* at 11 (¶ 33).  Retracting support for students' development causes irreparable harm.  *See N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024) (quoting *Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm"); *see N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1112 (9th Cir. 2010) (affirming finding that teacher furloughs caused irreparable harm related to the "regression in" student's "behavior, increased difficulty with activities," "outbursts of frustration and violence," and "regression in behavior leading to increased aggression"); *see also John T. v. Delaware County Intermediate Unit,* 2000 WL 558582 at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time").

---

[2] SFUSD is also reviewing the permissibility of student gender and sexuality alliance clubs in light of the Directive.

## 2.    <u>Harm from Threat of Loss of Funding for Non-Compliance</u>

Second, Plaintiffs are likely to suffer irreparable harm from ongoing threat of a loss of funding for non-compliance, particularly where the mandated conditions for compliance appear at this juncture to be unclear.  In its Directive, AmeriCorps gave recipients three clear options: certify compliance, amend awards to be able to certify compliance, or relinquish awards.  Dkt. 18-2 at 8.  Plaintiffs argue that losing funding is not a viable option and Defendants have failed to unconditionally guarantee that they will not pull Plaintiffs' funding for non-compliance during the period of the requested TRO.[3]  For SFUSD's Healthy Choices Program, its AmeriCorps grant represents "half of the program's budget."  Dkt. 1 at 7 (Compl. ¶ 25).  Consequently, losing access to the "$667,194 obligated to the District" means "drastically cut[ting] the number of mentors in…schools and significantly reduc[ing] the programs provided, including impacting Mentoring for Success."  Dkt. 18-3 (¶ 33).  SFUSD's AmeriCorps funding is critical in light of SFUSD's "$113 million deficit for the 2025-26 school year."  Dkt. 18-4 at 2 (Su Decl. ¶¶ 5-6) (Superintendent of SFUSD states: "In this budget climate, losing around $667,000—which is being used…to provide services…to vulnerable students—would be a significant hardship").  Similarly, Santa Fe faced the impossible choice of amending its awards or losing "at least $93,013 in federal funding…[for] vital services."  Dkt. 18-6 at 5 (Hammond-Paul Decl. ¶ 23).[4]  Such loss of funding is a "predictable result from a broad policy" and "is sufficiently-specific to allege

---

[3] Plaintiffs note that AmeriCorps communicated that it would take "no further action" to enforce the new conditions "until lawsuits challenging the legality of the applicable executive orders have been resolved."  Dkt. 31 at 17 (quoting Opposition at 5).  However, several lawsuits are pending, and Plaintiffs cannot ascertain when they will be finally resolved.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025), *opinion clarified*, 2025 WL 750690 (D. Md. Mar. 10, 2025), *appeal filed*, No. 25-1189 (4th Cir.) (preliminary injunction stayed pending appeal); *R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 1:25-cv-00079 (D.R.I. filed Mar. 6, 2025).  More to the point, the fact that AmeriCorps will not take immediate action, does not mean it will not cut funding retroactively based on the current failure of the Plaintiffs to comply with its Directive.  When invited by the Court at the hearing to make a commitment not to penalize conduct during the pendency of the TRO, Defendants refused.

[4] Losing their funding means that children will lose access to "one-on-one mentorship provided by Foster Grandparents…to close opportunity gaps in education," underrepresented groups will have reduced access to "food security programs" and "literacy projects" managed by the Retired & Senior Volunteer Program, and homebound individuals will lose care from Senior Companions.  *See* Dkt. 18-6 at 5-6 (Hammond Decl. ¶¶ 26-29).

irreparable harm." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs*., 408 F. Supp. 3d 1057, 1122 (N.D. Cal. 2019), *aff'd sub nom. City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs*., 981 F.3d 742 (9th Cir. 2020) (finding that a "likely loss of $7.5 million in Medicaid reimbursements (based on a 2.5% disenrollment rate)" constituted irreparable harm). Plaintiffs point out that they are faced with a Hobson's choice of cutting certain services to minimize the risk of being found in non-compliance or continuing to provide current services and programs and run the substantial risk of losing all funding. Or putting it differently, the choice is between refusing to sign a constitutionally objectionable grant agreement or signing an amended grant agreement that contains unconstitutional conditions. However framed, the fact remains that having to decide between two losing options constitutes irreparable injury because "very real penalty attaches to [Plaintiffs] regardless of how they proceed." *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding irreparable harm where plaintiffs faced a "Hobson's choice" between 1) "refus[ing] to sign [a] likely unconstitutional…agreement[]" and losing "customer goodwill" or their business, or 2) "sign[ing] an agreement to conditions which are likely unconstitutional," which would "disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone"). Plaintiffs contend with good reason that this choice is made even more problematic because the conditions for compliance are unclear.

### a.  Confusion Regarding How to Comply

Moreover, confusion about the new conditions, particularly regarding which activities are 'non-compliant' because they 'promote DEI', harms Plaintiffs because they do not know how to come into compliance with the AmeriCorps Directive. Plaintiffs' amendments to their awards illustrate the total confusion. Upon receiving a "spreadsheet showing terms AmeriCorps found to be problematic in [SFUSD's] original grant applications," such as "equity" and "gender identity," SFUSD employees "delete[d] any practices that might 'promote DEI activities,' even though [they] did not really understand what that means and still don't." *Id.* at 7 (¶ 23). This is one of many examples of how the ambiguity of the conditions leaves Plaintiffs operating in the dark.

For example, Santa Fe does not know whether compliance with AmeriCorps' new

conditions means significant modifications to or wholesale termination of its AmeriCorps programs.  Specifically, Santa Fe is "unsure whether its entire Foster Grandparent program…can exist at all" because the program "serves children from racially diverse and economically disadvantaged communities" and, therefore, may be viewed as 'promoting DEI.'  Dkt. 31 at 15.  Thus, Santa Fe fears that the program may be considered 'non-compliant' in its entirety.

For SFUSD, Members do not know whether compliance with the new conditions includes, for example, forbidding mentees from seeking counsel from AmeriCorps mentors on "community violence, racism, poverty, and drug use," which would undermine "student success and safety."  Dkt. 18-3 at 9 (¶ 30).  Thus, because Plaintiffs do not know which activities are 'non-compliant,' Plaintiffs do not know how to protect their funding.

### b.  Consequent Chilling Effect

The specter of an abrupt loss of funding and the muddied language of the new conditions have spurred a chilling effect.  The consequent chilling effect includes self-censorship, mired recruiting, and inability to build or maintain essential partnerships.  At SFUSD:

> Members and SFUSD employees worry that their conversations, questions, good intentions, and attempts to help students may jeopardize the entire Healthy Choices program. As Members start to censor themselves or end conversations with students about these important topics, our students are left underserved.

*Id.* at 10 (¶ 32).  In Santa Fe, "[t]he new restrictions have created a chilling effect on the programs by threatening their long-term stability, which has impacted the City's ability to recruit potential volunteers and build or maintain partnerships that are crucial to the success of the programs."  Dkt. 18-6 at 5 (Hammond-Paul Decl. ¶ 24).

### 3.  Harm from a Constitutional Violation

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Here, Plaintiffs allege that AmeriCorps' new conditions on the receipt of federal funds violates the Spending Clause of the Constitution because they are ambiguous.  Specifically, Plaintiffs maintain that the new conditions are unconstitutional because they fail to "put [grant] recipients on notice of what is required of them."  Dkt. 18-1 at 13.  A condition on the grant of

United States District Court
Northern District of California

1  federal funds violates the Spending Clause when the condition fails to enable the prospective

2  recipient to "clearly understand…the obligations of the [conditions]."  *Arlington Cent. Sch. Dist.*

3  *Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).  That is what Plaintiffs have alleged here, and

4  although this Court is not reviewing the merits of the Spending Clause claim, from the briefing

5  received thus far, it appears at least to be plausible.  *See Arizona v. Yellen*, 34 F.4th 841, 853 (9th

6  Cir. 2022) (finding cognizable injury related to potential violation of Spending Clause because

7  plaintiff would face "serious consequences" from being held to federal funding offer with

8  "ambiguous and coercive" terms that it allegedly did not understand)*; see also W. Virginia by &*

9  *through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (affirming

10 district court's decision that the same "ambiguous terms" of federal funding in *Arizona v. Yellen*

11 constituted a facial violation of the Spending Clause and irreparable injury warranting a grant of

12 preliminary injunction).

13     Thus, because Plaintiffs have demonstrated current and future "harm for which there is no

14 adequate legal remedy," Plaintiffs have shown a likelihood of irreparable injury.  *Brewer*, 757

15 F.3d at 1068.

16 **C.     Balance of Hardships and Public Interest**

17     Finally, the balance of hardships and public interest tip sharply in Plaintiffs' favor.  *See*

18 *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a

19 party, these last two factors merge").  Defendants offer no argument regarding any hardship they

20 will face if the Court grants the requested TRO.  Much of the Defendants' concern about unlawful

21 preferences already falls within the ambit of anti-discrimination laws such as Title VI of the Civil

22 Rights Act of 1964 which prohibits recipients of federal grants from engaging in unlawful

23 discrimination.  *See* 42 U.S.C. § 2000d *et seq*.  And while the federal government has an interest

24 in being able to enforce a chosen policy, that interest is eviscerated if the policy is not lawful, the

25 very issue before this Court.  At bottom, Defendants have pointed to no current concrete harm if

26 the TRO were granted.  Thus, Plaintiffs' likely irreparable injury outweighs any hardship to

27 Defendants.

28     Similarly, public interest favors the Plaintiffs.  Plaintiffs were approved for grants and

United States District Court
Northern District of California

were authorized to use AmeriCorps funding to fulfill the purpose of AmeriCorps to "meet unmet human…needs" and supporting "diverse communities." 42 U.S.C. § 12501(b). For example, SFUSD's Healthy Choices program supports youth with high rates of truancy and low rates of academic engagement across 38 schools in San Francisco. Dkt. 1-1 at 5 (SFUSD Healthy Choices Grant Agreement). Santa Fe's Senior Companion program supports homebound elderly who often have physical and/or mental health limitations with everyday tasks such as grocery shopping and healthcare planning. Dkt. 1 at 11 (¶ 44); Dkt. 1-3 at 2 (Santa Fe Senior Companion Grant Agreement). The public interest embodied in the AmeriCorps statute favors permitting the previously approved grants — and programs of the Plaintiffs thereunder — to continue pending a hearing on the preliminary injunction.

Consequently, all factors favor a grant of the requested TRO.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs have made a sufficient showing in support of their motion for a TRO. Accordingly, until this Court rules on the motion for preliminary injunction (to be heard on April 15, 2025 unless the parties stipulate to an extension of time), it is ordered that:

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' continued operation, during the pendency of this TRO, of their AmeriCorps-funded programs as originally approved;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' failure to certify or execute new grants, during the pendency of this TRO, certifying compliance with executive orders issued by President Trump on or after January 20, 2025;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate existing AmeriCorps funding awards on the basis of recipients' failure, during the pendency of this TRO, to certify, or execute new grants certifying, that the funded programs do not include any "activities that promote DEI activities" or similar language (together with the executive order compliance condition, the "Enjoined Conditions");

- Defendants are **ENJOINED** during the pendency of this TRO from modifying, or requiring Plaintiffs to modify, the terms of any of Plaintiffs' extant federal grants and contracts to comply with the Enjoined Conditions, or adding, or requiring Plaintiffs to add, any terms to forthcoming grants and contracts predicated on the Enjoined Conditions or similar language;

- Defendants are **ENJOINED** during the pendency of this TRO from requiring Plaintiffs to make any "certification" or other representation related to compliance with the Enjoined Conditions;

- Defendants, and other persons who are in active concert or participation with Defendant, are **ENJOINED**, during the pendency of this TRO, from initiating any investigations of Plaintiffs under the authority of the Enjoined Conditions, and specifically from publishing or making any list of Plaintiffs as targets of investigation as mandated by Executive Order 14173;

It is furthered ordered that Defendants are ordered to show cause why a preliminary injunction should not be issued.  Defendants shall have until April 3, 2025 to file a brief in response to the OSC and in opposition to a preliminary injunction.  Plaintiffs shall have until April 8, 2025 to file a reply.  Absent stipulation, the preliminary injunction shall be heard on April 15, 2025 at 9:30 a.m.  This TRO shall remain in place until such time as the Court rules on the preliminary injunction.

**IT IS SO ORDERED**.

Dated: March 31, 2025

_____

EDWARD M. CHEN
United States District Judge