# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STATE OF MAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25-cv-00131-JAW |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

The state of Maine requests a temporary restraining order to enjoin the United States Department of Agriculture and the United States Secretary of Agriculture from terminating, freezing, or otherwise interfering with the State's access to federal funds based on alleged Title IX violations without following the process required by federal statute. Concluding the plaintiff has demonstrated a likelihood of success on the merits of its claim that the defendants' actions were taken without observance of procedure required by law, and further that the State has established a likelihood of irreparable harm absent emergency injunctive relief and the other factors weigh in its favor, the court grants the plaintiff's motion. The court orders the defendants to immediately unfreeze and release to the state of Maine any federal funding that they have frozen or failed or refused to pay because of the State's alleged failure to comply with the requirements of Title IX. The court further bars the defendants from freezing, terminating, or otherwise interfering with the State's future federal funding for alleged violations of Title IX without complying with the legally required

procedure.  Finally, within seven days of the date of this order, the court orders the state of Maine to provide security pursuant to Federal Rule of Civil Procedure 65(c).

## I.    AN OVERVIEW[1]

On April 2, 2025, Brooke Rollins, Secretary of the United States Department of Agriculture (USDA), wrote to state of Maine Governor Janet Mills and informed Governor Mills that Secretary Rollins on behalf of USDA (collectively, the Federal Defendants) was "freezing Maine's federal funds for certain administrative and technological functions in schools." *Am. Compl. (Verified)* ¶ 69 (ECF No. 8) (*Verified Compl.*) (quoting *id.*, Attach. 14, *Ex. N: 4/2/2025 Letter from Brooke L. Rollins* (*Rollins Letter*)).  Secretary Rollins explained that her decision was based on a disagreement between the federal and state governments about whether the state of Maine was complying with Title IX,[2] the federal law that, among other things, prohibits sex-based discrimination in educational programs receiving federal assistance.  *Id.* (quoting *Rollins Letter*).  On April 3, 2025, the day after Governor Mills received Secretary Rollins's letter, the Maine Department of Education's (MDOE) Child Nutrition Program (CNP) was unable to access several sources of federal funds, *State of Me.'s Mot. for Emergency TRO*, Attach. 1, *Decl. of Jane McLucas* ¶ 12 (ECF No. 3) (*McLucas Decl.*); *Verified Compl.* ¶ 86, and on April 7, 2025, the state of Maine filed a complaint and motion for emergency injunction,

---

[1]    In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored."  *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

[2]    Title IX of the Education Amendments of 1972, codified at 20 U.S.C. §§ 1681-1688.

seeking a court order requiring the USDA to reinstitute federal funding of the frozen CNP initiatives. *Compl.* (ECF No. 1); *State of Me's Mot. for Emergency TRO* (*Mot. for TRO*); *see also Verified Compl.*

In ruling on the State's request, the Court is not weighing in on the merits of the controversy about transgender athletes that forms the backdrop of the impasse between the State and the Federal Defendants. *Verified Compl.* ¶ 3 ("There is no need . . . for the Court to interpret Title IX here (at least not in this lawsuit)"). This lawsuit raises two primary questions, both narrow: (1) if the USDA wishes to withhold appropriated funds to a state, whether there are regulatory steps it must follow before doing so, and (2) in the instant case, whether the Federal Defendants complied with those procedures. The Court quickly resolved these questions in favor of the State. In fact, the Federal Defendants have not argued in this case that the relevant federal laws and regulations for terminating federal funding of state programs do not apply to this situation, nor do they claim that they complied with the applicable federal law in the events resulting in this litigation.

Instead, in response to the State's request for emergency injunctive relief, the Federal Defendants have raised two primary defenses: (1) that this Court does not have jurisdiction to hear this lawsuit, and (2) that the State has failed to allege irreparable harm, which is a critical element before a court may issue an injunction. Here, the Court resolves both these issues in favor of the State. To make certain, however, that the laws and regulations the State has alleged the Federal Defendants failed to follow are applicable, the Court briefly reviewed those regulations before

concluding that the Federal Defendants froze the appropriated funds without observance of procedure required by law.

## II.    BACKGROUND

### A.    Procedural History

On April 7, 2025, the State filed in this Court a civil complaint against the USDA and Brooke Rollins, in her official capacity as United States Secretary of Agriculture, alleging the Federal Defendants violated the Administrative Procedure Act (APA), codified at 5 U.S.C. §§ 701-706, by withholding disbursement of federal funds allocated to Maine to feed schoolchildren in what the Federal Defendants termed a "freeze" based on their conclusion that the State's policies regarding transgender student athletes is in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.  *Compl.*  The State filed an amended, verified complaint on April 8, 2025.  *Verified Compl.*[3]

The State moved the Court to issue an order temporarily restraining the Federal Defendants "from terminating, freezing, or otherwise interfering with

---

[3]    The original complaint was not verified.  The State filed Director McLucas's sworn declaration, but it contained a much narrower set of facts than alleged in the complaint.  *Compare Compl. with McLucas Decl.*  Under Federal Rule of Civil Procedure 65(b)(1)(A), in issuing a temporary restraining order (TRO), a court may rely on "specific facts in an affidavit or verified complaint" if those facts "clearly show that immediate and irreparable injury, loss or damage will result."  FED. R. CIV. P. 65(b)(1)(A).  At a telephone conference of counsel on April 8, 2025, the Court questioned counsel as to what it could consider as part of the record in the absence of a verified complaint.  Later that day, the State filed a verified complaint.  *Verified Compl.*

The State filed its amended complaint once as a matter of right, and the Court treats it as superseding the original complaint.  FED. R. CIV. P. 15(a)(1); *accord ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) ("An amended complaint, once filed, normally supersedes the antecedent complaint . . .. Thereafter, the earlier complaint is a dead letter and 'no longer performs any function in the case'") (citing *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003); quoting *Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003)).

Maine's access to federal funds allocated to Maine based on Maine's alleged violation of Title IX without complying with the requisite statutory and regulatory procedures" on April 7, 2025. *Mot. for TRO*. In support, the State attached a sworn declaration of Jane McLucas, the Child Nutrition Director of the MDOE, to its motion for temporary restraining order (TRO). *McLucas Decl.*

On April 8, 2025, the Court set an expedited briefing schedule with the Federal Defendants' response due by midnight on April 9, 2025 and the State's reply by 11:00 a.m. on April 10, 2025. *Min. Entry* (ECF No. 7).[4] Federal Defendants responded on April 9, 2025, attaching a sworn declaration from Shiela Corley, Chief of Staff for the Food, Nutrition, and Consumer Services subagency of USDA. *Opp'n to State of Me.'s Mot. for Emergency TRO* (ECF No. 10) (*Defs.' Opp'n*); *id.*, Attach. 1, *Decl. of Shiela Corley* (*Corley Decl.*). The State replied on April 10, 2025. *State of Me.'s Reply in Support of Mot. for Emergency TRO* (ECF No. 11) (*Pl.'s Reply*).

## B.    Factual Record[5]

For the purposes of the requested TRO, the Court reviews the relevant facts as pleaded in the verified complaint and the declarations submitted by the parties, which the Court takes as true at this stage of the proceeding.[6]

---

[4]    The Court subsequently ordered the parties to respond, within their respective response and reply to the motion for TRO, to a jurisdictional question raised by an April 4, 2025 decision from the United States Supreme Court. *Order to Respond* (ECF No. 9).

[5]    In accepting the allegations in the State's verified complaint, the Court has "eschew[ed] reliance on the pleader's rhetorical flourishes, including unsupported conclusions and assertions." *Palmer v. Champion Mortg.*, 465 F.3d 24, 25 (1st Cir. 2006).

[6]    The factual record contains information on comments made and actions taken by other federal agencies and actors, namely, the U.S. Department of Education, the U.S. Department of Health and Human Services, the Social Security Administrator, and the United States Attorney General regarding the state of Maine's compliance with Title IX. *See, e.g., Verified Compl.*, Attach. 1, *Ex. A:*

### 1. The Parties

The state of Maine is a sovereign state of the United States of America. *Verified Compl.* ¶ 6.  The State is represented in this litigation by Aaron M. Frey, the Attorney General of Maine, who is authorized to pursue this action pursuant to 5 M.R.S. § 191. *Id.*

The United States Department of Agriculture is a cabinet-level agency within the executive branch of the United States government. *Id.* ¶ 7.  Brooke Rollins is the Secretary of Agriculture and the highest-ranking official of the USDA. *Id.* ¶ 8.

### 2. Title IX

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* ¶ 9 (quoting 20 U.S.C. § 1681(a)).

To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the

---

*2/21/2025 USDOE Letter*; *id.*, Attach. 2, *Ex. B: 2/21/2025 USHHS OCR Letter*; *id.*, Attach. 3, *Ex. C: 2/25/2025 Letter from Pam Bondi*; *id.*, Attach. 4, *Ex. D: 3/19/2025 USDOE Letter*; *id.*, Attach. 5, *Ex. E: Resol. Agreement*; *id.*, Attach. 6, *Ex. F: 3/31/2025 USDOE Letter*; *id.*, Attach. 7, *Ex. G: 2/25/2025 USHHS OCR Letter*; *id.*, Attach. 8, *Ex. H: Voluntary Resol. Agreement*; *id.*, Attach. 10, *Ex. J: 3/5/2025 USHHS OCR Letter*; *id.*, Attach. 11, *Ex. K: 3/17/2025 USHHS OCR Letter*; *id.*, Attach. 12, *Ex. L: Voluntary Resol. Agreement*; *id.*, Attach. 13, *Ex. M: 3/28/2025 USHHS OCR Letter*.

While these records provide context, none of these agencies and entities is a party to this dispute and the Court thus confines its recitation of the factual background to the actions of the Federal Defendants themselves: the United States Department of Agriculture and the Secretary of Agriculture Brooke L. Rollins.  The Federal Defendants agree that the documents Plaintiff attaches to its verified complaint regarding other federal actors addressing Maine's Title IX compliance are beyond the scope of instant dispute. *See Defs.' Opp'n* at 7 ("Beyond the immediate action challenged here, the State also includes in its Motion discussion of communication and actions undertaken by other federal agencies.  None of those actions or communications are challenged here, and none are relevant to the resolution of the emergency motion") (citing *Verified Compl.* ¶¶ 46-47).

provisions of" 20 U.S.C. § 1681 "by issuing rules, regulations, or orders of general applicability." *Id.* ¶ 11 (quoting 20 U.S.C. § 1682). Congress authorized federal agencies to enforce compliance with the requirements of their respective Title IX rules and regulations "by the termination of or refusal to grant or to continue [financial] assistance . . . to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" or "by any other means authorized by law." *Id.* ¶ 12 (quoting 20 U.S.C. § 1682).

Before taking an action to terminate, or to refuse to grant or continue, federal financial assistance, an agency must first "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." *Id.* ¶ 13 (quoting 20 U.S.C. § 1682). Any action by a department or agency terminating financial assistance is subject to judicial review. *Id.* ¶ 14 (citing 20 U.S.C. § 1683).

### 3.   USDA's Title IX Regulations

USDA's regulations implementing Title IX, as codified at 7 C.F.R. Part 15a, require covered entities to "provide equal athletic opportunity for members of both sexes," and do not expressly address the participation of transgender athletes in athletic programs. *Id.* ¶¶ 15, 16 (quoting 7 C.F.R. § 15a.450).

USDA's regulations for enforcing Title IX adopt USDA's procedures for enforcing Title VI of the 1964 Civil Rights Act. *Id.* ¶ 17 (citing 7 C.F.R. § 15a.605

7

(adopting and applying 7 C.F.R. §§ 15.5-15.11, 15.60-15.143)). Under these enforcement regulations, USDA "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with the regulations and this part and shall provide assistance and guidance to recipients to help them comply voluntarily with the regulations in this part." *Id.* ¶ 18 (quoting 7 C.F.R. § 15.5).

"In the event of noncompliance, [USDA] shall seek to secure voluntary compliance by all appropriate means." *Id.* ¶ 19 (quoting 7 C.F.R. § 15.5). If there appears to be noncompliance, and it cannot be corrected by informal means, compliance can be effected "by the suspension or termination of or refusal to grant or to continue Federal financial assistance, upon a finding, in accordance with the procedure hereinafter prescribed, by any other means authorized by law." *Id.* ¶ 20 (quoting 7 C.F.R. § 15.8(a)). The regulations non-exhaustively define "other means" to include: "(1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law." *Id.* ¶ 21 (quoting 7 C.F.R. § 15.8(a)). The regulations state:

> No order suspending, terminating, or refusing to grant or to continue Federal financial assistance shall become effective until (1) the Agency has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with the requirement imposed by or pursuant to the regulations in this part, (3) the action has been approved by the Secretary pursuant to § 15.10(e), and (4) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate, having

legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

*Id.* ¶ 22 (quoting 7 C.F.R. § 15.8(c)).

The regulations provide further that "[a]ny action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." *Id.* ¶ 23 (quoting 7 C.F.R. § 15.8(c)). In addition, 7 C.F.R. § 15.8(d) specifies:

No action to effect compliance by any other means authorized by law shall be taken until (1) the Secretary has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least ten days from the mailing of such notice to the recipient or other person. During this period of at least ten days, additional efforts shall be made to persuade the recipient or other person to comply with the regulations in this part and to take such corrective action as may be appropriate.

*Id.* ¶ 24 (quoting 7 C.F.R. § 15.8(d)).

### 4. President Trump's Executive Orders

#### a. Executive Order 14168

President Donald J. Trump was sworn in as President of the United States on January 20, 2025. *Id.* ¶ 32. On the same day, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Executive Order 14168), which declares "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not interchangeable and are grounded in fundamental and

9

incontrovertible reality." *Id.* ¶¶ 33-34 (citing and then quoting Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (Exec. Order No. 14168)) (citation corrected).

Executive Order 14168 states "'[s]ex' shall refer to an individual's immutable biological classification as either male or female," and "'[s]ex] is not a synonym for and does not include the concept of 'gender identity.'" *Id.* ¶ 35 (quoting Exec. Order No. 14168). It defines "women" and "girls" as "adult and juvenile human females, respectively," and defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.* ¶ 36 (quoting Exec. Order No. 14168). "Men" and "boys" are defined as "adult and juvenile human males, respectively," and "male" is defined further to mean "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* ¶ 37 (quoting Exec. Order No. 14168).

### b. Executive Order 14201

On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports" (Executive Order 14201). *Id.* ¶ 38 (quoting Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 20, 2025) (Exec. Order No. 14201)) (citation corrected). Executive Order 14201 incorporates by reference the definitions of Executive Order 14168 and posits "[i]n recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls

the equal opportunity to participate and excel in competitive sports." *Id.* ¶¶ 39-40 (citing and then quoting Exec. Order No. 14201).

Executive Order 14201 announces "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." *Id.* ¶ 41 (quoting Exec. Order No. 14201). It directs the United States Secretary of Education to "prioritize Title IX enforcement actions against educational institutions (including athletic associations composed of or governed by such institutions) that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against or to appear unclothed before males," and further instructs that "[a]ll executive departments and agencies . . . shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.* ¶¶ 42-43 (quoting Exec. Order No. 14201).

### 5. President Trump's Statements Regarding Maine

On February 20, 2025, President Trump stated at a gathering of Republican governors that he heard "men are still playing in Maine." *Id.* ¶ 45 (quoting Donald Trump, Pres. of the United States, Remarks by Pres. Trump at Republican Govs. Ass'n Meeting (Feb. 20, 2025)) (*Pres. Trump Feb. 20, 2025 Remarks*) (citation corrected). He continued, "well, I hate to tell you this, but we're not going to give them any federal money. They are still saying we want men to play in women's

11

sports, and I can't believe that they're doing that . . . so we're not going to give them any money—none whatsoever—until they clean that up." *Id.* (quoting *Pres. Trump Feb. 20, 2025 Remarks*).

### 6. President Trump's Exchange with Governor Mills

The next day, President Trump addressed a group of governors, including Maine Governor Janet Mills, at a meeting of the National Governors Association. *Id.* ¶ 46 (citing Rachel Ohm & Randy Billings, *Trump Admin. Orders Investigation After Gov. Mills Publicly Defies Pres. Over Transgender Pol'y*, PORTLAND PRESS HERALD, Feb. 21, 2025 (updated Feb. 22, 2025), https://www.pressherald.com/2025/02/21/trump-threatens-to-cut-federal-funding-to-maine-over-transgender-athlete-policy/) (*Press Herald Feb. 21, 2025 art.*) (citation corrected)).

At this meeting, President Trump asked Governor Mills whether she was going to comply with Executive Order 14201; she responded, "I'm complying with state and federal law." *Id.* ¶ 47 (quoting *Press Herald Feb. 21, 2025 art.*). President Trump said, "Well, we are the federal law. You'd better do it. You'd better do it, because you're not going to get any federal funding at all if you don't." *Id.* (quoting *Press Herald Feb. 21, 2025 art.*). Governor Mills responded, "See you in court," to which President Trump replied, "I look forward to that—that should be a real easy one." *Id.* (quoting *Press Herald Feb. 21, 2025 art.*). President Trump subsequently said that he "need[s] a full[-]throated apology from the Governor herself, and a statement that she will never make such an unlawful challenge to the Federal Government again,

before this case can be settled." *Id.* ¶ 48 (quoting Steff Danielle Thomas, *Trump presses Me. gov. for 'full throated apology' after transgender athlete spat*, THE HILL, Mar. 22, 2025, https://thehill.com/homenews/lgbtq/5208797-donald-trump-maine-governor-transgender-sports-policy/) (citation corrected) (*The Hill Mar. 22, 2025 art.*).

### 7. United States Department of Agriculture Determines Maine's Noncompliance with Title IX and Immediately Freezes Funds

#### a. Secretary Rollins's April 2, 2025 Letter to Governor Mills

On April 2, 2025, Governor Mills received a letter from Secretary Rollins, dated the same day, stating, in relevant part:

> You cannot openly violate federal law against discrimination in education and expect federal funding to continue unabated. Your defiance of federal law has cost your state, which is bound by Title IX in educational programming. Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools. This is only the beginning, though you are free to end it at any time by protecting women and girls in compliance with federal law.

*Id.* ¶ 67 (quoting *Rollins Letter*). The MDOE received a copy of this letter on the same day. *McLucas Decl.* ¶ 11.

Secretary Rollins's letter continued that USDA "is additionally reviewing all research and education-related funding in Maine for compliance with the Constitution, federal laws including Titles VI and IX, and the priorities of the Trump Administration." *Verified Compl.* ¶ 70 (quoting *Rollins Letter*). "In order to continue to receive taxpayer dollars from USDA, the state of Maine must demonstrate compliance with Title IX's protection of female student athletes from having to compete with or against or having to appear unclothed before males." *Id.* ¶ 71

(quoting *Rollins Letter*). The same communication said "USDA has launched a full review of grants awarded by the Biden Administration" to Maine DOE," "[m]any of these grants appear to be wasteful, redundant, or otherwise against the priorities of the Trump Administration," and "USDA will not extend the Biden Administration's bloated bureaucracy and will instead focus on a Department that is farmer-first without a leftist social agenda." *Id.* ¶ 72 (quoting *Rollins Letter*).

Secretary Rollins's April 2, 2025 letter to Governor Mills said the funding freeze would "not impact federal feeding programs or direct assistance to Mainers," and that "if a child was fed today, they will be fed tomorrow." *Id.* ¶ 73 (quoting *Rollins Letter*).

To date, Secretary Rollins has not filed a report with the relevant House or Senate committee pursuant to 20 U.S.C. § 1682. *Id.* ¶ 74.

### 8.    The Impact of USDA's Action

#### a.    MDOE's Child Nutrition Program

Housed within MDOE is the Child Nutrition Program, which administers several federal programs designed to fight hunger by reimbursing organizations such as schools, childcare centers, and after-school programs for providing healthy free or reduced-price meals to children. *McLucas Decl.* ¶ 1; *Verified Compl.* ¶ 75. As part of her official duties as MDOE's Child Nutrition Director, Jane McLucas is responsible for overseeing CNP, including its federally funded school nutrition programs and the Child and Adult Care Food Program (CACFP). *McLucas Decl.* ¶ 3. Director McLucas is also charged with managing CNP's fifteen employees and five contractors, who, as

relevant, receive reimbursement claims from schools and other sponsors, access federal accounts and draw down the funds, and provide timely reimbursements to schools and sponsors so that they can operate their respective programs. *Id.*; *Verified Compl.* ¶ 77.

### b.     CNP's Initiatives and Funding Sources

As relevant to this dispute, the CNP administers and oversees numerous initiatives which receive federal funds from the USDA, including CACFP Sponsor Administrative Funds, CACFP "Cash in Lieu," State Administrative Funds as well as the Summer Food Service Program, Child Nutrition Technology Innovation Grants (NTIG), National School Lunch Program Equipment Assistance Grants, and Farm to School State Formula Grants. *Corley Decl.* ¶ 3; *McLucas Decl.* ¶ 5; *Verified Compl.* ¶ 78.

### i.     Child and Adult Care Food Program

CACFP provides meals for young children who attend daycare programs, at-risk school-age children outside of school hours, and adults in adult daycare programs. *McLucas Decl.* ¶ 6; *Verified Compl.* ¶ 79. In Maine, there are eighty-three CACFP sponsoring organizations, such as public schools and community non-profits, that are responsible for overseeing 186 of their own sites as well as 388 CACFP providers, small family daycare providers and adult care providers, where food is served to the target populations. *McLucas Decl.* ¶ 6; *Verified Compl.* ¶ 80.

There are three financial subcomponents to CACFP: food reimbursement, which reimburses sponsors and sites for meals actually served; "cash in lieu," which

15

is paid to sponsors and sites as an alternative to their accessing commodity foods offered by USDA at discounted rates; and administrative funds, which go to sponsors to pay the costs of preparing and providing the meals and administering the local programs. *McLucas Decl.* ¶ 6; *Verified Compl.* ¶ 81.

### aa.    Sponsor Administrative Funds

More specifically, CACFP administrative funds are used to make administrative payments to day care home sponsoring organizations to help offset administrative costs. *Corley Decl.* ¶ 8. Federal reimbursement is based on the number of homes claimed multiplied by the rate established by the federal government each year. *Id.*

### bb.    "Cash in Lieu" Payments

"Cash in lieu" funding is used to purchase food. *Id.* ¶ 10; *McLucas Decl.* ¶ 6. For each school year, the state of Maine may, upon application to Food, Nutrition, and Consumer Services prior to the beginning of the school year, elect to receive cash in lieu of donated foods for use in nonresidential childcare or adult care institutions participating in the CACFP. *Corley Decl.* ¶ 10. The State must then promptly and equitably disburse any cash received in lieu of donated foods to eligible schools, service institutions, and nonresidential childcare institutions, as applicable. *Id.* Under the terms of the grant, the funds are only to be used to purchase United States agricultural commodities and other foods for use in food service under the National School Lunch Program, CACFP, or Summer Food Service Program, as applicable. *Id.*

16

### ii.      State Administrative Funds

State Administrative Funds (also referred to as state-level operating costs) pay for the salaries, including employee benefits and professional travel expenses, of CNP employees charged with monitoring compliance and processing the reimbursements to schools and other sponsors for all the USDA-funded child nutrition initiatives, as well as necessary office expenses, such as computers, phones, and other office supplies. *McLucas Decl.* ¶ 7; *Verified Compl.* ¶ 82; *Corley Decl.* ¶ 6. State-level operating costs also provide salaries for State personnel for the Summer Food Service Program. *Corley Decl.* ¶ 9.

### iii.      Child Nutrition Technology Innovation Grants

Child Nutrition Technology Innovation Grants provide funding to every state, Indian tribal organization, and territory administering these programs, supporting planning and implementation activities aimed at improving efficiency, accountability, and overall program integrity. *Id.* ¶ 5. Recipient states may use NTIG funds to conduct feasibility studies, review data and processes, assess training needs, and plan for automation programs. *Id.* Implementation efforts may include developing web-based software, improving system interfaces, purchasing technology and hardware, hiring specialized contractors, and training staff and local operators. *Id.* These grants also pay for CNPweb, the computer program through which schools and other program sponsors interface with MDOE to submit claims and receive reimbursement. *McLucas Decl.* ¶ 8; *Verified Compl.* ¶ 83.

17

### iv. National School Lunch Program Equipment Assistance Grants

The National School Lunch Program Equipment Assistance Grant reimburses schools for the purchase of commercial grade kitchen equipment used to make the food for their child nutrition programs. *McLucas Decl.* ¶ 9; *Verified Compl.* ¶ 84; *Corley Decl.* ¶ 7. The grant's specific purpose is to purchase equipment needed to serve healthier meals, improve food safety, and help support the school meal program. *Corley Decl.* ¶ 7. Local operators, including local education agencies, school food authorities, and schools, apply and are awarded funding to purchase equipment with a value of $1,000 or greater. *Id.* Food, Nutrition, and Consumer Services requires State agencies and local operators to follow federal and state procurement regulations to ensure responsible stewardship of federal funds while improving school nutrition. *Id.*

### v. Farm to School State Formula Grant

The Farm to School State Formula Grant pays for regional coordinators who work with farmers and schools to increase the capacity of schools to procure and use local foods. *McLucas Decl.* ¶ 10; *Verified Compl.* ¶ 85.

The specific objectives of this funding are: (a) to build and increase the capacity of participating institutions to procure and use local food in program meals; and (b) to provide agricultural education opportunities for participating children. *Corley Decl.* ¶ 4. State-level conduct to support farm to school includes, but is not limited to, local food procurement capacity building and coordination (such as value chain coordination, grower/buyer matching tools, etc.), training and technical assistance for

local producers and program operators, local food promotional and educational activities for participating institutions and children (such as Harvest of the Month promotions or "crunches"), and outreach to local producers or participating institutions not engaged in farm to school.  *Id.*  States may directly fund State-level farm to school staff and projects and may choose to provide funds to partner organizations to conduct allowable activities, or to participating institutions, through contracts, subrecipients, or incentive payments.  *Id*.

### c.      USDA Freezes CNP's Funding

On April 3, 2025, the day after Governor Mills and the MDOE, respectively, received Secretary Rollins's letter, the CNP was unable to access several sources of federal funds.  *McLucas Decl.* ¶ 12; *Verified Compl.* ¶ 86.  While the CACFP account for food reimbursement was accessible, the program's "cash in lieu" and administrative funds were inaccessible.  *McLucas Decl.* ¶ 12; *Verified Compl.* ¶ 86. Furthermore, all the accounts for state-level operating costs, NTIG, the National School Lunch Program Equipment Assistance Grant, and the Farm to School State Formula Grant were inaccessible.  *McLucas Decl.* ¶ 12; *Verified Compl.* ¶ 86.  The following amounts, per program, are currently frozen.

### i.      CACFP

Approximately $71,135.00 and $2,047.00, as reported by Chief of Staff Corley, *Corley Decl.* ¶ 8, or $97,085, as reported by Director McLucas, of CACFP administrative funds were frozen as of approximately April 9, 2025.  *McLucas Decl.*

¶ 13.[7]  These funds are not used or intended to be used to purchase food.  *Corley Decl.* ¶ 8.

For CACFP's "Cash in Lieu" program, as of April 9, 2025, $49,188.60 remains frozen and $24,200.00 exists in Fiscal Year 2024 Q3 funds which are not to be distributed.  *id.* ¶ 10; *McLucas Decl.* ¶ 13.  In Fiscal Year 2024, the Food, Nutrition, and Consumer Services distributed $40,294,374.00 in USDA funds, allotted for food, labor, and other indirect expenses, to the state of Maine; the State only used $35,734,264.59 of those funds.  *Corley Decl.* ¶ 10.

### ii.   State Administrative Funds

Chief of Staff Corley reports the amounts frozen as of April 9, 2025 in state-level operating expenses as $68,951.23, $25,950.00, and $374,753.89.  *Id.* ¶ 6.  In addition, she says that $122,572.93 exists in Fiscal Year 2024 Q3 funds which are not to be distributed.  *Id.*  As of April 7, 2025, Director McLucas reports Maine has received or anticipates receiving approximately $990,817 for state-level operating costs and says prior year funds awarded but currently inaccessible amount to $68,952.  *McLucas Decl.* ¶ 13.  State Administrative Funds are not used or intended to be used to purchase food.  *Corley Decl.* ¶ 6.

The amount frozen as of April 9, 2025 for the Summer Food Service Program, which falls within state-level operating costs, is $77,949.30; these funds are not used

---

[7]     Although the Court is not sure whether this explains the differences in the amount of paused funds estimated by Director McLucas and Chief of Staff Corley in their respective declarations, it notes that Director McLucas submitted her declaration on April 7, 2025, while Chief of Staff Corley submitted her own on April 9, 2025.  It is possible this brief timing discrepancy accounts or helps account for the divergent figures.  These minor discrepancies do not alter the Court's ruling.

or intended to be used to purchase food. *Id.* CNP anticipates funding of approximately three million dollars, typically awarded in July of each year, for the summer meal program sponsor administration and meal reimbursement. *McLucas Decl.* ¶ 13.

### iii. NTIG

The amounts frozen as of April 9, 2025 for NTIG are $117,405.30, $101,111.38, and $698,507.00. *Corley Decl.* ¶ 5; *McLucas Decl.* ¶ 13. These funds are not used or intended to be used to purchase food. *Corley Decl.* ¶ 5.

### iv. National School Lunch Program Equipment Assistance Grants

$37,544.00 in National School Lunch Program Equipment Assistance Grants is frozen as of April 9, 2025. *Id.* ¶ 7; *McLucas Decl.* ¶ 13. These funds are not used or intended to be used to purchase food. *Corley Decl.* ¶ 7.

### v. Farm to School Formula Grant

The amount frozen as of April 9, 2024 in Farm to School State Formula Grant funds is $592,838.42. *Id.* ¶ 4; *McLucas Decl.* ¶ 13. The funds are not used or intended to be used to purchase food. *Corley Decl.* ¶ 4.

### d. Impact of Funding Freeze on CNP's Programming

Director McLucas says the inaccessibility of two of the funding streams in CACFP grants "directly impact this 'federal feeding program.'" *McLucas Decl.* ¶ 14; *see also Verified Compl.* ¶ 87. "Shutting of the CACFP cash in lieu account prevents providers from using the funds to purchase the food that is distributed to children and adult in daycare settings," and "[s]hutting of the CACFP administrative funds

21

account prevents providers from paying the individuals who run the programs that prepare and provide the food to children and adults." *McLucas Decl.* ¶ 14; *see also Verified Compl.* ¶¶ 88-89.  In Maine, the sites and providers are too small to access the discounted commodity foods which are distributed in large quantities that could not be properly stored or managed without significant waste. *McLucas Decl.* ¶ 14. Without access to funds in the "cash in lieu" and administrative funds account, providers will have to cease operations and children (and vulnerable adults) will not be fed. *Id.*; *see also Verified Compl.* ¶ 90.

Director McLucas says further that "[a]lthough the accounts holding funds to reimburse schools for providing meals under the National School Lunch Program and the School Breakfast Program are still accessible, the funds that pay for the twelve CNP employees . . . who monitor the programs and process the reimbursements to the schools are inaccessible. Unless an alternate funding source can be immediately identified, these employees will be laid off." *McLucas Decl.* ¶ 15.

"Also inaccessible are the funds that pay for the computers, telephones, and other equipment that CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and process the reimbursements," she reports. *Id.* ¶ 16; *see also Verified Compl.* ¶ 92.  Director McLucas says that without staff and equipment, "there will be no way for CNP to ensure that programs receiving federal funds are operating in accordance with federal laws and regulations.  More importantly, without these funds, there will be no CNP staff to collect, approve, and process claims for reimbursement from schools and other facilities providing meals

to children and vulnerable adults.  In other words, there will be no way to get funds from the USDA to the schools and other facilities, and children will not be fed." *McLucas Decl.* ¶ 17; *see also Verified Compl.* ¶ 93.

Loss of CNP staff means there "will be no way to oversee and monitor the local programs, resulting in the loss of program integrity, including inconsistent meal quality and reduced outreach to low-income families, thus widening the gaps in access to healthy meals for children who depend on these programs," *McLucas Decl.* ¶ 18; *see also Verified Compl.* ¶ 94, and will also impair the State's ability to comply with USDA regulations, "which could jeopardize the integrity of child nutrition programs, and cause fraud, waste, and abuse of federal dollars." *McLucas Decl.* ¶ 19; *see also Verified Compl.* ¶ 95.

The state of Maine does not have state funds available to replace the federal funds that have been frozen.  *McLucas Decl.* ¶ 20; *see also Verified Compl.* ¶ 96.

## III.  THE PARTIES' POSITIONS

### A.  The State of Maine's Motion for TRO

The Plaintiff brings a motion for TRO, requesting emergency injunctive relief prohibiting the Federal Defendants "from terminating, freezing, or otherwise interfering with Maine's access to federal funds allocated to Maine based on Maine's alleged violation of Title IX without complying with the requisite statutory and regulatory procedures." *Mot. for TRO* at 1.  The State argues the matter warrants emergency relief because the Federal Defendants have "blocked access to federal

funds Maine uses to feed at-risk and needy children, as well as vulnerable adults."
*Id.*

More specifically, the State seeks judicial review of the Federal Defendants'
freezing of federal aid to the MDOE, contending the Federal Defendants' actions
violated the APA and rejecting as plainly "not true" Secretary Rollins's proffer that
the pause in disbursement would "not impact federal feeding programs or direct
assistance to Mainers," and "if a child was fed today, they will be fed tomorrow." *Id.*
at 2, 11.

### 1.    Likelihood of Success on the Merits

### a.    Availability of Judicial Review Under the APA

The State argues it is likely to prevail on the merits. *Id.* at 12. As an initial
matter, the State argues the Federal Defendants' action pausing disbursement of
federal funds on the basis of the State's alleged violation of Title IX is judicially
reviewable under the APA, contending "Congress has expressly declared that actions
by federal agencies 'terminating or refusing to grant or to continue financial
assistance' upon a finding of a violation of Title IX are subject to judicial review in
accordance with the APA, and 'such action shall not be deemed uncommitted to
unreviewable agency discretion within the meaning of [5 U.S.C. § 701]." *Id.* (quoting
20 U.S.C. § 1683).

### b.    The Merits

Turning to the merits, the Plaintiff says that under the APA, a reviewing court
may hold unlawful and set aside an agency action that is arbitrary, capricious, not in

accordance with law, or was taken "without observance of procedure required by law." *Id.* (quoting 5 U.S.C. § 706).  The State insists "Secretary Rollins'[s] action is all of these things." *Id.*

### i. Not in Accordance with Law and Taken Without Observance of the Required Legal Procedures

"Most obviously," the Plaintiff argues, "the Secretary's action was not in accordance with law and was taken without observance of the required legal procedures." *Id.*  The State contends Secretary Rollins "cannot simply declare that the [s]tate of Maine is in violation of Title IX and terminate federal funding" because "Congress has expressly declared that to terminate or refuse to continue federal financial assistance to a recipient, the agency must first hold a hearing and then make an 'express finding on the record' that the recipient violated Title IX." *Id.* (quoting 20 U.S.C. § 1682).  The State alleges that "USDA's own regulations also require a hearing and an express finding on the record," and "impose additional requirements beyond those established by Congress." *Id.* (citing 7 C.F.R. § 15.8(c)).  Pursuant to the applicable regulations, the Plaintiff proffers the USDA "must first notify the recipient of its failure to comply and consider security compliance by voluntary means," then the Secretary must issue a final decision pursuant to 7 C.F.R. § 15.10(e), and, finally, under both federal law and USDA regulations, the Secretary must file with the appropriate House and Senate committees "a full written report of the circumstances and the grounds" for the contemplated action and then wait at

least 30 days before taking such action. *Id.* at 12-13 (citing 20 U.S.C. § 1682; 7 C.F.R. § 15.10(e)).

Here, the State concludes "[t]he Secretary did not do any of these things. Instead, without any prior notice, opportunity for a hearing, finding on the record, or report to Congress, she terminated the [s]tate of Maine's federal funding. This termination is both not in accordance with the law and in violation of required legal procedures and must be set aside." *Id.* at 13.

### ii. Arbitrary and Capricious

The Plaintiff argues further that the Secretary's action also must be set aside as arbitrary and capricious. *Id.* "An agency action is arbitrary or capricious where it is not 'reasonable and reasonably explained,'" *id.* (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and an agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Turning to the instant case, the State insists Secretary Rollins "offered no explanation for her determination that the [s]tate of Maine is in violation of Title IX." *Id.* "She did not cite any provision in Title IX or USDA's implementing regulations prohibiting schools from allowing transgender girls and women to play on girls['] and women's teams," or cite any caselaw supporting such a proposition; instead, the Plaintiff insists, "[s]he simply declared her interpretation of Title IX without providing a single bit of legal support." *Id.*

26

The State presses further that, even if it assumed Secretary Rollins's interpretation of Title IX is correct, the Secretary's action is nevertheless arbitrary and capricious and thus violative of the APA because "she did not explain why MDOE is somehow in violation of Title IX [on the basis that] schools in Maine allow (as they should) transgender girls and women to play on girls['] and women's teams." *Id.* The State insists Secretary Rollins's letter cited no caselaw or other authority—"[i]n short, she provided no basis for her determination that the [s]tate of Maine is in violation of Title IX." *Id.* at 14.

The State concludes that it is likely to succeed on the merits of its claim because the Secretary ignored all legally required procedures and provided no basis for her action terminating the State's funding. *Id.*

## 2. Irreparable Harm

The State argues it will suffer irreparable harm absent a TRO. *Id.* It says that if emergency relief is not granted, "hungry children and vulnerable adults will not be fed (despite Secretary Rollins'[s] claim to the contrary)." *Id.*

The State begins by detailing the multiple food assistance programs MDOE operates through CNP with the assistance of USDA federal funding, including the National School Lunch Program, the School Breakfast Program, CACFP, state-level operating costs, NTIG, National School Lunch Program Equipment Assistance Grants, and Farm to School State Formula Grants, all of which the State reports are "designed to fight hunger by reimbursing organizations such as schools, childcare centers, and after-school programs for providing healthy free or reduced-price meals

27

to children." *Id.* (citing *McLucas Decl.* ¶¶ 1, 4). The State reports many of these programs were unable to access federal funds on April 3, 2025, just one day after Governor Mills and MDOE received Secretary Rollins's letter. *Id.* at 16 (citing *McLucas Decl.* ¶ 12).

Anticipating the Federal Defendants' argument that this pause in disbursement is not irreparable because many of these programs serve administrative functions, the State insists, "[t]he inaccessibility of two of the funding streams in the CACFP grants directly impairs the ability of CNP to feed children." *Id.* (citing *McLucas Decl.* ¶ 14). Plaintiff explains:

> First, without access to the cash in lieu account, providers have no funds to purchase the food that is distributed to children and adults in daycare settings. Second, without access to the administrative funds account, providers have no funds to pay the individuals who run the programs that prepare and provide food to children and adults. In sum, without access to these two accounts, CACFP will have to cease operations and children (and vulnerable adults) will not be fed.

*Id.* (citing *McLucas Decl.* ¶ 14).

The Plaintiff says further that Secretary Rollins's action "also cripples Maine's National School Lunch Program and School Breakfast Program" because "[a]lthough the accounts holding funds to reimburse schools for providing meals under these programs are still accessible, the funds that pay for the twelve CNP employees . . . who monitor the programs and process the reimbursements to the schools are inaccessible." *Id.* (citing *McLucas Decl.* ¶ 15). Unless an alternative funding source can be identified, the State maintains, these employees will be laid off. *Id.* (citing *McLucas Decl.* ¶ 15).

28

Noting that the funds paying for the computers, telephones, and other equipment CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and to process the reimbursements are also inaccessible, the State argues that "[w]ithout staff and equipment, there will be no way for Maine to collect, approve, and process claims for reimbursement from schools and other facilities providing meals to schoolchildren." *Id.* (citing *McLucas Decl.* ¶¶ 16-17). "Because the State has no state funds available to replace the funds that have been frozen, the lack of staff and equipment means that USDA funds will not reach the schools and other facilities, and the children will not be fed." *Id.* at 16-17 (citing *McLucas Decl.* ¶¶ 17, 20). "In short," the Plaintiff concludes, "Secretary Rollins blew up the bridge necessary to get funds from USDA to the schools and other entities that need the funds to feed children and vulnerable adults." *Id.* at 17.

### 3.     The Balance of the Equities and the Public Interest

Addressing the balance of the equities and the public interest in tandem, the State asserts "the principal public interest is ensuring that needy children and vulnerable adults are fed," and, "[a]s set forth above, that interest cannot be served if MDOE continues to be denied access to federal funds." *Id.* The State argues further that "the public has an important interest in making sure government agencies follow the law." *Id.* (quoting *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "Conversely," it says, "there is generally no public interest in the perpetuation of unlawful agency action." *Id.*

(quoting *Planned Parenthood of N.Y.C., Inc. v. United States HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (citation corrected)).

Turning to the balance of the equities, the Plaintiff argues that while the public has a strong interest in "feeding children and vulnerable adults," and a further interest in ensuring USDA follows the law, "the federal government faces no 'harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Id.* (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (in turn quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); citing *Planned Parenthood of N.Y.C., Inc.*, 337 F. Supp. 3d at 343). It contends that "[b]ecause USDA's funding freeze was unlawful, Defendants have no cognizable interest in it being continued." *Id.* The State asserts further that the Federal Defendants will not be burdened or otherwise harmed by a restraining order because a TRO would not prevent the Federal Defendants from moving forward with efforts to terminate federal funding for Maine's alleged violation of Title IX; rather, "[t]hey would simply need to do so through the legally required process" and "[f]ollowing the law is not a burden." *Id.* at 18.

The state of Maine concludes by urging the Court to enter a TRO barring the Federal Defendants from freezing, terminating, or otherwise interfering with its federal funding for alleged Title IX violations without complying with the required procedures. *Id.*

**B.      The Federal Defendants' Response**

The Federal Defendants oppose the State's motion for TRO.  *Defs.' Opp'n.*  The

Federal Defendants' opposition principally rests on the argument that the Plaintiff's

motion should be denied because the State has not demonstrated a risk of irreparable

harm; however, Federal Defendants also contend the other TRO factors weigh in their

favor.  *Id.* at 1-14.

**1.      Likelihood of Success on the Merits**

The Federal Defendants confine their discussion of the State's likelihood of

success on the merits to the jurisdictional question raised by the Court in its April 9,

2025 order.  *See Order to Respond.*  The Federal Defendants contend:

> As this Court noted in its recent Order to Respond, in a recent case
> involving similar challenges to Education's alleged termination of
> certain grants, *Department of Education v. California*, No. 24A910, 2025
> WL 1008354 (Apr. 4, 2025) (per curiam), the Supreme Court granted the
> Government's application for a stay of a temporary restraining order
> pending appeal.  It did so because the Tucker Act required the
> challenges to proceed before the Court of Federal Claims, and not in a
> federal district court.  *Id.* at *1.  Insofar as the State here is also
> effectively trying to enforce its rights in certain grants that employ
> contracts to set the terms and commitments of recipients, then this
> Court would lack jurisdiction for the same reason as in *Department of
> Education v. California.*

*Defs.' Opp'n* at 10.

"It is well-established that the federal government is 'immune from suit in

federal court absent a clear and unequivocal waiver of sovereign immunity,'" the

Federal Defendants allege, and "although the APA provides 'a limited waiver of

sovereign immunity for claims against the United States' seeking non-monetary

relief, that waiver does not apply 'if any other statute that grants consent to suit

31

expressly or impliedly forbids the relief which is sought.'" *Id.* at 10-11 (first quoting *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022); then quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012)).

Here, the Federal Defendants argue the proper forum for this suit is the United States Court of Federal Claims pursuant to the Supreme Court's April 4, 2025 interpretation of the Tucker Act in *Department of Education v. California. Id.* at 11 (citing *Dep't of Educ.*, No. 24A910, 2025 U.S. LEXIS 1370, at *1-2 (Apr. 4, 2025); *Order to Respond* at 2 (citations amended)). Construing this case as essentially a contractual dispute for monetary damages, the Federal Defendants contend the Court of Federal Claims has exclusive jurisdiction pursuant to 28 U.S.C. § 1491(a). *Id.* (citing 28 U.S.C. § 1491(a)) (the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States").

In determining whether the State's "particular action" here is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly before this district court, the Federal Defendants submit the Court must consider "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Id.* at 11-12 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *accord Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (evaluating whether "the essence of the action is in contract")). The

Federal Defendants maintain "[a]pplying those principles here, to the extent the State is effectively trying to enforce its rights in certain grants that employ contracts to set the terms and commitments of recipients, then this action would sound in contract and this Court would lack jurisdiction for the same reasons as *Department of Education v. California.*" *Id.* at 12.

### 2. Risk of Irreparable Harm

The Federal Defendants argue entry of TRO is improper because the State does not stand to suffer irreparable harm in its absence. *Id.* at 8 (collecting cases). The Federal Defendants' core assertion is "[t]he State has failed to establish that the freeze at issue 'will prevent children from being fed' because no such thing will occur." *Id.* at 9 (quoting *Verified Compl.* ¶ 14). To the contrary, the Federal Defendants maintain:

> [T]he only grant funding which can be used for purposes of purchasing food is the Child and Adult Care Food Program "Cash in Lieu" program, for which only $49,188.60 remains frozen and $24,200.00 exists in Fiscal Year 2024 Q3 funds which are not to be distributed. None of the other programs at issue are used to purchase food for children. Instead, the suspended funds concern administrative, technological, equipment, and personnel-related funding streams.

*Id.* at 9 (citing *Corley Decl.* ¶¶ 3-10).

Moreover, the Federal Defendants claim "[t]he State's fiscal claims of net irreparable harm also warrant a closer look," alleging, "[a]s with prior fiscal years, the State ended 2024 with a surplus, reportedly tallying $93.5 million." *Id.* (citing ME. DEP'T OF ADMIN. & FIN. SERVS., "State of Me. ends Fiscal Year 2024 with Surplus," Aug. 2, 2024, https://www.maine.gov/dafs/news/state-maine-ends-fiscal-

year-2024-surplus) ("State of Maine ends Fiscal Year 2024 with Surplus") (citation amended)).  They add that the 2024 fiscal year-end balance of the Budget Stabilization Fund was $968.3 million.  *Id.* at 10 (citing "State of Me. ends Fiscal Year 2024 with Surplus"; ME. DEP'T OF ADMIN. & FIN. SERVS., "Me. Budget Stabilization Fund,"  https://www.maine.gov/osc/financial-reporting/maine-budget-stabilization-fund) (citation amended)).  "Accordingly, the State's assertion that it 'does not have state funds available to replace the funds that have been frozen' is belied by the public record," the Federal Defendants conclude.  *Id.* (quoting *McLucas Decl.* ¶ 20) (citation amended).

### 3. Balance of the Equities and the Public Interest

Finally, the Federal Defendants contend the Plaintiff is incorrect in claiming that they stand to experience no harm from the imposition of the requested TRO.  *Id.* at 13.  The Federal Defendants observe, "[i]n *Department of Education v. California*, the Supreme Court concluded that the [TRO] factors militated in favor of Education, because the federal government will be harmed if it is unable to 'recover the grant funds once they are disbursed' while, conversely, grant recipients 'can recover any wrongfully withheld funds through suit in an appropriate forum.'"  *Id.* (quoting *Dep't of Educ.*, 2025 U.S. LEXIS 1370, at *2 (citation corrected)).  They insist "[t]he same is true here: USDA will likely be unable to recover any grant funds once they are disbursed.  Relatedly, despite the present suspension of the USDA funding at issue, the State by all appearances maintains the fiscal wherewithal to fund its own school nutrition programs."  *Id.*

34

The Federal Defendants conclude by urging the Court to deny the TRO and, in the event the Court grants the Plaintiff its requested emergency relief, they "request that security be given by the State." They explain, pursuant to the recent Executive Order entitled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)," it is the policy of the Executive Branch "to demand that parties seeking injunctions against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained." *Id.* at 13 n.7 (citing Mem.: Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c) (Mar. 11, 2025) https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/) (citation amended).

### C. The State of Maine's Reply

As a preliminary point, the State observes that the response in opposition to the motion for TRO did not dispute the Plaintiff's assertions that the Federal Defendants' actions violated the APA; "Defendants instead attempt to deflect by suggesting that the Court might not have jurisdiction over this matter, and, even if it does, there is no remedy for Defendants' illegal action because the State failed to demonstrate irreparable harm. Defendants apparently acknowledge acting unlawfully but argue that there is nothing the Court can do about it." *Pl.'s Reply* at 1. The State's reply tracks the structure of the Federal Defendants' response and addresses the Federal Defendants' contentions regarding irreparable harm and the Court's jurisdiction. *See id.* at 1-8.

### 1.      Likelihood of Success on the Merits

Plaintiff rejects the Federal Defendants' allegation that this Court lacks jurisdiction to hear this case based on *Department of Education*, which the State characterizes as a "divided, per curiam decision" to grant a stay pending appeal.  *Id.* at 3 (citing *Dep't of Educ.*, 2025 U.S. LEXIS 1370, at *1-2 (citation amended)). Plaintiff observes the Federal Defendants "concede that case 'may exhibit some characteristics distinguishable from this case' and that unlike in that case, 'the State's allegations rely on certain characteristics applicable to USDA, in addition to the APA itself,'" and that "[t]hey further hedge when they say that *Department of Education. v. California* would apply 'to the extent the State is effectively trying to enforce its rights in certain grants that employ contracts to set the terms and commitments of recipients.'"  *Id.* at 3-4 (quoting *Defs.' Opp'n* at 12 & n.5).  The Plaintiff insists, in this case, "the State is not to <u>any extent</u> attempting to enforce the terms of the frozen grants"; "[r]ather, it is seeking judicial review of a federal agency's Title IX enforcement action," and, thus, *Department of Education* and the Tucker Act "have nothing to do with this case."  *Id.* at 3, 5 (emphasis in original).  The State asserts further that Congress clearly provided in 20 U.S.C. § 1683 that an action terminating federal financial assistance for a violation of Title IX is judicially reviewable under the APA.  *Id.* at 5.

Plaintiff next asserts that even if, "for argument's sake," this case did implicate the terms of grants, the Tucker Act still would not apply because § 702 of the APA carves out claims for "money damages," and, here, the Plaintiff does not seek such

relief.  *Id.* at 6 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988) ("the exception for an action seeking 'money damages' should not be broadened beyond the meaning of its plain language")).  The State maintains judicial review of this action for equitable relief is available under the APA pursuant to *Bowen*.  *Id.* (citing 487 U.S. at 893).  Finally, the Plaintiff argues the availability of judicial review of this action is consistent with the Supreme Court's recent holding in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  *Id.* at 7 (citing *Loper Bright Enters.*, 603 U.S. at 391) ("Congress . . . enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices").  "The APA check is needed here, and there is no question that the Court has jurisdiction to review Defendants' unlawful actions," the State concludes.  *Id.*

## 2. Irreparable Harm

The Plaintiff rejects the Federal Defendants' argument that there is no irreparable harm absent a TRO based on their conclusion that the funding freeze will not prevent children from being fed, insisting "as the State demonstrated in its motion, with no funds for state level operating costs (referred to by Defendants as state administrative funds) [CNP] cannot administer the food programs and children will go hungry."  *Id.* at 1-2 (citing *McLucas Decl.* ¶ 17).  "Nor do Defendants contest that the freezing of CACFP administrative funds prevents providers from paying the individuals who run the programs that prepare and provide the food to children and adults," Plaintiff observes.  *Id.* at 2 (citing *McLucas Decl.* ¶ 14).

37

The State points out that the Federal Defendants' only response to the Plaintiff's pleaded harm is "to speculate that the State can replace the frozen funds with its own money." *Id.* As an initial matter, the State says the unrebutted evidence in the record is that "[t]he [s]tate of Maine does not have state funds available to replace the funds that have been frozen," further distinguishing this case from *Department of Education. Id.* at 2 & n.2 (quoting *McLucas Decl.* ¶ 20) (citing *Dep't of Educ.*, 2025 U.S. LEXIS 1370, at *2 (respondents "represented . . . that they have the financial wherewithal to keep their programs running") (citation amended)).

"[M]ore fundamentally," the State says, "Defendants ignore the legal limitations on use of State money" under the Maine Constitution, which provides "[n]o money shall be drawn from the treasury, except in consequence of appropriations or allocations authorized by law." *Id.* at 2 (quoting ME. CONST., art. V, pt. 3rd, § 4). The State thus rejects the Federal Defendants' suggestion that CNP can "simply take money from the Budget Stabilization Fund (or any other fund) without legislative authority," explaining further "[b]ecause USDA agreed to fund CNP, the Legislature has not allocated state funds for that purpose." *Id.* Moreover, the State insists that "even if the Legislature was able to act now and appropriate state funds, unless it did so with a 2/3 majority, legislative actions do not become effective until ninety days after adjournment." *Id.* (quoting ME. CONST., art. IV, pt. 3rd, § 16).

The State reports that, in analogous circumstances, the United States District Court for the District of Rhode Island recently held:

38

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*Id.* at 2-3 (quoting *New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *49 (D.R.I. Mar. 6, 2025)) (citation amended). Plaintiff notes further that the same court underscored "[t]his is particularly true where the States had no notice of a potential freeze so they could plan." *Id.* at 3 (quoting *New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *49-50) (citation amended).

Finally, the State alleges that irreparable harm absent a stay is more than just pecuniary. *Id.* Observing the Federal Defendants do not dispute that they acted unlawfully, the State argues "[b]eyond harming the State and its residents, unlawful conduct by federal agencies 'harm[s] . . . our orderly system of government.'" *Id.* (quoting *New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *50) (citation amended). Furthermore, the State insists when Congress has enacted "statutes and appropriated these funds for legitimate reasons," a federal agency's "categorical freeze, untethered to any statute, regulation, or grant term, frustrates those reasons, and causes significant and irreparable harms to the States." (quoting *New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *55) (citation amended).

### 3. Balance of the Equities and the Public Interest

The Plaintiff reasserts its argument that the third and fourth injunctive relief factors weigh in its favor, emphasizing first that "[a]n agency is not harmed by an

order prohibiting it from violating the law." *Id.* at 7 (quoting *New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *59 (citation amended)).  Further, the Plaintiff observes that the Federal Defendants' arguments on these two factors are premised on the notion that they may prevail on the merits—claims the Plaintiff urges the Court not to credit because, "given that they do not dispute that the freezing of federal funds was unlawful, it is impossible to see how that could happen." *Id.*  Moreover, the Plaintiff says, "in light of Defendants' argument that the funds at issue are a small amount given Maine's annual budget, it lacks credibility for Defendants to then suggest that given the overall size of the federal budget, the amount at issue would harm the federal government if it could not be recovered." *Id.*

## IV.    LEGAL STANDARD

The standard for issuing a temporary restraining order is the same as for a preliminary injunction and is provided by traditional equity doctrines. *Aftermarket Auto Parts All., Inc. v. Bumper2Bumper, Inc.*, Civil No. 1:12-cv-00258-NT, 2012 U.S. Dist. LEXIS 143685, *3 (D. Me. Oct. 4, 2012); *accord* 11A WRIGHT, MILLER & KANE § 2942, at 37; *Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 U.S. Dist. LEXIS 79863, at *15 (D. Me. May 6, 2020) (collecting cases).

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)

("The authority of the District Court Judge to issue a preliminary injunction should be sparingly exercised")). "In order for a court to grant this type of relief, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest.' ." *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9 (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). "The party seeking the preliminary injunction bears the burden of demonstrating that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "[T]rial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief. *Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2010).

## V.    DISCUSSION

### A.    Likelihood of Success on the Merits

The First Circuit has observed that likelihood of success on the merits is both the "sine qua non" and the "most important part of the preliminary injunction assessment," explaining that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7, 10 (1st Cir. 2012) (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008); *New Comm Wireless Servs. Inc. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). To carry its burden on this factor, the Plaintiff "must establish a 'strong likelihood' that [it] will

41

ultimately prevail." *Id.* at 10 (quoting *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

### 1. Availability of Judicial Review Under the APA

#### a. Sovereign Immunity

It is well established that the United States, as sovereign, is immune from suit absent a clear and express waiver by statute. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Until Congress has expressly and unequivocally waived the United States' sovereign immunity, actions against the United States must be dismissed for lack of subject matter jurisdiction. *United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940). However, an exception to the doctrine of sovereign immunity exists when the requested relief from a federal entity or official is equitable in nature. Under the APA, an action "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied" on the basis of the United States' sovereign immunity. 5 U.S.C. § 702 (expressly providing that sovereign immunity is waived in actions for review of agency action under 28 U.S.C. § 1331 in cases in which equitable, rather than monetary damages, is requested).

Here, the issue is more nuanced: Plaintiff seeks emergency injunctive relief which, if granted, will likely result in monetary payments. The Supreme Court considered a similar issue in the canonical case of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), and concluded that, although a district court order redressing an APA

42

violation would likely result in "the payment of money by the Federal Government to the State, such payments are not 'money damages,' and the orders are not excepted from § 702's grant of power by § 704." *Id.* at 910. The *Bowen* Court explained:

> It is true that [the district court's order] describes [a challenged agency action] as one that had disallowed reimbursement of $6,414,964 to the State, but it did not order that amount to be paid, and it did not purport to be based on a finding that the Federal Government owed Massachusetts that amount, or, indeed, any amount of money. Granted, the judgment tells the United States that it may not disallow reimbursement on the grounds given, and thus it is likely that the Government will abide by this declaration and reimburse Massachusetts the requested sum. <u>But to the extent that the District Court's judgment engenders this result, this outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law</u>.

*Id.* at 909-10 (emphasis supplied by Court). The Supreme Court concluded "since the [District Court] orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910.

The result is the same here: the Plaintiff challenges the Federal Defendants' compliance with the APA, alleging the Federal Defendants failed to follow the proper procedure before freezing funding. Although, as in *Bowen*, a decision in the Plaintiff's favor will likely result in "the payment of money by the Federal Government to the State," "this outcome is a mere by-product of [this] court's primary function of reviewing the Secretary's interpretation of federal law." *See id.* at 909-10. Similarly here, the Court's primary function is to determine if the USDA and Secretary Rollins

followed the proper procedure to effectuate the termination of a portion of MDOE's Title IX funds.[8]

Having determined 5 U.S.C. § 702 waives the United States' sovereign immunity in this suit seeking injunctive relief for agency action, the Court proceeds to consider whether the challenged agency action is a justiciable controversy.

---

[8]      The Supreme Court's April 4, 2025 decision to vacate and stay a district court's TRO enjoining the U.S. Department of Education from terminating various education-related grants on the ground that the Tucker Act provided exclusive jurisdiction to the United States Court of Federal Claims does not change the Court's determination that it is a proper forum for this dispute under the APA. *See Dep't of Educ. v. Cal.*, No. 24A910, 2025 U.S. LEXIS 1370 (Apr. 4, 2025). The Supreme Court acknowledged "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *Id.*, at *2 (quoting *Bowen*, 487 U.S. at 910), but held "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" making the Court of Federal Claims the proper forum for that case. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); citing 28 U.S.C. § 1491(a)(1)).

While bearing some similarities to the instant suit, the Supreme Court issued this decision on its emergency docket, without full briefing or hearing, *id.* at *3-4 (Kagan, J., diss.); *id.* at *4-5 (Jackson, J., joined by Sotomayor, J., diss.), and its precedential value is thus limited. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target. The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket. To reiterate: The Court's stay order is not a decision on the merits"); *accord id.* at 883 (Roberts, C.J., dissenting) (critiquing the Supreme Court's emergency orders for necessitating decisions without the opportunity for "full briefing and argument—[]based on the scanty review this Court gives matters on its shadow docket").

In *Bowen*, the Supreme Court wrote that "[i]t would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of federal-state interaction to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908. If *Bowen* means that the district courts have jurisdiction over claims that touch on claims for money damages against the federal government, it is also true that if the United States Court of Federal Claims has exclusive jurisdiction over claims like the one Maine is bringing, the Court of Federal Claims will be charged with deciding issues decidedly outside its limited jurisdiction, a result that *Bowen* rejected. Absent clear guidance from the Supreme Court that *Bowen* and its progeny are no longer good law, the Court follows this well-established precedent in concluding the APA has waived the United States' sovereign immunity on this case seeking temporary injunctive relief, inclusive of the fact that, in the event the Plaintiff prevails, the requested TRO will likely result in monetary payments. *See id.*, 487 U.S. at 909-10.

44

## b.    Justiciable Controversy

The APA allows courts to review certain agency action and set the action aside if they find it unlawful, 5 U.S.C. § 706, and "establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'"   *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-17 (2020) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (in turn quoting 5 U.S.C. § 702)). Specifically, the APA provides that any person "adversely affected or aggrieved" by agency action, including the "failure to act," is entitled to "judicial review thereof," if the action is made reviewable by statute or there is a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. §§ 702, 704; *see Heckler v. Chaney*, 470 U.S. 821 (1985).   Agency actions are presumed reviewable except when the statute "preclude[s]" review or the "agency action is committed to agency discretion by law."  *See* 5 U.S.C. § 701(a)(1), (a)(2); *accord Regents of the Univ. of Cal.*, 591 U.S. at 17.

The Court construes Plaintiff's filings as asserting that the Federal Defendants' freezing of funds constitutes final agency action and, further, that Title IX does not preclude judicial review.  The Federal Defendants do not dispute that the USDA's action was final and, thus, is justiciable on this basis pursuant to 5 U.S.C. § 704.  *See Defs.' Opp'n* at 1-15.

Furthermore, the Court agrees with the Plaintiff that 20 U.S.C. § 1683 does not preclude judicial review pursuant to the APA; to the contrary, the statute makes clear that any person aggrieved by an agency action terminating or refusing to grant

or continue funding upon a finding of Title IX noncompliance "may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title."  20 U.S.C. § 1683.  The full text of § 1683 reads:

> Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.  In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

*Id.*; *accord Tennessee v. Dep't of Educ.*, 104 F.4th 577, 604 (6th Cir. 2024) ("Looking at the plain text, it's clear that there is more than one path to some type of judicial review [under 20 U.S.C. § 1683].  The second sentence of § 1683, which provides one avenue to judicial review, says that after an administrative enforcement proceeding strips the recipient of its funding, the recipient can sue under the APA").

Consistent with the plain language of 20 U.S.C. § 1683 and the presumption in favor of judicial review of agency actions, *see Regents of the Univ. of Cal.*, 591 U.S. at 17, the Court agrees with the Plaintiff that it has jurisdiction to review the disputed agency action.

## 2. The Merits of the APA Argument[9]

The APA directs courts to uphold an agency decision unless, in relevant part, it was "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Here, the State alleges "Secretary Rollins'[s] action is all of these things." *Mot. for TRO* at 12.

### a. Not in Accordance with Law and Taken Without Observance of the Required Legal Procedures

The State urges this Court to temporarily restrain the Federal Defendants' funding freeze because it was not made in accordance with law and was taken without observance of the required legal procedures. *Mot. for TRO* at 12. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). Therefore, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

---

[9] Plaintiff correctly observes, as the Court also notes above, that Federal Defendants do not dispute the merits of its contention that they violated the APA. *Pl.'s Reply* at 1; *Defs.' Resp.* at 1-15. Instead, the Federal Defendants' arguments regarding the first factor of the TRO analysis focus on the jurisdictional issue already addressed above, and to the Plaintiff's favor. *See Defs.' Resp.* at 10-12. Thus, the Court deems the Federal Defendants' opposition to the State's APA arguments waived. *See Rivera-Quiñones v. US Sec. Assocs.*, Civ. No. 12-1598 (SEC), 2013 U.S. Dist. LEXIS 149732, at *10 (D.P.R. Oct. 16, 2013) ("[A party's] unexcused failure to respond authorizes the presiding district judge to summarily grant the unopposed motion, at least when the result does not clearly offend equity or conflicts with the Federal Rules of Civil Procedure") (citations and internal punctuation omitted). Nevertheless, in its discretion and considering equitable principles as well as the significance of this order, the Court proceeds to the merits of the Plaintiff's arguments.

The statutory scheme governing Title IX enforcement and USDA's own regulations are at the forefront of the State's claim that the Federal Defendants' paused disbursement was not in accordance with law and was taken without observance of the required legal procedures. *See Mot. for TRO* at 12-13. The State contends that, pursuant to these regulations, the Secretary "cannot simply declare that the [s]tate of Maine is in violation of Title IX and terminate federal funding" because "Congress has expressly declared that to terminate or refuse to continue federal financial assistance to a recipient, the agency must first hold a hearing and then make an 'express finding on the record' that the recipient violated Title IX." *Id.* at 12 (quoting 20 U.S.C. § 1682). The Plaintiff alleges "USDA's own regulations also require a hearing and an express finding on the record," and "impose additional requirements beyond those established by Congress." *Id.* (citing 7 C.F.R. § 15.8(c)). Moreover, the State proffers the applicable regulations require that USDA, before freezing funding, "must first notify the recipient of its failure to comply and consider security compliance by voluntary means," then the Secretary must issue a final decision pursuant to 7 C.F.R. § 15.10(e), and, finally, under both federal law and USDA regulations, the Secretary must file with the appropriate House and Senate committees "a full written report of the circumstances and the grounds" for the contemplated action and then wait at least 30 days before taking such action. *Id.* at 12-13 (citing 20 U.S.C. § 1682; 7 C.F.R. § 15.10(e)). Here, the State concludes "[t]he Secretary did not do any of these things." *Id.*

### i.    20 U.S.C. § 1682

To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of" 20 U.S.C. § 1681 "by issuing rules, regulations, or orders of general applicability." *See* 20 U.S.C. § 1682. Congress further authorized federal agencies to enforce compliance with Title IX:

> (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

*Id.*

At bottom, the Supreme Court has interpreted 20 U.S.C. § 1682 as "direct[ing] [] federal agencies engaged in the distribution of public funds" as to what they can do to "effect[]" compliance: terminate or refuse funding after a "hearing" and "an express finding [of noncompliance] on the record" or, in the alternative, take other measures "authorized by law." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (quoting 20

U.S.C. § 1682). By its plain language, the statute also requires notice, 20 U.S.C. § 1682 ("no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means"), and provides for the filing of a written report with the relevant House and Senate committees. *Id.* ("[T]he head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report"). The Supreme Court held that by having one "express provision of . . . enforc[ement]," § 1682 signals "that Congress intended to preclude others." *Sandoval*, 532 U.S. at 289.

The Court turns to the factual record to determine whether the actions taken by the Federal Defendants prior to the challenged funding freeze is in accordance with 20 U.S.C. § 1682's requirements of notice and a hearing, a written report followed by a thirty-day stay, or measures otherwise authorized by law. *See* 20 U.S.C. § 1682.

The record contains one communication from the Federal Defendants to the State: a letter, written by Secretary Rollins and addressed to Governor Mills, dated April 2, 2025, informing the Governor "Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools." *Rollins Letter* at 1. Explaining her actions, Secretary Rollins said, "[y]ou cannot openly violate federal

law against discrimination in education and expect federal funding to continue unabated. Your defiance of federal law has cost your state, which is bound by Title IX in educational programming." *Id.*

As noted earlier, the Court does not address the issue, which the parties agree is not presently before it, of whether the Federal Defendants are correct in their determination that the State is violating Title IX. The question presented is limited to whether the procedural steps taken by the Federal Defendants prior to pausing disbursement of a portion of the State's Title IX funds violated the APA on the ground that the Federal Defendants' actions "were not in accordance with law" and were taken "without observance of procedure required by law." *See* 20 U.S.C. § 1682.

The Court now concludes that the Defendants' actions were contrary to law, for multiple reasons. First, 20 U.S.C. § 1682 requires notice and a hearing prior to action. *See id.* Secretary Rollins's plainly letter provides neither, and the factual record does not indicate either was provided through another medium. Instead, the April 2, 2025 letter tells Governor Mills that the USDA, as of April 2, 2025 (the date of the letter's mailing and the date of Governor Mill's receipt) is "freezing Maine's federal funds." *Rollins Letter* at 1. No plausible construction of that language could lead to the conclusion that it provided notice or an opportunity to be heard, as § 1682 requires. There is also no indication that, in the alternative, the Federal Defendants submitted a written report to the appropriate subcommittees and then waited thirty days before taking further action. *See* 20 U.S.C. § 1682. Indeed, the factual record confirms this. *Verified Compl.* ¶ 74 ("Upon information and believe, Secretary Rollins

51

has not filed a report with the appropriate House or Senate committee, as required by 20 U.S.C. § 1682").

Second, 20 U.S.C. § 1682 provides that agency action to "terminat[e] or refus[e]" Title IX assistance after the proper procedural steps are taken to determine noncompliance "shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 20 U.S.C. § 1682. The Court reads this language as requiring that, upon an agency's determination that a recipient is not in compliance with Title IX, any action of "termination or refusal [to continue or grant funding]" must be "limited in its effects to the particular program, or part thereof, in which such noncompliance has been so found." *Id.* This must mean that the repercussions of a particular program's noncompliance should be experienced by that same program.

Here, Secretary Rollins tells Governor Mills that her decision to freeze Title IX funding for administrative and technological functions in schools "is only the beginning, though you are free to end it at any time by protecting women and girls in compliance with federal law," and adds, "[i]n order to continue to receive taxpayer dollars from USDA, the state of Maine must demonstrate compliance with Title IX's protection of female student athletes from having to compete with or against or having to appear unclothed before males." *Rollins Letter* at 1. Thus, it appears from the Secretary's letter, as well as the broader context provided in the factual record of the federal government's communications with Governor Mills regarding the State's

Title IX compliance, that Secretary Rollins determined the State's student athletic programs, particularly those involving female student athletes, were in violation of Title IX.

However, as the Secretary's April 2, 2025 letter, alongside the parties' submitted declarations from Director McLucas and Chief of Staff Corley, make clear, the Federal Defendants did not restrict Title IX funding from student athletics; rather, they restricted funding to food assistance programs overseen by the Child Nutrition Program. *Compare id.* ("In order to continue to receive taxpayer dollars from USDA, the state of Maine must demonstrate compliance with Title IX's protection of female student athletes from having to compete with or against or having to appear unclothed before males") *with id.* ("Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools") *and McLucas Decl.* at ¶¶ 1-20 (describing the inaccessibility of certain CNP funds). On the basis of this disconnect, the Court concludes the Federal Defendants' procedural steps were not in accordance with the law as provided in 20 U.S.C. § 1682. *See* 20 U.S.C. § 1682 (decisions to terminate or refuse funding "shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found").

### ii.    7 C.F.R. Part 15a

As noted, 20 U.S.C. § 1682 authorizes a funding agency to effect compliance with Title IX "by any other means authorized by law." 20 U.S.C. § 1682. The Court

thus looks to 7 C.F.R. Part 15a, which codifies USDA regulations for Title IX enforcement, to see whether the Federal Defendants' actions, while not in accordance with 20 U.S.C. § 1682, were in accordance with USDA's federal regulations.

As noted, USDA's regulations for enforcing Title IX adopt USDA's procedures for enforcing Title VI of the 1964 Civil Rights Act, *see* 7 C.F.R. § 15a.605 (adopting and applying 7 C.F.R. §§ 15.5-15.11, 15.60-15.143)), and, under the regulations for enforcing Title VI, USDA "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with the regulations and this part and shall provide assistance and guidance to recipients to help them comply voluntarily with the regulations in this part." 7 C.F.R. § 15.5. "In the event of noncompliance, [USDA] shall seek to secure voluntary compliance by all appropriate means." *Id.* If there appears to be noncompliance, and it cannot be corrected by informal means, the regulations instruct that compliance can be effected "by the suspension or termination of or refusal to grant or to continue Federal financial assistance, upon a finding, in accordance with the procedure hereinafter prescribed, by any other means authorized by law." 7 C.F.R. § 15.8(a). "Other means" include, inter alia: "(1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law." 7 C.F.R. § 15.8(a). The regulations further state:

> No order suspending, terminating, or refusing to grant or to continue Federal financial assistance shall become effective until (1) the Agency

> has advised the applicant or recipient of his failure to comply and has
> determined that compliance cannot be secured by voluntary means, (2)
> there has been an express finding on the record, after opportunity for
> hearing, of a failure by the applicant or recipient to comply with the
> requirement imposed by or pursuant to the regulations in this part, (3)
> the action has been approved by the Secretary pursuant to § 15.10(e),
> and (4) the expiration of 30 days after the Secretary has filed with the
> committee of the House and the committee of the Senate, having
> legislative jurisdiction over the program involved, a full written report
> of the circumstances and the grounds for such action.

7 C.F.R. § 15.8(c).

7 C.F.R. § 15.8(c) provides further that "[a]ny action to suspend or terminate

or to refuse to grant or to continue Federal financial assistance shall be limited to the

particular political entity, or part thereof, or other applicant or recipient as to whom

such a finding has been made and shall be limited in its effect to the particular

program, or part thereof, in which such noncompliance has been so found." 7 C.F.R.

§ 15.8(c). 7 C.F.R. § 15.8(d) additionally specifies:

> No action to effect compliance by any other means authorized by law
> shall be taken until (1) the Secretary has determined that compliance
> cannot be secured by voluntary means, (2) the recipient or other person
> has been notified of its failure to comply and of the action to be taken to
> effect compliance, and (3) the expiration of at least ten days from the
> mailing of such notice to the recipient or other person. During this
> period of at least ten days, additional efforts shall be made to persuade
> the recipient or other person to comply with the regulations in this part
> and to take such corrective action as may be appropriate.

7 C.F.R. § 15.8(d).

In sum, 7 C.F.R. Part 15(a), like 20 U.S.C. § 1682, imposes numerous steps an

agency must take before refusing or terminating funding for noncompliance,

including (1) notice and a determination compliance cannot be achieved through

voluntary means, (2) an express finding on the record, after opportunity for hearing,

of a failure by the applicant or recipient to comply with the requirement imposed by or pursuant to the regulations in this part, (3) approval of the action by the Secretary of Agriculture pursuant to § 15.10(e), and (4) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate, having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. 7 C.F.R. § 15.8(c). As discussed above in regards to 20 U.S.C. § 1682, the factual record does not indicate the Federal Defendants took *any* of these actions before freezing Maine's federal funds, and the Court thus concludes the Federal Defendants did not comply with the USDA's federal regulations as outlined in 7 C.F.R. Part 15(a).

This conclusion is supported by a second observation. 7 C.F.R. § 15.8(c) provides that "[a]ny action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 7 C.F.R. § 15.8(c). This language is nearly identical to the relevant provision of 20 U.S.C. § 1682 and the Court determines, for the same reasons, that the Federal Defendants' action to terminate funds to CNP based on a determination that programs involving female student athletes were not in compliance with Title IX violates 7 C.F.R. § 15.8(c).

The Court addresses a final issue on this thread. Secretary Rollins's assertions that the Federal Defendants are reviewing "all research and education-related

56

funding in Maine for compliance with . . . the priorities of the Trump Administration," "launch[ing] a full review of grants awarded by the Biden Administration to the Maine Department of Education[,] [m]any of [which] appear to be wasteful, redundant, or otherwise against the priorities of the Trump Administration," and "focus[ing] on a Department that is farmer-first and without a leftist social agenda," *Rollins Letter* at 1-2, do not change the Court's conclusion that the Federal Defendants' actions were contrary to law. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals"); *accord New York v. Trump*, C.A. No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 40346, at *41 (D.R.I. Mar. 6, 2025) (quoting *City & Cnty. of San Francisco*, 897 F.3d at 1235).

Based on the foregoing, the Court concludes that prior to freezing a portion of the State's Title IX funds, the Federal Defendants acted "without observance of procedure required by law," so as to be in violation of the APA. 5 U.S.C. § 706.[10] The Court accordingly concludes that the Plaintiff has demonstrated its "strong likelihood" of success on the merits of its claim. *See Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 10.

---

[10] The State also claims that the Federal Defendants' actions were arbitrary and capricious. *See Mot. for TRO* at 13-14. In light of its determination that the Federal Defendants undertook actions "not in accordance with law" and "without observance of procedure required by law," 5 U.S.C. § 706, the Court does not reach whether the Federal Defendants' actions were also arbitrary and capricious in this emergency order.

## B.    Likelihood of Irreparable Harm

Plaintiffs seeking preliminary injunctive relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "[I]rreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-Simons II*) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (*Ross-Simons I*)). "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13) (quoting *K-Mart Corp.*, 875 F.2d at 915).

The Court concludes the Plaintiff has demonstrated its likelihood of irreparable harm absent temporary injunctive relief. Here, there is ample evidence that the Federal Defendants' termination of the State's Title IX funding will harm the beneficiaries and employees of those programs that rely on these funds. While the Court accepts the Federal Defendants' point that much of the frozen funding is not directly earmarked for the purchase of food, *see Corley Decl.* ¶¶ 1-10, this does not sway the Court's determination that the Plaintiff has established its likelihood of irreparable harm absent TRO.

58

The Court returns to the factual record. According to CNP Director McLucas, on April 3, 2025, the day after Governor Mills received Secretary Rollins's letter stating that funding would be immediately paused, the CNP was unable to access several sources of federal funds. *McLucas Decl.* ¶ 12. While the CACFP account for food reimbursement was accessible, CACFP's "cash in lieu" payments and administrative funds were inaccessible. *Id*. Furthermore, all the accounts for state-level operating costs (also referred to as State Administrative Funds), NTIG, the National School Lunch Program Equipment Assistance Grant, and the Farm to School State Formula Grant were inaccessible. *Id*.

Director McLucas says the inaccessibility of two of the funding streams in CACFP grants "directly impact this 'federal feeding program,'" contrary to Secretary Rollins's assertion to the contrary. *Compare id.* ¶ 14 *with Rollins Letter* at 1 ("This pause does not impact federal feeding programs or direct assistance to Mainers; if a child was fed today, they will be fed tomorrow"). "Shutting of the CACFP cash in lieu account prevent providers from using the funds to purchase the food that is distributed to children and adult in daycare settings," and "[s]hutting of the CACFP administrative funds account prevents providers from paying the individuals who run the programs that prepare and provide the food to children and adults." *McLucas Decl.* ¶ 14. In Maine, Director McLucas explains that the sites and providers are too small to access the discounted commodity foods which are distributed in large quantities that could not be properly stored or managed without significant waste. This necessarily means that without access to funds in the "cash in lieu" and

59

administrative funds account, providers will be forced to cease operations and children (and vulnerable adults) will not be fed.  *Id.*

Director McLucas reports further that "[a]lthough the accounts holding funds to reimburse schools for providing meals under the National School Lunch Program and the School Breakfast Program are still accessible, the funds that pay for the twelve CNP employees who monitor the programs and process the reimbursements to the schools are inaccessible.  Unless an alternate funding source can be immediately identified, these employees will be laid off."  *Id.* ¶ 15.  "Also inaccessible are the funds that pay for the computers, telephones, and other equipment that CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and process the reimbursements," she reports.  *Id.* ¶ 16.  Director McLucas says that without staff and equipment, "there will be no way for CNP to ensure that programs receiving federal funds are operating in accordance with federal laws and regulations.  More importantly, without these funds, there will be no CNP staff to collect, approve, and process claims for reimbursement from schools and other facilities providing meals to children and vulnerable adults.  In other words, there will be no way to get funds from the USDA to the schools and other facilities, and children will not be fed."  *Id.* ¶ 17.

Loss of CNP staff means there "will be no way to oversee and monitor the local programs, resulting in the loss of program integrity, including inconsistent meal quality and reduced outreach to low-income families, thus widening the gaps in access to healthy meals for children who depend on these programs."  *Id.* ¶ 18.

The Federal Defendants' primary argument on irreparable harm is that Plaintiff has not shown its likelihood of success on this factor because the majority of inaccessible programs do not directly provide food to children and vulnerable adults, meaning, in the Federal Defendants' view, the State can either be reimbursed by the Federal Defendants, or can reorganize its own budget to remedy the shortfall.

The Court explores this argument. By the Federal Defendants' own accounting, which differs in only minor ways from the Plaintiff's, approximately three million dollars have already been frozen. *See Corley Decl.* ¶¶ 1-10. This amount, the Court reasonably infers, will only increase as long as the freeze remains in place. The factual record indicates that the state of Maine does not have state funds legally available to replace the funds that have been frozen. *Id.* ¶ 20. Furthermore, although the Federal Defendants speculate that the State in fact does have funds to replace the paused amounts, the Plaintiff convincingly explains why the situation is not so easily remedied:

> Defendants ignore the legal limitations on use of State money. Under Maine's Constitution, "[n]o money shall be drawn from the treasury, except in consequence of appropriations or allocations authorized by law." So CNP cannot simply take money from the Budget Stabilization Fund (or any other fund) without legislative authority. Because USDA agreed to fund CNP, the Legislature has not allocated state funds for that purpose. And even if the Legislature was able to act now and appropriate state funds, unless it did so with a 2/3 majority, legislative actions do not become effective until ninety days after adjournment.

*Pl.'s Reply* at 2 (quoting ME. CONST., art. IV, pt. 3rd, § 16; Art. V, pt. 3rd, § 4).

As the State highlights, the District of Rhode Island recently considered the process by which the federal government terminated multiple states' financial assistance and determined:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

*New York v. Trump*, 2025 U.S. Dist. LEXIS 40346, at *49; *accord New York v. Trump*, No. 25-1236, 2025 U.S. App. LEXIS 7022, at *41-46, 47-48 (1st Cir. Mar. 26, 2025) (denying defendants' motion for stay of preliminary injunctive relief and rejecting defendants' argument that the states had not shown a risk of irreparable harm).[11]

Thus, although it appears from the declarations of both Director McLucas and Chief of Staff Corley that some of Maine's programming to provide children and vulnerable adults with food has not been directly harmed by the paused disbursement, that does not convince the Court that the Federal Defendants' actions to hamper the infrastructure necessary to obtain, organize, transport, distribute, monitor, and account for this food source will not have the same or a similar result. The Court readily concludes this presents a risk of irreparable harm. *See Cigar*

---

[11] After the district court issued a preliminary injunction, the Federal Agency Defendants in that case moved the Court of Appeals for the First Circuit for a stay of the district court order. *New York v. Trump*, No. 25-1236, 2025 U.S. App. LEXIS 7022 (1st Cir. March 26, 2025). Although the Federal Agency Defendants asserted that the district court order would cause them irreparable harm, there is no suggestion in the First Circuit opinion that the Federal Agency Defendants urged the First Circuit to overturn the district court's finding of irreparable harm to the state from the withholding of federal funds. *Id.* at *1-48.

*Masters Providence, Inc. v. Omni R.I., LLC*, No. CV 16-471-WES, 2017 U.S. Dist. LEXIS 149193, at *46 (D.R.I. Aug. 18, 2017) ("Threats to public health and safety constitute irreparable harm that will support an injunction"); *see also Ross-Simons II*, 217 F.3d at 13 ("[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm").

### C. The Balance of the Equities and the Public Interest[12]

Finally, upon consideration of the last two factors, the balance of the equities weighs heavily in favor of granting the Plaintiff's TRO, and a TRO would serve the public interest. To obtain preliminary injunctive relief, a Plaintiff must also show "the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20. This involves weighing "the balance of relevant hardships as between the parties." *Vaqueria Tres Monjitas, Inc. v. Fabre Laboy*, 587 F.3d 464, 482 (1st Cir. 2009). Furthermore, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

The record shows that, absent a TRO, CACFP providers will be prevented from using the "cash in lieu" funds to purchase the food that is distributed to children and adult in daycare settings, CACFP will be unable to pay the individuals who run the

---

[12] The Supreme Court has instructed that the last two factors in the TRO analysis "merge when the Government is the party opposing the [TRO]"; the Court follows this instruction and reviews the balance of the equities and the public interest in tandem. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

programs that prepare and provide the food to children and adults in children and adult daycare settings, and "[w]ithout access to funds in the cash in lieu and administrative funds account, providers will have to cease operations and children (and vulnerable adults) will not be fed." *McLucas Decl.* ¶ 14.  Absent a TRO, the funds that pay for the twelve CNP employees who monitor the National School Lunch Program and School Breakfast Program and process the reimbursements to school are inaccessible; "[u]nless an alternate funding source can be immediately identified, these employees will be laid off."  *Id.* ¶ 15.  "Also inaccessible are the funds that pay for the computers, telephones, and other equipment that CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and process the reimbursements."  *Id.* ¶ 16.  Without staff and equipment, "there will be no way for CNP to ensure that programs receiving federal funds are operating in accordance with federal laws and regulations.  More importantly, without these funds, there will be no CNP staff to collect, approve, and process claims for reimbursement from schools and other facilities providing meals to children and vulnerable adults.  In other words, there will be no way to get funds from the USDA to the schools and other facilities, and children will not be fed."  *Id.* ¶ 17.

On the other hand, as the District of Rhode Island explained in a recent order on analogous facts, if the Court were to grant the requested TRO, Federal Defendants "merely would have to disburse funds that Congress has appropriated to the States and others."  *New York v. Trump*, No. 25-cv-39, 2025 U.S. Dist. LEXIS 17593, at *17 (D.R.I. Jan. 31, 2025).  This Court agrees with the District of Rhode Island that

"absent such an order, there is a substantial risk that the State[] and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding." *Id.* Further, "[t]he fact that [Plaintiff] has shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest." *Id.*; *accord League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations") (internal quotation marks omitted). Thus, these final factors in the analysis lean in the Plaintiff's favor.

## VI.   SUMMARY

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right," *Peoples Fed. Sav. Bank*, 672 F.3d at 8-9, and "[t]he party seeking the preliminary injunction bears the burden of demonstrating that these four factors weigh in its favor." *Monroig-Zayas*, 445 F.3d at 18. Here, the Court concludes the Plaintiff has met this burden. The Court grants the state of Maine's motion for temporary injunctive relief and orders the Federal Defendants to immediately unfreeze and release to the state of Maine any federal funding that they have frozen or failed or refused to pay because of the State's alleged failure to comply with the requirements of Title IX. Furthermore, the Federal Defendants are barred from freezing, terminating, or otherwise interfering with the State's future federal funding for alleged violations of Title IX without complying with the legally required

procedure.  Finally, within seven days of the date of this order, the court orders the state of Maine to provide security pursuant to Federal Rule of Civil Procedure 65(c).

## VII.  BOND REQUIREMENT

Pursuant to Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  The First Circuit has explained "[t]he purpose of such a bond is to ensure that the enjoined party may readily be compensated for the costs incurred as a result of the injunction should it later be determined that it was wrongfully enjoined."  *Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018); *accord Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) ("The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction").

The First Circuit has previously indicated "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond," *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) (collecting cases), but the district courts in this circuit have generally required a bond to be posted.  *See WEX Inc. v. HP Inc.*, No. 2:24-cv-00121-JAW, 2024 U.S. Dist. LEXIS 119715, at *99-100 (D. Me. July 9, 2024) (collecting cases).  Further, in this case, the Government has specifically argued "[t]he Court's potential reinstatement

of suspended funding may impose significant monetary losses" and requested the Court to "require the State to provide security in an amount commensurate with these costs." *Gov't's Opp'n* at 14.

District courts are vested with "wide discretion" to set the amount of the bond. *Axia NetMedia*, 889 F.3d at 11; *accord Totem Forest Prods. v. T & D Timber Prods.*, No. 2:17-cv-00070-JDL, 2017 U.S. Dist. LEXIS 26062, at *5 (D. Me. Feb. 24, 2017) ("The Court has discretion to determine the amount of the security"). Typically, in determining the appropriate amount of bond, district courts consider "the potential incidental and consequential costs as well as [] the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2954 (3d ed. 2013); *accord WEX Inc.*, 2024 U.S. Dist. LEXIS 119715, at *99-100. However, the First Circuit has recognized a trend in "suits to enforce important federal rights or 'public interests'" to not require posting of a substantial bond. *See Crowley v. Local No. 82, Furniture & Piano Moving,* 679 F.2d 978, 999-1000 (1st Cir. 1982) (collecting cases), *rev'd on other grounds*, 467 U.S. 526 (1984); *accord Sanchez*, 2010 U.S. Dist. LEXIS 9942, at *36-37 ("As recognized by the First Circuit in *Crowley v. Local No. 82, Furniture & Piano Moving*, there is a trend in 'public interest' litigation to only require nominal security or to completely dispense with the security requirement"). This trend extends to other federal courts. *See, e.g., Alabama ex rel. Baxley v. Corps of Eng'rs of U.S. Army*, 411 F. Supp. 1261, 1275-76 (N. D. Ala. 1976) (collecting cases); *South Carolina v. United*

67

*States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018) (same), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Civ. No. ABA-25-0333, 2025 U.S. Dist. LEXIS 31747, at *85 (D. Md. Feb. 21, 2025).

The *Crowley* Court provided a three-factor test to aid the district court's determination of whether to impose a substantial bond requirement: (1) "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant"; (2) "the impact that a bond requirement would have on the enforcement of a federal right"; and (3) whether the likelihood of success on the merits of the claims at issue is "extraordinarily high." *Crowley,* 679 F.2d at 1000 & n.25; *accord Sanchez*, 2010 U.S. Dist. LEXIS 9942, at *37.

Applying these factors to the case at bar, the Court concludes that a nominal bond is appropriate. It is true that the temporary restraining order risks a harm to the Government by directing it to unfreeze the disputed funds, as nothing in the limited record indicates the Government would be likely to recover the grant funds once disbursed. *See Dep't of Educ. v. California*, 2025 U.S. LEXIS 1370, at *2. However, the ultimate costs associated with the Government's action are too complex to calculate in this expedited proceeding. The Government characterizes the case as "focused on less than $3 million dollars," *Def.'s Opp'n* at 1, but, by the Government's own admission, this figure only represents the frozen funds as of the date of the Plaintiff's filing. *See id.* (describing these funds as "the amount[s] *currently* frozen" (emphasis supplied by the Court)). There is no suggestion that the Government

intends to lift its freeze voluntarily, and to estimate the duration of this lawsuit would be abject speculation. Further, even if a specific dollar amount of withheld funds could be calculated, it would likely be a sum so large as to prohibit the Plaintiff from pursuing its requested relief. Lastly, for the reasons previously explained, the Court concludes on the current record that the State's likelihood of success is extraordinarily high. Accordingly, the Court will require the Plaintiff to post a bond of $1,000.[13]

## VIII. CONCLUSION

The Court GRANTS the State of Maine's Motion for Emergency Temporary Restraining Order (ECF No. 3) and ORDERS as follows:

1.  During the pendency of this Temporary Restraining Order, the United States Department of Agriculture and Secretary of Agriculture Brooke L. Rollins must immediately unfreeze and release to the state of Maine any federal funding that they have frozen or failed or refused to pay because of the state of Maine's alleged failure to comply with the requirements of Title IX.

2.  During the pendency of this Temporary Restraining Order, the United States Department of Agriculture and Secretary of Agriculture Brooke L. Rollins are barred from freezing, terminating, or otherwise interfering with

---

[13] This District and other district courts within the First Circuit have similarly required a nominal bond in this amount. *See Nationwide Payment Sols., LLC v. Plunkett*, 697 F. Supp. 2d 165, 173 (D. Me. 2010); *Nw. Selecta, Inc. v. Sec'y of the Dep't Agric. of P.R.*, No. 22-1092(RAM), 2022 U.S. Dist. LEXIS 233421, at *18 (D.P.R. Dec. 29, 2022). The Court sees no reason to depart from this precedent.

the state of Maine's future federal funding for alleged violations of Title IX without complying with the legally required procedure.

3. Further, within seven days of the date of this order, the Court ORDERS the state of Maine to provide security in the amount of $1,000 pursuant to Federal Rule of Civil Procedure 65(c).

4. This Temporary Restraining Order shall be in effect until further order of the Court. A preliminary hearing, at which time the state of Maine will be required to produce specific evidence in support of a preliminary injunction, will be set shortly at a date and time convenient to the parties and the Court.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of April, 2025