# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN BAR ASSOCIATION**, | |
| Plaintiff, | |
| v. | Case No. 25-cv-1263 (CRC) |
| **U.S. DEPARTMENT OF JUSTICE, et al.**, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Last month, Deputy Attorney General Todd Blanche issued a memorandum prohibiting all Department of Justice ("DOJ") lawyers from participating in events sponsored by the American Bar Association ("ABA") on official time. The reason, Blanche candidly explained, was that the ABA had recently joined a lawsuit against the Trump Administration. The next day, DOJ cancelled a series of grants with the ABA that funded services to victims of domestic and sexual violence. The only explanation offered for the cancellation was a terse statement indicating that the grants "no longer effectuate[] . . . [DOJ] priorities." Connecting these two rather large dots, the ABA promptly filed suit. Among other claims, the complaint alleges that termination of the grants constituted unlawful retaliation against the ABA for exercising its First Amendment right to petition the courts. A motion for a temporary restraining order or preliminary injunction preventing DOJ from enforcing the termination soon followed.

The government does not meaningfully contest the merits of the ABA's First Amendment retaliation claim. It points to no deficiencies in the ABA's performance of its grant obligations. It concedes that similar grants administered by other organizations remain in place. It agrees that bringing a lawsuit is protected by the First Amendment. And it suggests no other cause for the

cancellation apart from the sentiments expressed by Deputy Attorney General Blanche in his memorandum.

Rather, the government objects to the issuance of a preliminary injunction mainly on jurisdictional grounds. It argues that because the ABA seeks reinstatement of the grants, its claims sound in contract and therefore belong in the Court of Federal Claims, and not this Court, under the Tucker Act. But the ABA's retaliation claim springs from the First Amendment to the Constitution, not the relevant grant agreements. As a result, this Court has jurisdiction to hear it. And because the First Amendment prohibits the type of reprisal DOJ appears likely to have taken, and the ABA has shown that it will suffer irreparable harm in the absence of preliminary relief and that the equities and public interest favor it, the Court will grant its motion for a preliminary injunction on its First Amendment retaliation claim. The Court need not, at this juncture, decide whether any of the ABA's other claims warrant injunctive relief or are subject to dismissal.

## I. Background

### A. Factual Background

The following background is drawn from the ABA's complaint unless otherwise indicated. Over thirty years ago, Congress passed the Violence Against Women Act ("VAWA") to enhance the investigation and prosecution of violent crimes against women and to provide support to survivors. See Compl. ¶ 21. As part of this effort, VAWA established the Office on Violence Against Women ("OVW") within DOJ to administer grant programs aimed at "reduc[ing] domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable." Id. ¶ 23 (quoting Grant Programs, OVW, https://www.justice.gov/ovw/grant-programs (last visited May 14, 2025)). These OVW

grants, which constitute "cooperative agreement[s]" between the recipient and DOJ, are awarded through an "extremely competitive" open application process.  Id. ¶¶ 24, 58.  They are governed by Office of Management and Budget guidance, which allows DOJ, upon written notice, to terminate a grant award in three circumstances: (1) noncompliance with the award's terms and conditions; (2) consent; and, relevant here, (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  Id. ¶ 33 (quoting 2 C.F.R. § 200.340(a)); see also id. ¶¶ 31–32, 35, 58.

This case is about five OVW grants to the ABA, the world's largest voluntary association of judges, lawyers, and legal professionals.  Id. ¶ 4.  The ABA established a Commission on Domestic Violence when VAWA was passed to "help the [ABA] play a more active national leadership role in the enhancement of legal system reform on domestic violence."  Id. ¶ 22.  Today, the original Commission's successor, the Commission on Domestic and Sexual Violence ("ABA CDSV"), provides training and technical assistance to legal practitioners and adjudicators who work with survivors of domestic violence, sexual assault, and stalking.  Id. ¶¶ 22, 39.

Since its inception, ABA CDSV has received training and technical assistance grants from OVW.  See id. ¶ 40.  It employs seven full-time staff members to support its OVW grant projects, five of whom are entirely or almost entirely funded by OVW grants.  Id. ¶ 44.  ABA CDSV and DOJ have historically enjoyed a collaborative relationship, with ABA CDSV providing input on new OVW grant programs and helping OVW coordinate and plan training for award recipients at the start of each new grant cycle.  Id. ¶ 43.  ABA CDSV has never been found to have violated the conditions of any grant awards.  Id.  Nor, before the events giving rise to this litigation, had it ever had a grant suspended or terminated.  Id.

But things changed after the start of President Trump's second term.  Between February and March 2025, the ABA publicly criticized the Administration for actions it viewed as undermining the judiciary and legal profession.  On February 11, 2025, for example, the ABA condemned "recent remarks of high-ranking officials of the administration that appear to question the legitimacy of judicial review."  Id. ¶ 60 (quoting ABA Condemns Remarks Questioning Legitimacy of Courts and Judicial Review, Am. Bar Ass'n (Feb. 11, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/02/aba-statement-re-remarks-questioning-judicial-review/).  On March 3, 2025, the ABA issued another statement decrying a "clear and disconcerting pattern" of targeting judges who issued "decision[s] this administration does not agree with."  Id. ¶ 62 (quoting The ABA Rejects Efforts to Undermine the Courts and the Legal Profession, Am. Bar Ass'n (March 3, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/03/aba-rejects-efforts-to-undermine-courts-and-legal-profession/).  And, on March 26, 2025, the ABA and over 100 other bar organizations issued a joint statement rejecting "the notion that the U.S. government can punish lawyers and law firms who represent certain clients or punish judges who rule certain ways."  Id. ¶ 63 (quoting Bar Organizations' Statement in Support of the Rule of Law, Am. Bar Ass'n (March 26, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/03/bar-organizations-statement-in-support-of-rule-of-law/).

The ABA also joined a lawsuit in February challenging the Administration's freeze on international development grants to the U.S. Agency for International Development and the Department of State.  Compl. ¶ 61.  That lawsuit apparently prompted DOJ to reconsider its chummy relationship with the ABA.  On April 9, 2025, Deputy Attorney General Todd Blanche issued a memorandum, "Engagement with the American Bar Association," to all DOJ

employees.  Id. ¶ 64; Memorandum from Deputy Att'y Gen. Todd Blanche to All Dep't Emps.

(Apr. 9, 2025), https://www.justice.gov/dag/media/1396116/dl?inline ("Blanche Memo").  The

Memo explained that DOJ had a history of engaging with the ABA even when their "positions

on contentious legal, policy, and social issues" had been at odds.  Blanche Memo at 1.  But, in

light of the ABA's lawsuit against the United States, DOJ was now litigating against an

organization it was also funding, while the ABA continued to benefit from its engagement with

DOJ through boosted attendance at ABA events and the legitimization of its positions "that are

contrary to the federal government's policies."  Id.

Thus, the Memo went on, while "[t]he ABA is free to litigate in support of activist

causes"—citing abortion, affirmative action, and religious exercise cases in which the ABA had

filed amicus curiae briefs—DOJ has an obligation to "be [a] careful steward[] of the public fisc,"

and its employees have to "conduct themselves in a manner that does not undermine or appear to

undermine the Department's core mission of administering justice in a fair, effective, and even-

handed manner."  Id. at 1–2.  Accordingly, the memo laid out a new DOJ policy regarding

engagement with the ABA:  First, DOJ would no longer use taxpayer funds to pay for any travel

to or involvement in ABA events.  Id. at 2.  Second, all DOJ employees would now be prohibited

from participating in ABA-related activities while on duty or using government resources.  Id.

And third, moving forward, "policy employees" —those who serve in policy-determining,

policymaking, or policy-advocating positions, including all political appointees—would have to

obtain approval from their component heads and Blanche himself before participating in any

ABA event or writing, speaking, or publishing materials in ABA sponsored media.  Id.  Policy

employees were now also prohibited from holding leadership positions in the ABA or even

renewing their existing memberships.  Id.

The next day, DOJ terminated all of ABA's OVW grants "effective immediately," citing a change in "agency priorities" under 2 C.F.R. § 200.340(a)(4).  Compl. ¶¶ 11, 71; see also Pl.'s Ex. A ("Termination Letter"), ECF 4-2 at 19–20 (page numbers designated by CM/ECF).  It gave no explanation for why the grants "no longer effectuate[d] . . . agency priorities." Termination Letter, ECF 4-2 at 19.  At the time, ABA CDSV had five active OVW grants totaling $3.2 million: (1) a $1,000,000 award to the Civil Litigation Skills Project for October 1, 2022, through September 30, 2025; (2) a $600,000 award to the Trauma-Informed Representation Project for October 1, 2022, through September 30, 2025; (3) a $450,000 award to the LGBTQI+ Legal Access Project for October 1, 2024, through September 30, 2027; (4) a $400,000 award to the LGBTQI+ Training for Coalitions Project for October 1, 2024, through September 30, 2026; and (5) a $750,000 award to OVW's Expanding Legal Services Initiative for October 1, 2023, through September 30, 2026.  Id. ¶¶ 47–56; see also Def.'s Mot. to Dismiss at 3.  The ABA had also previously received two additional grants that, by their terms, ended March 31, 2025.  Compl. ¶ 57.  DOJ cancelled "all unobligated balances remaining" on the seven awards, including the two that had already ended.  Termination Letter, ECF 4-2 at 19. According to the government, the unobligated balance on the grants is $2,046,034.42.  Def.'s Mot. to Dismiss at 31; ECF 16-2 (Declaration of Erin M. Loran) ¶ 4.

DOJ did not cancel any other OVW grants.  Compl. ¶ 74; Oral Arg. Tr. 31:4–12.  In fact, the ABA alleges, DOJ assured other grantees that their grants were safe, and that DOJ remained committed to their projects.  Compl. ¶ 74.

B.  Procedural Background

Approximately two weeks later, the ABA filed this lawsuit against the Department of Justice and Attorney General Pamela J. Bondi and Deputy Attorney General Blanche in their

official capacities (collectively, "Defendants"), asserting six claims: (1) First Amendment retaliation; (2) First Amendment viewpoint discrimination; (3) unconstitutional conditions on government grants in violation of the the First Amendment and Spending Power; (4) violation of Fifth Amendment Equal Protection; (5) violation of Fifth Amendment Procedural Due Process; and (6) violation of the Administrative Procedure Act. Id. ¶¶ 82–126. The ABA then moved for a Temporary Restraining Order or Preliminary Injunction "[1] barring Defendants from enforcing or otherwise giving effect to the termination of any grant to the" ABA CDSV, "including through the enforcement of closeout obligations; [2] barring [Defendants] from [reobligating] funds used to support ABA CDSV's grants; and [3] requiring Defendants to take all steps necessary to ensure that the Department of Justice disburses funds on ABA CDSV's grants in the customary manner and in customary timeframes." ECF 4 at 1. Following a scheduling conference with the Court, Defendants represented that they would not reobligate the funds at issue before June 2, 2025. ECF 10 at 1. They then moved to dismiss the ABA's complaint and opposed its motion for emergency relief. See Def.'s Mot. to Dismiss. The Court heard argument on the motions on May 12, 2025.

## II.    Legal Standards

A preliminary injunction "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Postal Police Officers Ass'n v. United States Postal Serv., 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (Cooper, J.) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)). When considering a motion for preliminary relief, the Court must determine whether the movant has met its burden of demonstrating that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities tilts in its favor; and (4)

consideration of the public interest favors preliminary relief.  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008).

## III.  Analysis

Although the ABA brings six claims, it need only show a likelihood of success on one to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied.  <u>See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget</u>, No. 25-239 (LLA), 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025).  Because the Court finds the ABA has made that showing as to its First Amendment retaliation claim and has satisfied the other factors, it will grant the motion for a preliminary injunction and deny Defendants' motion to dismiss as to that claim.  The Court will reserve judgment on whether any of the ABA's other claims warrant injunctive relief or survive Defendants' motion to dismiss.

### A.  <u>Likelihood of Success</u>

Although the government did not initially contest this Court's jurisdiction over the ABA's First Amendment retaliation claim, its reply brief argues that, because this case involves a cooperative agreement to which the government is a party, and awarding relief could result in the payment of money from the public fisc, the entire action belongs in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.  <u>Compare</u> Def.'s Mot. to Dismiss at 7, 21, <u>with</u> Def.'s Reply at 1.  Therefore, the Court will first address whether the ABA has established a likelihood of success on whether the Court has jurisdiction over the claim before turning to whether Defendants retaliated against the ABA for protected First Amendment activity.

#### 1.  *Jurisdiction*

"United States agencies 'are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity.'"  <u>Am. Near E. Refugee Aid v. U.S. Agency for</u>

Int'l Dev. ("ANERA"), 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (quoting Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 38 F.4th 1099, 1105 (D.C. Cir. 2022)).  However, sovereign immunity does not bar suits for injunctive or declaratory relief against federal officers acting unconstitutionally or beyond statutory authority.  See Pollack v. Hogan, 703 F.3d 117, 120 (D.C. Cir. 2012) (citing Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 689, 693 (1949); Dugan v. Rank, 372 U.S. 609, 621–22 (1963)).

Separately, the Tucker Act waives the United States's immunity from actions "founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  And it "create[s] a presumption" that the Court of Federal Claims has exclusive jurisdiction over such claims.  Franklin-Mason v. Mabus, 742 F.3d 1051, 1055 (D.C. Cir. 2014) (citation omitted).  Accordingly, if the ABA's First Amendment retaliation claim is a constitutional claim for specific relief, sovereign immunity does not apply, and jurisdiction in this Court is proper.  If, however, the ABA's First Amendment retaliation claim falls within the scope of the Tucker Act, jurisdiction lies exclusively within the Court of Federal Claims.

The Tucker Act applies when the claim is "essentially a contract action" and the Court of Federal Claims can exercise jurisdiction over the claim.  ANERA, 703 F. Supp. 3d at 132 (first quoting Albrecht v. Comm. on Emp. Benefits, 357 F.3d 62, 68 (D.C. Cir. 2004); and then citing Tootle v. Sec'y of Navy, 446 F.3d 167, 176–77 (D.C. Cir. 2006)).  The "longstanding test" to determine whether a claim is "'at its essence' contractual" examines "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought."  Crowley, 38 F.4th at 1106 (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).  Because the source of the right underlying the ABA's First Amendment retaliation claim is the Constitution,

not the cooperative agreements, its claim is not "essentially a contract action." <u>ANERA</u>, 703 F. Supp. 3d at 132 (quoting <u>Albrecht</u>, 357 F.3d at 68).

### a. Source of the Right

"In examining 'the source of the rights upon which the plaintiff bases its claims,'" the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" <u>Crowley</u>, 38 F.4th at 1106–07 (quoting <u>Megapulse</u>, 672 F.2d at 967–68). In this analysis, courts ask whether "the plaintiff's rights 'existed prior to and apart from rights created under the contract.'" <u>Id.</u> at 1107 (alteration omitted) (quoting <u>Spectrum Leasing Corp. v. United States</u>, 764 F.2d 891, 894 (D.C. Cir. 1985)).

The ABA alleges that Defendants terminated its cooperative agreements in retaliation for protected speech, an act that would violate the First Amendment regardless of the agreements' terms. This theory of pretextual termination does not turn on contractual language. <u>Cf. id.</u> at 1108–09 (holding that contract was not the source of the right where claim "require[d] primarily an examination of the statutes the [Defendant] ha[d] purportedly violated, not of [the] contract"). Suppose, for example, that the agreements permitted termination for failure to effectuate agency priorities, and ABA CDSV's grant projects had in fact failed to do so. Even then, if retaliation were a motivating factor in the grants' termination, the ABA would still have a First Amendment retaliation claim. <u>See</u> <u>Sanders v. District of Columbia</u>, 85 F. Supp. 3d 523, 532 (D.D.C. 2015) (recognizing that protected activity must be "substantial or motivating factor in prompting . . .

retaliatory action" to establish a First Amendment retaliation claim (quoting <u>Bowie v. Maddox</u>, 642 F.3d 1122, 1133 (D.C. Cir. 2011))).

As another court in this district has explained, "[t]he fact that [the ABA] alleges that [D]efendants 'us[ed] [their] contracting powers as a means to retaliate' . . . does not transform [its] claim into one arising under or relating to [its] contract." <u>Navab-Safavi v. Broad. Bd. of Governors</u>, 650 F. Supp. 2d 40, 68 (D.D.C. 2009), <u>aff'd sub nom.</u>, <u>Navab-Safavi v. Glassman</u>, 637 F.3d 311 (D.C. Cir. 2011) (fourth and fifth alterations in original) (quoting <u>Ervin & Assoc., Inc. v. Dunlap</u>, 33 F. Supp. 2d 1, 12 (D.D.C. 1997)).  The means of retaliation does not determine the nature of the action.  Indeed, the same constitutional injury could have occurred through the denial of a different government benefit or entitlement.  Accordingly, the Court finds the source of the ABA's claim is its First Amendment right to be free from retaliation for engaging in protected activity, which "existed prior to and apart from rights created under the contract." <u>Crowley</u>, 38 F.4th at 1007 (alteration omitted) (quoting <u>Spectrum</u>, 764 F.2d at 894). This right stands independent of the cooperative agreements.

### b.  Type of Relief Sought

As for the type of relief sought, the relevant inquiry is whether the plaintiff "'in essence' seeks more than $10,000 in monetary relief from the federal government." <u>Id.</u> 1107 (citations omitted).  On this claim, the ABA does not seek monetary damages; it seeks a declaration that Defendants acted unlawfully when they terminated the grants for retaliatory reasons and an injunction preventing Defendants from terminating the agreements on that basis.

True, a ruling for the ABA would effectively result in the continuation of monetary grants payment by the government.  But, as the Supreme Court explained in <u>Bowen v. Massachusetts</u>, 487 U.S. 879 (1988), there is a distinction between money damages, which are

"given to the plaintiff to *substitute* for a suffered loss," and "specific remedies," such as specific performance, which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." Id. at 895 (citation omitted). That the specific relief sought here—preventing the government from terminating the contract for retaliatory reasons—may result in a monetary payout does not convert it into a claim for money damages.

And, even if the relief sought were characterized as contractual in nature, see Crowley, 38 F.4th at 1110 (describing specific performance as a "classic contractual remedy" (quoting Spectrum, 764 F.2d at 894)), that alone is not enough to bring the claim within the scope of the Tucker Act given that the ABA's First Amendment claim has an independent source. See id. at 1113 ("A plaintiff satisfies this test if its asserted right is based in contract *and* seeks 'in essence' more than $10,000 in monetary relief from the federal government." (emphasis added)).

The Supreme Court's recent per curiam opinion in Department of Education v. California, 145 S. Ct. 966 (2025), does not compel a contrary result. There was no constitutional claim in that case; the issue was whether the government was likely to succeed in showing that the district court lacked jurisdiction over the plaintiffs' APA challenge to the termination of their grants. See id. at 968; California v. U.S. Dep't of Educ., No. 25-cv-10548 (MJJ), 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025).

The D.C. Circuit's recent opinion in Widakuswara v. Lake, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), which has been administratively stayed by an en banc panel, is also distinguishable. The D.C. Circuit did not reach the First Amendment claim there because the district court's injunction was not based on it. Id. at *5 n.6. As for the plaintiffs' other constitutional claims, the Circuit concluded that "they simply flow[ed] from allegations that the Executive Branch has failed to abide by governing congressional statutes." Id. at *5. But here,

for the reasons explained above, the ABA's constitutional claim flows directly from the First Amendment.

Accordingly, the Tucker Act poses no obstacle to the Court's jurisdiction to consider the ABA's First Amendment retaliation claim.

### 2. Merits

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 605–06 (2021) (quoting U.S. Const. amend. I). Accordingly, "the First Amendment bars [government] retaliation for protected speech." Crawford-El v. Britton, 523 U.S. 574, 592 (1998).

Here, the ABA claims that DOJ terminated its OVW grants to retaliate against it for "supporting 'activist causes,' taking positions 'not aligned with' DOJ's, and filing suit to challenge the termination of ABA's federal funding for foreign-assistance projects." Compl. ¶ 85 (quoting Blanche Memo).

To prevail on this claim, the ABA must show that (1) it "engaged in conduct protected under the First Amendment"; (2) Defendants "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) "there is 'a causal link' between the protected First Amendment activity and 'the adverse action taken against' the [ABA]." Perkins Coie LLP v. U.S. Dep't of Just., No. 25-cv-716 (BAH), 2025 WL 1276857, at *27 (D.D.C. May 2, 2025) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)). Courts may consider a defendant's "contemporaneous statements" when assessing "retaliatory motive." Nat'l Treasury Emps. Union v. Trump, No. 25-cv-0935 (PLF), 2025 WL 1218044, at *10 (D.D.C. Apr. 28, 2025); see also Florida v. United States, 885 F. Supp. 2d 299,

13

354 (D.D.C. 2012). Thus, while the government emphasizes that the Blanche Memo did not purport to terminate any of the grants, it is nonetheless relevant because it announced a new DOJ policy toward the ABA and came just a day before the grants were terminated.

The ABA has made a strong showing that Defendants terminated its grants to retaliate against it for engaging in protected speech. The government does not dispute that the ABA has met the first two elements of a retaliation claim. First, the Blanche Memo "openly acknowledges that plaintiff engaged in speech and other activities protected by the First Amendment." Perkins Coie, 2025 WL 1276857, at *27. It identifies the catalyst for the memo and DOJ's change in policy as to the ABA: "[T]he ABA filed a lawsuit against the United States." Blanche Memo at 1. And it describes the ABA's history of "tak[ing] positions on contentious legal, policy, and social issues" that "frequently have not aligned with the positions advanced by [DOJ]" and its "litigat[ion] in support of activist causes." Id. This activity is protected under the First Amendment. See, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."); Perkins Coie, 2025 WL 1276857, at *27 (D.D.C. May 2, 2025) ("Well-settled law establishes that 'advocacy by . . . attorney[s] to the courts' falls within the category of 'private . . . speech' protected by the First Amendment." (alterations in original) (quoting Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 542–43 (2001))).

Second, DOJ's termination of the grant funding is an action "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." Perkins Coie, 2025 WL 1276857, at *27. This element is "satisfied by [the ABA's] showing of irreparable harm," see infra Part III.B. Perkins Coie, 2025 WL 1276857, at *30.

Third, the ABA's allegations, accepted as true, plausibly plead that the government's proffered justification for terminating the grants is pretextual, and that the real reason was retaliation. The Blanche Memo explicitly spells out how DOJ will be changing its approach toward the ABA in light of the ABA's lawsuit against the United States. And the temporal proximity between the Blanche Memo and the termination of the ABA's grants is probative of Defendants' retaliatory motive. See Nat'l Treasury Emps. Union, 2025 WL 1218044, at *10; Florida, 885 F. Supp. 2d at 354. The Memo may not have mentioned the ABA's grants specifically, but it promised to stop funding ABA events because of the DOJ's duty to be a "careful steward[] of the public fisc." Blanche Memo at 1.

The government claims that it had a nonretaliatory motive for terminating the grants: They no longer aligned with DOJ's priorities. But the government has not identified any nonretaliatory DOJ priorities, much less explained why they were suddenly deemed inconsistent with the goals of the affected grants. And the government's different treatment of other grantees suggests this justification is pretextual. DOJ did not terminate any other OVW grants, and, at oral argument, the government conceded that other grant recipients continue to conduct similar training functions with OVW money. Oral Arg. Tr. 31:4–12. The government has offered no nonretaliatory explanation for why it continues to fund these other OVW grantees after terminating the ABA's grants, or why these other grantees' projects still effectuate DOJ's priorities while the ABA's do not. Finally, DOJ also purported to terminate two grants that, by their terms, had already ended, making it even less plausible that DOJ conducted an individualized analysis of whether each grant aligned with DOJ policy. Based on all this, the Court cannot but conclude that the ABA is likely to succeed on its claim that Defendants terminated the agreements because of its protected activity in violation of the First Amendment.

B. Irreparable Harm

By establishing a likelihood of success on the merits of its First Amendment claims, the ABA has established it will suffer irreparable harm in the absence of preliminary relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Singh v. Berger, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (per curiam)).

The case the government relies on in opposition is inapposite. In Getty Images News Services Corp. v. Department of Defense, 193 F. Supp. 2d 112 (D.D.C. 2002), a press organization sought a preliminary injunction in part to challenge the "alleged denial of equal access to the detention facilities at Guantanamo Bay." Id. at 118. The Court denied the injunction because any alleged harm was speculative. Id. at 122–23. The organization had claimed it was harmed by limited access to Guantanamo Bay, but the Court found this harm existed only in comparison to a hypothetical Department of Defense policy that would have offered greater access. See id. The Court was similarly unpersuaded by the argument that the absence of a press pool at Guantanamo constituted a constitutional violation because the First Amendment did not necessarily guarantee such access. Id. at 123.

Here, by contrast, the First Amendment injury is concrete and ongoing. The ABA regularly engages in protected expressive activity, and DOJ's termination of its grants directly punishes that activity. Unlike Getty, this case involves actual government retaliation for speech, not a speculative comparison to an ideal access regime.

The ABA also alleges that the termination of the grants will force it to lay off most or all of ABA CDSV's staff within a month. Pl.'s Mot. at 22 (citing Decl. of Maricarmen Garza ¶ 48, ECF 4-2 at 16 (page numbers designated by CM/ECF)). The loss of funding thus "threaten[s]

the very existence of the movant's" operations.  <u>Climate United Fund v. Citibank, N.A.</u>, No. 25-cv-698 (TSC), 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025) (quoting <u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Accordingly, this loss of funding goes further than the sort of "economic loss" that cannot usually constitute irreparable harm.  <u>See John Doe Co. v. CFPB</u>, 849 F.3d 1129, 1134 (D.C. Cir. 2017).

The Court therefore finds that the ABA would suffer irreparable harm in the absence of preliminary relief.

C.  <u>Balance of the Equities and Public Interest</u>

Finally, the ABA must show that the balance of the equities and the public interest weigh in favor of an injunction.  "These factors merge when the Government is the opposing party."  <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)

"[G]overnment actions in contravention of the Constitution are 'always contrary to the public interest.'"  <u>Turner v. U.S. Agency for Glob. Media</u>, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (quoting <u>Gordon v. Holder</u>, 721 F.3d 638, 653 (D.C. Cir. 2013)).  Once again, then, the likelihood-of-success factor weighs on these factors:  Given that the ABA has established a likelihood of success on the merits of a constitutional claim, it has shown that the balance of the equities and public interest favor an injunction preventing the government from continuing to violate the Constitution.

The government's contrary arguments are unavailing.  First, the government contends that an injunction would prevent OVW from reobligating the funds to organizations that better serve its goals.  Def.'s Mot. to Dismiss at 28.  But it has neither identified those goals nor explained why the ABA no longer advances them.  It is therefore impossible for the Court to

weigh this asserted interest.  The same is true of the government's claims that injunctive relief would undermine its contractual rights.  Id. at 29.

Next, while the executive branch's general interest in managing public funds carries significant weight, that interest does not outweigh the strong constitutional interests at stake here, particularly given the relatively modest amount of funding involved ($3.2 million total and only $2 million outstanding, see Def.'s Mot. to Dismiss at 31) and the tailored nature of the relief sought.  The ABA does not seek, and the Court will not require, Defendants to reinstate the grants that had, by their terms, already ended or to renew the grants at the end of their terms.  See Oral Arg. Tr. 25:10–22.  Nor will it prevent Defendants from terminating ABA CDSV's grants for permissible and *truly* nonretaliatory reasons.  See id. at 25:23–26:3.  Therefore, the Court concludes the balance of the equities and public interest favor preliminary relief.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for a Preliminary Injunction on its First Amendment retaliation claim.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  May 14, 2025