# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, et al., | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-10912-ADB |
| DEPARTMENT OF ENERGY et al., | * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs Association of American Universities ("AAU"), Association of Public and

Land-Grant Universities ("APLU"), American Council on Education ("ACE," and, with AAU

and APLU, the "Organizational Plaintiffs"), and several public and private universities (together

with the Organizational Plaintiffs, "Plaintiffs") seek a preliminary injunction halting

implementation of a Department of Energy ("DOE" or "the Department") "Policy Flash," which

sets a universal cap on indirect funding costs for Institutes of Higher Education ("IHEs") (the

"Rate Cap Policy" or the "Policy Flash").  Plaintiffs allege that the Rate Cap Policy is arbitrary

and capricious, impermissibly retroactive, and contrary to governing law.  For the foregoing

reasons, the Plaintiffs' motion for a preliminary injunction is **GRANTED**.

# I.      BACKGROUND

## A.      Factual Background

### 1.      DOE Funding for Indirect Costs

The federal government awards billions of dollars each year to universities to support research that can effectively further the DOE's goals.  [Compl. ¶ 27].  In fact, the majority of DOE-funded research occurs at outside institutions—and, as relevant here, IHEs—which allows the DOE to fund a wide array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.  [Id. ¶ 29].  During fiscal year 2023, the DOE awarded more than $2.6 billion to nearly 400 different universities.  [Id.].  As such, at any given time, many individual research universities are likely depending on DOE grants to support independent research projects across multiple departments and research centers.  [Id. ¶ 30].  This DOE-funded research at universities has made the United States a world leader in science, resulting in innumerable scientific breakthroughs, all to the benefit of the United States and the rest of the world, as evidenced by the fact that dozens of DOE-supported scientists have earned Nobel Prizes for their groundbreaking work.  [Id. ¶¶ 27, 28].

Universities and other grant recipients generally do not receive lump-sum grants from the DOE.  [Compl. ¶ 34].  Rather, they use cost-based accounting systems whereby the universities first incur expenses and then recover their actual, documented direct and indirect costs for conducting their research.  [Id. ¶¶ 34, 35].  "Direct costs" are those costs which can be readily attributed to a specific research project; for example, the salary of a graduate student assigned to a particular research project or the cost of a specialized piece of equipment purchased for a particular research project.  [Id.].  "Indirect costs," on the other hand, are costs that are necessary

for research but support multiple research projects, making them more difficult to trace back to a specific project.  [Id. ¶ 36].

Indirect costs are comprised of "facilities" and "administration" costs (and are often referred to as "F&A costs").  [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))]; see also 2 C.F.R. § 200.1 (noting that, for IHEs, the term "facilities and administrative (F&A) cost is often used to refer to indirect costs").  The "facilities" costs are "defined as depreciation on buildings, equipment, and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."  [Compl. ¶ 37 (quoting 2 C.F.R. § 200.414(a))].  This category includes the costs of the physical infrastructure necessary for carrying out research, such as the construction and maintenance of buildings, including specialized facilities and laboratories.  [Id.].  These costs are indirect because a single building, such as a state-of-the-art nuclear facility, might house numerous research groups engaged in multiple distinct projects.  [Id.].  The "administration" costs are defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities.'" [Id. ¶ 38 (quoting 2 C.F.R. § 200.414(a))].  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as information technology professionals, experts on safety and security, technical staff, and many others.  [Id.].  These are indirect costs because a single employee or group of employees will typically handle these necessary administrative activities across multiple DOE grants.  [Id.]. Because of caps on administrative costs, universities often contribute a significant amount of their own funds to cover such costs, thereby subsidizing the work funded by grants in what can be characterized as a mutually beneficial partnership.  [Id.].

3

The computation and determination of indirect costs are subject to extensive regulation, discussed further <u>infra</u>, and then fixed for a specific period of time in recognition of the institutions' needs for predictability and to allow proper planning. [Compl. ¶¶ 39–50]. The regulations require research institutions to express their indirect costs as a rate that is multiplied by the overhead-bearing direct costs of each individual research grant associated with those costs, with the purpose of ensuring that indirect costs are allocated fairly across supported projects. [<u>Id.</u> ¶ 39]. Resource-intensive research projects are typically the most expensive and are allocated a larger share of indirect costs. [<u>Id.</u>]. Plaintiffs provide a simplified example: Suppose a single laboratory houses two research projects—one with $75,000 of annual overhead-bearing costs and the other with $25,000—and that the laboratory's sole indirect cost is electricity, which costs $10,000 per year. [<u>Id.</u>]. Because the cost of electricity is 10 percent of the overhead-bearing direct costs (or, $100,000), the indirect cost rate would be 10 percent. [<u>Id.</u>]. Thus, $7,500 of electricity costs would be allocated to the first project, and $2,500 would be allocated to the second project. [<u>Id.</u>].

Because different institutions conduct different types of research, negotiated rates vary significantly from institution to institution. [Compl. ¶ 48]. Certain facilities, like specialized laboratories, and certain types of research are more expensive than others. [<u>Id.</u>]. As such, institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research, such as state of the art nuclear and energy research. [<u>Id.</u> ¶ 49]. Many Plaintiffs in this action have indirect cost rates exceeding 50 or 60 percent. <u>See, e.g.</u>, [ECF No. 2-1 at ¶ 11 ("Many of the AAU's member universities have negotiated an indirect cost rate that is significantly higher than 15 percent, often in the 50-to-60-percent range.")]; [ECF No. 2-4 ¶ 13 (Cornell University has a negotiated indirect cost rate of 64

4

percent)]; [ECF No. 2-5 ¶ 12 (University of Illinois Urbana-Champaign has a negotiated indirect

cost rate of 58.6 percent)]; [ECF No. 2-6 ¶ 10 (MIT has a negotiated indirect cost rate of 59

percent)]; [ECF No. 2-7 ¶ 11 (University of Michigan has a negotiated indirect cost rate of 56

percent)].

2.   Regulatory Framework

DOE grants to IHEs are, and have long been, issued pursuant to an elaborate, well-

established legislative and regulatory framework that facilitates long range planning by

maintaining predictability in funding levels.  [Compl. ¶¶ 3–4, 8, 31].  Congress has authorized

the DOE to provide grants under various statutes, and it has further permitted agencies to set

indirect cost rates in connection with such grants.  [Id. ¶ 31(citing 41 U.S.C. § 4708)]; see also

[id. ¶ 36 (explaining that, in 1962, Congress authorized the use of "predetermined fixed-

percentage rates" for "payment of reimbursable indirect costs" attributable to research

agreements with educational institutions)].  Congress also instructed the Office of Management

and Budget ("OMB") to issue general guidance on fiscal administration issues.  [Compl. ¶ 31

(citing 31 U.S.C. § 503(a), (b)(2)(C))].  Pursuant to statutory authority, OMB has in turn

established uniform guidance for agencies to administer grants under the agencies' purview, [id.

(citing 2 C.F.R. pt. 200)], which the DOE has adopted into its own regulations, [id. (citing 2

C.F.R. § 910.120)].

These regulations prescribe a detailed and well-settled methodology for negotiating

indirect cost rates with IHEs, [Compl. ¶ 40], and establish that "negotiation of predetermined

rates for indirect (F&A) costs for a period of two to four years should be the norm,"  2 C.F.R. pt.

200, app. III(C)(4).  The process begins when a single agency (the "cognizant agency")

negotiates an indirect cost rate with an institution.  Id. at app. III(C)(11).  For IHEs, rates are

5

generally negotiated by either the Department of Health and Human Services ("HHS") or the Department of Defense's Office of Naval Research ("DOD").  [Compl. ¶ 3 (citing 2 C.F.R. pt. 200, app. III(C)(11)(a)(1))].  To facilitate these negotiations, the institutions are required to conduct and then submit to their federal agency comprehensive cost analyses that follow detailed federal cost accounting guidelines governing reasonable and allowable indirect costs.  [Id. ¶ 41]. For example, an institution which seeks to recover the cost of building maintenance must document and allocate the maintenance costs across research and non-research programs.  [Id.]. The federal agency then reviews and verifies these proposals and determines the institution's indirect cost rate, which reflects actual, verified costs incurred by the institution.  [Id. ¶ 42]. After costs are incurred, federal agencies audit institutions to ensure that the negotiated indirect cost rate approximates to the actual indirect costs that were incurred, with the understanding that the rate can be adjusted if the audit establishes that it does not.  [Id. ¶ 44].

Once negotiated with the cognizant agency, the final negotiated indirect cost rate is memorialized in writing, in a document commonly referred to as a "Negotiated Indirect Cost Rate Agreement," or "NICRA."  [ECF No. 60 ¶ 4]; see also [ECF No. 2-16 ¶ 11 (explaining University of Wisconsin-Madison "has a Negotiated Indirect Cost Rate Agreement ('NICRA') with DHHS, covering all federal agencies"); [ECF No. 2-8 ¶ 10 (same regarding Michigan State University)].  An authorized representative for both the cognizant agency and the individual IHE signs the NICRA.  [ECF No. 60 ¶ 4].  The NICRA is then used for all of an IHE's grants across the entire federal government during the period that the negotiated rate is in effect, which is typically at least one year, although in some cases that rate can remain in effect for up to four years.  [Compl. ¶¶ 41, 43].

6

As such, when the DOE issues a Notice of Funding Opportunity ("NOFO"), which is what begins the DOE's competitive grantmaking process, an IHE applying for that funding will submit its NICRA as part of the application process.  [ECF No. 60 ¶ 5]; see also [Compl. ¶ 32 (citing 2 C.F.R. § 200.204)].  After a formal review process that includes peer review, the DOE issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested from the agency.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(b)(7))]; [ECF No. 60 ¶¶ 5–6].  A NOA is issued for the initial budget period and then each subsequent budget period, and it reflects any future-year understandings about the continuation of the funded project.  [Compl. ¶ 33 (citing 2 C.F.R. § 200.211(c)(1)(iv))].

The negotiated indirect cost rate, memorialized in the NICRA, "must be accepted by all federal agencies" granting awards unless certain exceptions apply.  As relevant here, Section (c)(1) establishes the conditions under which the awarding agency is permitted use a different rate. 2 C.F.R. § 200.414(c)(1) ("Section (c)"); see also [Compl. ¶¶ 3, 8].  Specifically, Section (c)(1) provides that the awarding agency "may use a different rate" from the NICRA "for either a class of Federal awards or a single Federal award" when "approved by the awarding Federal agency in accordance with [2 C.F.R. § 200.414(c)(3)]." 2 C.F.R. § 200.414(c)(1).  A "class of Federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply." 2 C.F.R. § 200.1.  Section (c)(3), in turn, requires that "[t]he Federal agency must implement, and make publicly available, the policies, procedures and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 2 C.F.R. § 200.414(c)(3).  Section (c)(2) requires the agency to notify OMB of any approved deviations, and Section (c)(4) requires the agency to include the

7

policies relating to indirect cost rate reimbursement in the notice of funding opportunity.  2

C.F.R. §§ 200.414(c)(2), (4).

                        3.    <u>Rate Cap Policy</u>

      On Friday, April 11, 2025, the DOE issued the Rate Cap Policy, titled "Adjusting

Department of Energy Grant Policy for Institutes of Higher Education (IHE)."  [Compl. ¶ 60];

<u>see also</u> [ECF No. 2 at 2–3].  The Rate Cap Policy announced that "hereinafter, the Department

will no longer use the negotiated indirect cost rate for grants awarded to IHEs.  Instead, it is

setting a standardized 15 percent indirect cost rate for all grant awards to IHEs."  [ECF No. 2 at

3].  The Rate Cap Policy further provides that "[a]ll future Department grant awards to IHEs will

default to this 15 percent indirect cost rate" and that "the Department is undertaking action to

terminate all grant awards to IHEs that do not conform with this updated policy."  [<u>Id.</u>].

      The Rate Cap Policy purports to justify this sweeping change by stating 1) "[t]his system

will better balance the Department's twin aims of funding meaningful research and upholding its

fiduciary duties to the American people," and 2) "[t]o improve efficiency and curtail costs where

appropriate, the Department seeks to better balance the financial needs of grant recipients with

the Department's obligation to responsibly manage federal funds."  [ECF No. 2 at 3].  By its

terms, the Rate Cap Policy applies this supposedly necessary limit on indirect cost rates "only

with respect to" IHEs, and not to other recipients of DOE grants.  [<u>Id.</u> at 2].

      Since the Rate Cap Policy was issued, at least one IHE, Cornell, has received a letter

conditionally terminating its awards "in accordance with" the new policy.  [ECF No. 33-1].

Specifically, the letter stated that "[p]ursuant to the Department's policy memorandum dated

April 11, 2025 . . . the Department has undertaken a review of all Department grant awards to

ensure that the awards comply with this updated Department policy," and that "[d]uring this

review, the Department determined that [certain Cornell] grants . . . are not currently in
compliance with the policy memorandum."  [Id. at 8].  The letter further advised that Cornell
could "avoid termination of these awards" by agreeing to "an updated indirect cost rate of 15
percent."  [Id.].  Another IHE, Arizona State University, received an email regarding an invoice
previously submitted for a DOE funded project, which stated that "[d]ue to the Policy Flash from
DOE, and the pending process changes, currently invoices from IHEs are not being
processed . . . The option we have at this time is for the invoice to be submitted without any
indirect charges and we can pay the direct costs."  [ECF No. 53-1 at 7].

### 4. Prior Attempts to Limit Indirect Cost Funding

This is not the government's—or even this administration's—first attempt to limit
indirect funding costs.  [Compl. ¶¶ 5, 6].  In 2017, the then-administration released a budget
proposal that would have slashed indirect cost rates for the National Institutes of Health ("NIH")
to 10 percent.  [Id. ¶ 51].  The proposal was met with "widespread criticism and alarm,"
particularly in Congress, which enacted a bipartisan appropriations rider that provided that
regulator "provisions relating to indirect costs . . . including with respect to the approval of
deviations from negotiated rates[] shall continue to apply to [NIH] to the same extent and in the
same manner."  [Id. ¶¶ 52–53].  Both the House and Senate Report on the rider identified serious
problems with the proposal, observing that it would "radically change the nature of the Federal
Government's relationship with the research community" by altering a methodology for indirect
rates that "has been in place since 1965," and concluded that the proposal was "misguided and
would have a devastating impact on biomedical research across the country."  [Id. ¶ 5 (first citing
S. Rep. No. 115-150, at 109 (2017); and then citing H.R. Rep. No. 115-244, at 50 (2017))].  The
rider that was subsequently enacted has been repeatedly reenacted ever since.  [Id. ¶ 55].

9

Despite Congress' evidenced commitment to the grant funding regime, in February 2025, the current administration tried again, with NIH issuing a notice that stated that it was "imposing a standard indirect cost rate on all grants of 15%" for all existing and future grant awards for biomedical research, with an effective date of February 10, 2025.  [Compl. ¶¶ 6, 57 (quoting NIH, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (or, the "NIH Rate Change Notice"), NOT-OD-25-068 (Feb. 7, 2025))].  Shortly thereafter, three sets of plaintiffs—a group of 22 states, a group of five medical associations, and a group of 17 associations and universities, including many of the plaintiffs in the present action—filed complaints and motions for temporary restraining orders, arguing that the NIH Rate Change Notice was unlawful under the Administrative Procedure Act ("APA").  [Id. ¶ 58].

Another session of this Court found that the serious consequences of the NIH Rate Change Notice warranted issuance of a nationwide temporary restraining order to maintain the status quo until the matter could be fully addressed, following which the Court also issued a nationwide preliminary injunction.  [Compl. ¶ 59]; see also Massachusetts v. Nat'l Insts. of Health, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025), judgment entered, No. 25-cv-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) ("NIH").  The Court found that the administration had not only flouted the appropriations rider that Congress had enacted in the wake of the 2017 NIH episode but also that it had violated the government-wide regulations governing indirect cost rates and the reasoned decision-making requirements of the APA.  [Compl ¶ 6].

## B.    Procedural History

On April 14, 2025, Plaintiffs filed their Complaint seeking declaratory and injunctive relief.  See [Compl.].  They also filed a motion for a temporary restraining order ("TRO"), [ECF

No. 3], which the Court granted on April 16, 2025, [ECF No. 34]. Defendants submitted an opposition on April 22, 2025, [ECF No. 47], and Plaintiffs filed a further reply in support of their motion on April 25, 2025, [ECF No. 53].

The Court held a hearing on the motion for injunctive relief on April 28, 2025, at which time it took the motion for injunctive relief under advisement. [ECF No. 54].

## II.    DISTRICT COURT JURISDICTION

As a threshold matter, Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims because the waiver of sovereign immunity in the APA, 5 U.S.C. § 702, does not extend to actions of contract, which are within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. [ECF No. 47 at 6–8]. Plaintiffs, who contend they have brought a proper challenge under the APA, disagree that the Tucker Act divests this Court of jurisdiction. [ECF No. 19 at 24–29]; [ECF No. 53 at 7–10].

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). The APA's waiver of sovereign immunity, however, "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Educ. v. California, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702). One such statute, the Tucker Act, vests jurisdiction in the United States Court of Federal Claims with respect to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although "[t]he 'jurisdictional boundary' between the Tucker Act and [APA] is well-traversed by litigants

seeking relief against the federal government,. . . the boundary's precise contours remain elusive." NIH, 2025 WL 702163, at *5 (quoting Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007)).

Both parties focus their dispute on a recent per curium decision from the United States Supreme Court, Department of Education v. California ("California"), which granted a stay of a temporary restraining order issued by another session of this Court pending appeal of that order. That suit arose after the Department of Education sent termination letters to almost all awardees of Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED) grants on the grounds that "[t]he grant[s were] . . . inconsistent with, and no longer effectuate[d], Department priorities." California v. U.S. Dep't of Educ., No. 25-cv-10548, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025). Plaintiffs sought an injunction preventing the Department of Education from implementing the grant terminations, asserting that the terminations were arbitrary and capricious and not in accordance with governing law proscribing methods by which agencies can terminate grants. Id. at *2.

The district court granted the application for a temporary restraining order, finding that the terminations were arbitrary and capricious under the APA. California v. U.S. Dep't of Educ., 2025 WL 760825, at *3. In so doing, the district court, accepting NIH's position, held that the action did not fall within the Court of Federal Claims' jurisdiction under the Tucker Act because "the 'essence' of the action was not contractual in nature since the source of the plaintiffs' rights was in federal statute and regulations and because the relief was injunctive in nature." Id. at *1 (quoting NIH, 2025 WL 702163, at *8). Defendants moved for a stay pending appeal, and the First Circuit denied the stay and affirmed the district court on the jurisdictional issue, reasoning that "if the Department breached any contract, it did so by violating the APA. And if the

12

Department did not violate the APA, then it breached no contract."  California v. U.S. Dep't of Educ., 132 F.4th 92, 97 (1st Cir. 2025).

Defendants in California then petitioned the Supreme Court for emergency relief.  A per curium panel of the court granted the stay, finding that "the District Court's 'basis for issuing the order [is] strongly challenged,' as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."  California, 145 S. Ct. at 968 (alteration in original) (quoting Sampson v. Murray, 415 U.S. 61, 87 (1974)).  The analysis that followed was brief, providing in full:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." Ibid. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds.  Bowen v. Massachusetts, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).  But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here.  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).  Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Id.  Defendants in this action contend that this language from California is dispositive as to this Court's jurisdiction, contending it "addressed [the jurisdictional] issue in the same context in which Plaintiffs' claims arise, i.e., grant awards" and thus forecloses "Plaintiffs['] attempt to shoehorn their claims into the APA by styling their complaint as one for injunctive relief ."  [ECF No. 47 at 7–8].

Although mindful of the fact that "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings," McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991), this Court is hesitant to conclude that California requires it to cede jurisdiction to the Federal Court of Claims simply because both cases involve federal grant

13

funding and bear a superficial resemblance to one another.  It is true that an injunction in each action would have the effect of requiring the government to continue to pay money pursuant to certain grant agreements.  That said, on a closer look, the two actions are far from identical twins.  For example, contrary to the facts here, the <u>California</u> plaintiffs asserted violations of governing law rooted in regulations about terminating rather than awarding grants.  Thus, the "source of the right[]" to the grant was, in <u>California</u>, arguably, the grant agreements, and the relief contemplated was the money owed under those grants, making the case more akin to a contract action.  <u>Widakuswara v. Lake</u>, No. 25-cv-1015, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) (quoting <u>Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.</u>, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  Additionally, the plaintiffs in <u>California</u> sued to enjoin terminations on already awarded grants; they did not sue to enjoin any action as to future, unawarded grants.

By contrast to the paucity of relevant regulations in <u>California</u>, as discussed <u>supra</u>, a vast regulatory structure protects Plaintiffs' right to rely on negotiated indirect cost rates with regards to current and future grants.  Although the negotiated rates are ultimately incorporated into written agreements and awards, and an injunction here may impact payments on current and future grants, Plaintiffs are not suing to enforce those rates or to collect those costs.  Rather, Plaintiffs are seeking to protect their right to <u>maintain</u> the memorialized rates absent the DOE meeting the regulatory requirement for a deviation (as to current awards) and to be able to <u>negotiate</u> those rates, institution by institution, based on reimbursable costs and subsequent audits (as to future awards), both of which are rights provided by the regulations, not the NICRAs themselves, and that are alleged to have been usurped by the Rate Cap Policy.  The terms and conditions of each individual NICRA (or the terms of any existing grants) are not at issue, as the DOE's Rate Cap Policy "was not based on individualized assessments of any

14

particular grant terms or conditions or agreements." New York v. Trump, No. 25-cv-00039, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025). Rather, the issue is whether the "broad, categorical" policy itself runs afoul of the APA, warranting forward-looking injunctive relief. Id.

It may well be that these distinctions would not differentiate this case from California in the eyes of the Supreme Court, but this Court cannot read those tea leaves. The brief analysis within the California stay order lacks guideposts as to which facts the Supreme Court viewed as distinguishing that case from the longstanding precedent it cited for the proposition that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." California, 145 S. Ct. at 968 (citing Bowen, 487 U.S. at 910); see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric., No. 25-cv-00097, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) ("The Supreme Court's brief treatment of Bowen and Great-West Life in California and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite the Government's arguments to the contrary."). In light of well-settled precedent and practice, as well as the many facts that distinguish this case from California, the Court declines, on this record, to adopt a categorical rule that would see all federal grant funding disputes go to the Court of Claims. Rather, this Court returns to first principles and asks "[w]hether [the Plaintiffs'] claim is 'at its essence' contractual," which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate),'" and determines that it is not. Crowley, 38 F.4th at 1106 (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).

The Court agrees with the well-reasoned opinion of a sister session of this court in NIH and, for the reasons articulated supra, finds that "the gravamen of Plaintiffs' Complaint[] does

not turn on terms of a contract between the parties[, but rather] on federal statute and regulations put in place by Congress and [DOE]." NIH, 2025 WL 702163, at *6. "While it is true that the Notice of Award operates as a contract, the claims in this case turn on how the regulations govern the provision of these awards"—a fact which "is further underscored by the [Rate Cap Policy's] impact not just on current grants, but future ones as well." Id. Moreover "Plaintiffs do not bring claims for past pecuniary harms. Rather, like the petitioners in Bowen, their claims are to preserve their ongoing and prospective agreements with" the DOE and, as discussed further infra, to avoid various irreparable harms unrelated to any monetary relief. Id. at *7.

For the forgoing reasons, the Court finds it has jurisdiction pursuant to the APA.[1]

## III.    STANDING

The Constitution gives the judiciary power to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The Supreme Court has interpreted this requirement to mean that courts may decide only "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case." Id. Therefore, "the absence of standing sounds the death knell for a case." Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is "claim-specific," meaning that an individual plaintiff "must have standing to bring each and every claim that [he or] she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

---

[1] For the reasons the Court determines this is not an action where jurisdiction lies with the Federal Court of Claims pursuant to the Tucker Act, the Court also disagrees with Defendants' contention that this is an action seeking to compel the government to specifically perform a contract. [ECF No. 47 at 10–11].

Article III standing requires that three conditions be satisfied. "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'" Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical." Whitmore, 495 U.S. at 155 (internal quotations and citations omitted). Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Steel Co., 523 U.S. at 103. Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury." Id.

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances." Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)). Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The first two Hunt prongs are constitutional, and the third is prudential. United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–57 (1996). Only one member of an organization need have individual standing in order for that organization to satisfy the first Hunt factor. See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that every member of an association have standing before it can sue on behalf of its members. 'The association must allege that its members, or any

one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" (emphasis omitted) (quoting Warth, 422 U.S. at 511)).

Defendants contest only the third Hunt prong. Specifically, they contend that, "[a]s shown by the sheer number of declarations submitted by the Organizational Plaintiffs' member institutions in an attempt to show irreparable harm, Plaintiffs fail the third requirement: Individual members must participate to show entitlement to injunctive relief—particularly if this Court follows the proper practice of limiting any injunction to those institutions that have shown that the Policy Flash will cause them irreparable harm." [ECF No. 47 at 17]. Plaintiffs respond that "if that were the law, no associational plaintiff would ever have standing. In fact, injunctive suits like this one are bread-and-butter association standing cases." [ECF No. 53 at 13].

The Organizational Plaintiffs' argument is ultimately more availing. The injunctive and declaratory relief Plaintiffs request need not be tailored to or require any individualized proof from any particular member. See Camel Hair, 799 F.2d at 12 ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation."); see also Playboy Enters., 906 F.2d at 35 ("[J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit." (emphasis omitted)). "The nub of the [P]laintiff[s'] claim," that the Rate Cap Policy violates the APA, depends on the text of that policy and the underlying regulatory structure, "not on evidence that differs from member to member." Camel Hair, 799 F.2d at 12. "In addition, the relief sought, that the [Rate Cap Policy] be enjoined, will affect all members in the same way . . . [a]nd [D]efendants have adduced no reason to suggest that the [Organizational Plaintiffs] cannot adequately represent [their]

18

members' interests." <u>Id.</u>  As Defendants do not challenge the other <u>Hunt</u> factors, and because the

Court finds that, in any event, they are satisfied, the Organizational Plaintiffs have standing.

## IV.  PRELIMINARY INJUNCTION LEGAL STANDARD

When deciding whether to grant a motion for preliminary injunction, courts must

consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii)

whether and to what extent the movant will suffer irreparable harm if the injunction is withheld;

(iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction

(or the withholding of one) may have on the public interest."  <u>Corp. Techs., Inc. v. Harnett</u>, 731

F.3d 6, 9 (1st Cir. 2013).  The First Circuit has held that these four factors "are not entitled to

equal weight in the decisional calculus."  <u>Id.</u>  Rather, the movant's likelihood of success on the

merits "is the main bearing wall of the four-factor framework."  <u>Id.</u> at 10 (citation omitted).

"[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."

<u>Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.</u>, 794 F.3d 168, 173 (1st Cir. 2015)

(quoting <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002)).

Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their]

quest, the remaining factors become matters of idle curiosity."  <u>Id.</u> (quoting <u>New Comm</u>

<u>Wireless Servs.</u>, 287 F.3d at 9).  Likewise, the balance of hardships and public interest factors

"merge when the Government is the opposing party."  <u>Nken v. Holder</u>, 556 U.S. 418, 435

(2009).  As the moving party, Plaintiffs bear the burden of satisfying each of these four elements.

<u>See</u> <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003).

Preliminary injunctions function to "preserve the relative positions of the parties until a

trial on the merits can be held."  <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981).  As a

result, "findings of fact and conclusions of law made by a court granting a preliminary injunction

are not binding at trial on the merits." Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d

1321, 1324 (D.C. Cir. 1968)).  The granting of a preliminary injunction is "an 'extraordinary and

drastic remedy' that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV

Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674,

689–90 (2008)).

## V.      DISCUSSION

### A.      Likelihood of Success on the Merits

Plaintiffs contend that Defendants committed substantive violations of the APA by taking

agency action that is (1) not in accordance with the governing law, (2) arbitrary and capricious,

and (3) impermissibly retroactive.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As a general matter, judicial

review of an APA claim is "narrow" as the "APA standard affords great deference to

agency decisionmaking . . . because the [agency's] action is presumed valid." Associated

Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

#### 1.   Final Agency Action

As discussed infra, the APA entitles any person "suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action" to judicial review.  5 U.S.C. § 702.

Such review, however, is limited to final agency actions unless otherwise specified by statute.

See id. § 704.

An agency action is final if two conditions are met: first, the action must "mark the

consummation of the agency's decisionmaking process" and not be "of a merely tentative or

interlocutory nature," and, second, it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 117 (1st Cir. 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

Defendants contend that the Rate Cap Policy "is not a final agency action subject to judicial review under the APA because it does not have a legal effect or consequence." [ECF No. 47 at 12]. Rather, they contend that "[i]t is a mechanism for communicating financial assistance-related information [which] does not itself have the force or effect of law or direct any impact on any existing grant award." [Id.]. They further assert that the Rate Cap Policy itself "removes any doubt on this score: It closes by promising that '[a]dditional information is forthcoming'—making clear that the formal policy marking the end of the agency's decisionmaking process and carrying concrete consequences has not yet arrived." [Id. (alteration in original) (quoting Rate Cap Policy)].

Plaintiffs counter that, as to the first Bennett factor, the text of the Rate Cap Policy "could not be clearer: It says '[f]or the reasons set forth [here], hereinafter, [DOE] will no longer use the negotiated indirect cost rate,'" then establishes a standardized 15 percent rate, and says that the accompanying memorandum "sets forth the Department's policies, procedures, and general decision-making criteria" regarding the change. [ECF No. 53 at 10]. To the extent it promises that "additional information is forthcoming," Plaintiffs contend that this simply "promises more information about a decision already made." [Id. at 10].

21

As to the second prong, Plaintiffs assert that "the Policy's consequences are, in fact, quite clear," as evidenced by "the conditional termination letters DOE rushed out ahead of this Court's TRO ruling" that state that "they were issued 'pursuant to the [Rate Cap] Policy,'" [id. at 11 (quoting ECF No. 33-1 at 8, 10)], as well as the DOE email to Arizona State University communicating that "[d]ue to the Policy Flash from DOE, . . . currently invoices from IHEs are not being processed," [id. (emphasis omitted) (quoting ECF No. 53-1)].

For the purposes of a preliminary injunction, the Court is satisfied that the Rate Cap Policy constitutes final agency action. On the first Bennet prong, the Rate Cap Policy unambiguously states that, for the reasons set forth therein, the DOE "will no longer use the negotiated indirect cost rate for grants awarded to IHEs" and will instead use "a standardized 15 percent indirect cost rate for all grant awards to IHEs." [ECF No. 2 at 3]. This language is not "merely tentative or interlocutory" in nature, Harper, 118 F.4th at 116; rather, it is "mandatory," Union of Concerned Scientists v. Wheeler, 377 F. Supp. 3d 34, 42 (D. Mass. 2019), aff'd in part, rev'd in part and remanded, 954 F.3d 11 (1st Cir. 2020), in that it unequivocally states that the DOE has made a decision and is moving forward with it. Even accepting that IHEs will "receive separate notice and guidance," [ECF No. 2 at 3], there is no suggestion in the text that any such subsequent notice would backtrack on, rather than simply clarify or provide further instructions regarding, the Rate Cap Policy.

With regard to the legal effect, again, the plain text of the Rate Cap Policy communicates that consequences are forthcoming in short order. Specifically, as to current awards, the Rate Cap Policy establishes that the DOE is "undertaking action to terminate all grant awards to IHEs that do not conform with [the update]," [ECF No. 2 at 3], and, as to future awards, it similarly dictates that "[a]ll future [DOE] grant awards to IHEs will default to this 15 percent indirect cost

rate," [id.].  Moreover, if this announcement left any room for doubt as to whether Plaintiffs

would experience any legal effect, the DOE's conduct has removed any such doubt, as it has

begun to send conditional termination letters to IHEs, [ECF No. 33-1], as well as (mistakenly,

given the existence of the TRO at the time of the email) deny invoices based on that Rate Cap

Policy, [ECF No. 53-1].  As such, this Court is satisfied that the decision-making process is

complete, the policy is set, and the result of that process has already or will soon directly affect

the parties.  Brnovich, 630 F. Supp. 3d at 1171.[2]

## 2.  Arbitrary and Capricious

"The task of a court reviewing agency action under the APA's 'arbitrary and capricious'

standard is to determine whether the agency has examined the pertinent evidence, considered the

relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made.'"  Penobscot Air Servs., Ltd. v. FAA,

164 F.3d 713, 719 (1st Cir. 1999) (second-level internal quotation marks omitted) (quoting

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "While

---

[2] Defendants raise a separate challenge regarding the Rate Cap Policy's reviewability under the APA, contending that the "APA precludes judicial review because the DOE's grant funding decisions are 'committed to agency discretion by law.'"  [ECF No. 47 at 14–16 (quoting 5 U.S.C. § 701(a)(2))].  The Court disagrees.  Even assuming that this type of grant funding would be considered an "administrative decision traditionally regarded as committed to agency discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), and the Court is not convinced that it is, the exception is typically limited to those "rare circumstances" where "no meaningful standard" exists by which a reviewing judge could cabin that agency discretion, Dep't of Com. v. New York, 588 U.S. 752, 772 (2019).  Here, "applicable regulations cabin the Department's discretion as to when it can" deviate from negotiated indirect costs, which "create meaningful standards by which to judge the agency's action."  California, 132 F.4th at 97 (cleaned up); see Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations cabined its termination authority).

this is a highly deferential standard of review, it is not a rubber stamp." Id. at 720 (quoting

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)). The Court "may not

supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting

State Farm, 463 U.S. at 43).

      In the context of a policy change, "the requirement that an agency provide a reasoned

explanation for its action would ordinarily demand that it display awareness that it is changing

position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (emphasis omitted).

"An agency may not, for example, depart from a prior policy sub silentio or simply disregard

rules that are still on the books." Id. (citing United States v. Nixon, 418 U.S. 683, 696 (1974)).

That said, agencies are "free to change their existing policies as long as they provide a reasoned

explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)

(citations omitted). The agency must further "show that there are good reasons for the new

policy," although it need not demonstrate that "the reasons for the new policy are better than the

reasons for the old one." Fox Television Stations, 556 U.S. at 515 (emphasis omitted). "[I]t

suffices that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency believes it to be better, which the conscious change of course adequately

indicates." Id. (emphasis omitted).

      That said, a "more detailed justification" may be required when 1) the agency's new

position "rests upon factual findings that contradict those which underlay [the] prior" position or

2) when the agency's prior position "has engendered serious reliance interests." Fox Television

Stations, 556 U.S. at 515; see NLRB v. Lily Transp. Corp., 853 F.3d 31, 36 (1st Cir. 2017)

(Souter, J.) ("[A]n about-face . . . owing to facts changed from those underlying the prior view

requires that the new facts be addressed explicitly by reasoned explanation for the change of

direction.").  Further, "when an agency rescinds a prior [position,] its reasoned analysis must

consider the 'alternative[s]' that are 'within the ambit of the existing [position].'"  DHS v.

Regents of the Univ. of Cal.,140 S. Ct. 1891, 1913 (2020) (second alteration in original) (quoting

State Farm, 463 U.S. at 51).

 Regardless of whether the DOE was required to put forth a "more detailed justification"

for the Rate Cap Policy, the Court cannot discern any "reasoned explanation" for the change.

The whole of the purported explanation seems to be:

> While the Department is cognizant that many grant recipients use indirect cost
> payments to effectuate research funded by the Department's grant awards, these
> payments are not for the Department's direct research funding. See 89 Fed. Reg.
> 30046–30093. As these funds are entrusted to the Department by the American
> people, the Department must ensure it is putting them to appropriate use on grant
> programs. To improve efficiency and curtail costs where appropriate, the
> Department seeks to better balance the financial needs of grant recipients with the
> Department's obligation to responsibly manage federal funds.

[ECF No. 2 at 2];  see also  [ECF No. 47 at 25–26 (discussing justifications within the Rate Cap

Policy)].  To be sure, this excerpt articulates very reasonable agency goals, namely, to allocate

"funds . . . entrusted to [DOE] by the American people . . . to appropriate use on grant programs"

and [t]o "improve efficiency and curtail costs where appropriate."  [ECF No. 2 at 2].  Statements

of aspirational goals, however, are not the same as reasoned explanations for why an action is

chosen or how the chosen action will effectuate the stated goals.

 Here, the Rate Cap Policy falls short.  It provides no reasoned explanation for how or

why the DOE concluded that indirect cost rates exceeding 15 percent do not constitute an

appropriate or efficient use of DOE funds, nor does it explain how limiting funding for indirect

costs would lead to that money being put to more appropriate and efficient uses.  For instance,

the Rate Cap Policy does not, as Defendants contend, explain that the money spent on indirect

costs will be redirected to direct costs; it simply says that indirect costs are not direct.  [ECF No.

2 at 2]. That said, even if the DOE had stated an intent to reinvest indirect costs in direct research funding, that explanation would not be particularly well-reasoned, given the amount of support in the record for the notion that Plaintiffs would not be able to accept further direct research funding (or, indeed, even utilize their current direct research funding) absent an indirect cost rate that continues to approximate actual expenditures. See, e.g., [ECF No. 2-4 at ¶ 18 ("[W]ithout continuing indirect cost reimbursement at Cornell's negotiated rates, Cornell would no longer be able to carry out all of the sponsored activities and properly maintain the facilities and equipment currently in use, jeopardizing the current and future conduct of the DOE-supported projects.")]. Nor does the Rate Cap Policy provide any rationale for concluding that subjecting all IHEs to the 15 percent de minimis rate, typically reserved for IHEs without negotiated rates, is more efficient or appropriate than the current negotiation and audit system. Uniformity is not necessarily efficient or appropriate, particularly when the record is clear that IHEs constitute a sizeable portion of the DOE's budget across distinct institutions, each with unique awards governed by individualized indirect cost rates. See, e.g., [ECF No. 2-1 ¶ 4 ("Together, [AAU member universities] receive a total of roughly $1.8 billion in DOE research and development expenditures . . . To give a sense of scale: DOE's research and development ('R&D') expenditures nationwide total approximately $2.7 billion, meaning that funding to AAU's members makes up about two-thirds of all such expenditures.")]; [ECF No. 2-5 ¶¶ 4, 12 (University of Illinois Urbana-Champaign's DOE portfolio includes 123 active awards at a 58.6% indirect cost rate)]; [ECF No. [ECF No. 2-18 ¶¶ 3, 11 (University of Nevada, Reno's DOE portfolio includes 48 active awards at a 47% indirect cost rate); [ECF No. 2-19 ¶ 4 (Tufts DOE portfolio has 29 active awards at a 58% indirect cost rate)].

These examples, and there are others, illustrate the overarching problem:  Although the DOE need not demonstrate that "the reasons for the new policy are better than the reasons for the old one," Fox Television Stations, 556 U.S. at 515 (emphasis omitted), it must, at base, offer "good reasons for the new policy,"  Encino, 579 U.S. at 223 (quoting Fox Television Stations, 556 U.S. at 515), not the mere conclusion that the Rate Cap Policy is more efficient or appropriate, Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("At bottom, an agency must explain 'why it chose to do what it did.'" (quoting Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001)).  Because the Rate Cap Policy does not offer more than conclusory policy goals, the Court need go no further:  Plaintiffs have demonstrated a likelihood of success in demonstrating that the Rate Cap Policy is arbitrary and capricious and therefore runs afoul of the APA.  See Encino, 579 U.S. at 224 ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all.").

That said, the Court would be remiss if it did not note that the Rate Cap Policy's lack of reasoned explanation is particularly troubling in light "of decades of industry reliance on [DOE's] prior policy" of accepting individually negotiated indirect cost rates for IHEs.  Encino, 579 U.S. at 222 (noting that "[a] summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy— the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position").  The well-established, decades-long relationship between IHEs and the DOE prior to the Rate Cap Policy afforded Plaintiffs several reasonable assumptions about the DOE's position on indirect costs, all of which were consistent with DOE goals of advancing science through cutting edge research in partnership with America's foremost research institutions, including that: 1) "negotiation of predetermined rates for indirect (F&A) costs for a

period of two to four years should be the norm," 2 C.F.R. pt. 200, app. III(C)(4); 2) the negotiated indirect cost rate, when finalized with Plaintiffs' cognizant agency, would be based on "an informed judgment as to the probable level of indirect (F&A) costs during the ensuing accounting periods," id.; 3) that rate would then, as it "must[,] be accepted by all Federal agencies," 2 C.F.R. § 200.414(c)(1); and, 4) the agreed-upon rate could only be changed after the DOE met certain regulatory requirements, id. § 200.414(c)(1)–(4). Pursuant to these reasonable expectations, Plaintiffs have, among other things, formulated their overall operating budgets; staffed departments; accepted undergraduate students, graduate, and post-doctoral candidates; and built and improved infrastructure to support both current and future research. See, e.g., [ECF No. 2-7 ¶ 14 ("The University of Michigan has for decades relied on the payment of indirect costs. And until now, we have been able to rely on the well-established process for negotiating indirect cost rates with the government to inform our budgeting and planning. Operating budgets rely on an estimate of both direct and indirect sponsored funding to plan for annual staffing needs (e.g., post-docs, PhD students, and other research staff), infrastructure support (e.g., IT networks, regulatory compliance, and grant management support), and facility and equipment purchases. And in some cases, the University of Michigan has long-term obligations—for example, long-term equipment maintenance contracts and service agreements, specialized technical staff positions in facilities supporting DOE research, debt service on research infrastructure investments and laboratory renovations; and it relies on budgeted grant funding, including associated indirect cost recovery, to fulfill these commitments.")]; see also [ECF Nos. 2-5 ¶ 15; 2-8 ¶ 15; 2-9 ¶ 28; 2-10 ¶ 14; 2-11 ¶ 15; 2-12 ¶ 16; 2-13 ¶ 13; 2-16 ¶ 14; 2-18 ¶ 15].

28

In the face of this longstanding course of conduct and the reliance it has engendered, the Rate Policy Flash offers only that "the Department is cognizant that many grant recipients use indirect cost payments to effectuate research funded by the Department's grant awards." [ECF No. 2 at 2]. It then notes that, despite this fact, "these payments are not for the Department's direct research funding." [Id.] This is both obvious and ultimately unhelpful. The distinction between direct and indirect costs has been recognized and embedded in the regulatory structure since OMB undertook to fund research at IHEs. The Rate Cap Policy wholly disregards the prior mutually understood reality that these indirect cost payments, while perhaps not sufficient for direct research to occur, are necessary to that research. They are, in fact, a crucial part of the funding structure which must be managed and protected to ensure our nation's ability to advance scientific innovation to meet very real energy, environmental, and nuclear challenges. Missing from the Rate Cap Policy's purported recognition of the indisputable reliance interest is a "reasoned explanation . . . for disregarding [that understanding, which was] engendered by the prior policy," and, notably, any acknowledgement of the potential consequences of the policy change. Encino, 579 U.S. at 222 (quoting Fox Television Stations, 556 U.S. at 515). As such, the Rate Cap Policy "f[alls] short of [DOE's] duty to explain why it deemed it necessary to overrule its previous position," id., and Plaintiffs are likely to succeed in establishing that the Rate Cap Policy is arbitrary and capricious for this reason as well.

### 3.   2 C.F.R. § 200.414

As discussed supra, one of the key regulatory provisions governing indirect cost rates is 2 C.F.R. § 200.414. In particular, Section (c), entitled "Federal Agency Acceptance of Negotiated

Indirect Cost Rates," proscribes the process by which OMB, and by extension DOE, can

"deviate" from previously negotiated indirect cost funding rates.[3]  2 C.F.R. § 200.414(c).

Plaintiffs contend that the Rate Cap Policy violates the requirements for utilizing an

indirect cost rate different from the rate memorialized in the NICRA.  [ECF No. 19 at 31–34].  In

particular, they contend that the requirements of Section (c), taken together, "at most authorize

the agencies to announce policies and procedure governing subsequent decisions to make

individualized deviations from the baseline negotiated rate.  They do not license agencies to, by

fiat, wipe out all negotiated rates for institutions of higher education."  [Id. at 32].  They urge the

Court to read Section (c) as mandating a sequential process by which "agencies 'must' accept[]

negotiated rates unless [the] agency publicizes 'policies, procedures and general decision-making

criteria' and then 'follow[s]' them "to seek and justify deviations from negotiated rates."  [ECF

No. 53 at 16 (emphasis added)].  They contend that, pursuant to this sequencing, the Rate Cap

Policy fails because "[w]hile the Rate Cap Policy insists that it 'sets forth [DOE's] policies,

---

[3] For ease of reference, Section (c) provides:

    (1) Negotiated indirect cost rates must be accepted by all Federal agencies.  A Federal
    agency may use a rate different from the negotiated rate for either a class of Federal
    awards or a single Federal award only when required by Federal statute or regulation, or
    when approved by the awarding Federal agency in accordance with paragraph (c)(3) of
    this section.
    (2) The Federal agency must notify OMB of any approved deviations.  The recipient or
    subrecipient may notify OMB of any disputes with Federal agencies regarding the
    application of a federally negotiated indirect cost rate.
    (3) The Federal agency must implement, and make publicly available, the policies,
    procedures and general decision-making criteria that their programs will follow to seek
    and justify deviations from negotiated rates.
    (4) The Federal agency must include, in the notice of funding opportunity, the policies
    relating to indirect cost rate reimbursement or cost share as approved under paragraph (e).
    As appropriate, the Federal agency should incorporate discussion of these policies into its
    outreach activities with applicants before posting a notice of funding opportunity.  See §
    200.204.

30

procedures, and general-decision making criteria,' it does no such thing [because] a categorical dictate of a 15% rate is not a 'procedure' and does not set forth 'general decision-making criteria' under the plain meaning of those terms."  [ECF No. 19 at 32].

Defendants counter that "Plaintiffs improperly seek to read into Subsection (c)(3) a requirement that any 'deviation' from negotiated indirect cost rates occur on a case-by-case basis," which is not supported by Subsection (c)(1) as it "specifically authorizes the use of [a] non-negotiated rate for a 'class of Federal awards,' without limiting the size of that class."  [ECF No. 47 at 19].  They further assert that to the extent Plaintiffs suggest that Subsection (c)(3) requires "some temporal distance between announcement of new 'policies, procedures, and general decision making criteria' and actual determination of a non-negotiated rate," that will occur here through "[a]pplication of the non-negotiated rates to new grant awards, and (in this case) future action to terminate existing grant awards."  [Id. at 20–21].  Defendants' position is that, in issuing the Rate Cap Policy, "DOE publicized the policy and decision-making criteria that it may later use in seeking and justifying deviations from negotiated rates" and "announced the procedure it would use for applying the new policy—application of a 15% rate for the IHEs." [Id. at 18–19].  As such, Defendants contend that the Rate Cap Policy "rests on a straightforward application of Section 200.414(c)(3), and therefore satisfies Section 200.414(c)(1)."  [Id. at 19].

Even assuming that all awards to all IHE's can properly be construed as a "class of Federal awards" under Section (c)(1) such that a rate change is permissible, [4] the Court disagrees

─────────────

[4] Given the purported size of this "class," this is far from clear to the Court.  As noted elsewhere, a "class of federal awards" is defined as "a group of Federal awards either awarded under a specific program or group of programs or to a specific type of recipient or group of recipients to which specific provisions or exceptions may apply."  2 C.F.R. § 200.1.  Although Defendants' reading of that definition as permitting the DOE to classify all IHEs as a "type of recipient" is

with Defendants' contention that the Rate Cap Policy clears Section (c)(1) by virtue of its (purported) compliance with Section (c)(3). By its plain terms, Section (c)(1) requires more than just compliance with Section (c)(3): It requires the awarding agency to "approve[]" the change. 2 C.F.R. § 200.414(c)(1). The Federal Register notice discussing 2 C.F.R. § 200.414(c) is instructive as to what this approval requires, explaining that the text of Section (c) contemplates "approval of the Federal awarding agency head . . . based on documented justification." Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78,590, 78,600 (Dec. 26, 2013). It continues on to discuss that it was important to the provision's drafters that a well-reasoned approval underlie Section (c)(1), explaining that "[s]ome commenters recommended that for even greater consistency decisions about the use of rates be subject to OMB approval rather than Federal agency approval," but this proposal was ultimately rejected on the basis "that the conditions set by OMB for these determinations are stringent enough to ensure that they do not occur <u>without strong justification</u>." <u>Id.</u> (emphasis added). Thus, although the term "documented justification" does not appear in Section (c)(1),[5] the provision clearly contemplates that agency approval of a departure from a

---

not inherently antithetical to the English language, the Court is skeptical that such a broad-based classification is what the regulations intended. IHEs, as discussed elsewhere in this order, account for a substantial percentage of the DOE's research and development budget, and they are awarded hundreds (if not thousands) of individualized grants to further distinct research goals. To permit an exception to the negotiated indirect cost rates for all these institutions and all their grant awards in the same missive strikes this Court as lacking the specificity that the definition contemplates.

[5] The term "documented justification" does appear in the substantially similar regulations governing permissible exceptions to NIH indirect cost rates. <u>See</u> 45 C.F.R. § 75.414(c)(1) ("An HHS awarding agency may use a rate different from the negotiated rate for a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by a Federal awarding agency head or delegate based on <u>documented justification</u> as described in paragraph (c)(3) of this section.") (emphasis added).

negotiated rate must be based on the careful consideration of a strong underlying rationale that warrants the change.

On the present record, there is nothing to indicate that the DOE approved the change to IHE indirect cost rates based on a "strong" or "documented" justification. As discussed supra, the Rate Cap Policy, even read generously, offers very little by way of explanation or justification for the decision to so suddenly and drastically limit reimbursement for indirect costs. The Court is mindful that the DOE is privy to information that could, in theory, have supported the policy change. If such data exists, however, it was not made public or otherwise articulated, and Plaintiffs are, at this stage, more likely than not to prevail on their argument that the Rate Cap Policy did not receive the "approv[al]" contemplated by Section (c)(1). Moreover, Plaintiffs are more likely than not to prevail on their argument that the Rate Cap Policy violates Section (c)(3) to the extent that the cross-reference to that provision within Section (c)(1) requires the documented justification underlying agency approval to be made publicly available, which did not happen here.

Additionally, the Court agrees with Plaintiffs that the Rate Cap Policy more likely than not violates Section (c) because the regulation contemplates a step-by-step process for a change to a negotiated indirect cost rate, rather than a one fell swoop approach invalidating all pre-existing NICRAs and changing the well-established procedure for all future grants. The plain terms of Section (c)(3), which outline the requirements for deviating from the negotiated indirect cost rate pursuant to Section (c)(1), appear to require sequencing. The provision states that the awarding agency seeking a deviation "'must'—present tense—make available the policies, procedures, and decision-making criteria that [it] 'will follow'—future tense—to seek and justify the deviation." NIH, 2025 WL 702163, at *10. To read the provision to permit the DOE to

make the 15 percent rate cap policy public at the same time as it seeks to enforce it would read

these verb tenses, as well as the requirement that the DOE "justify" the deviation, out of the

provision.  On this, the Federal Register is again instructive, as it describes Section (c) as

functioning through a sequential process, stating:

> Language in paragraph (c) provides for the consistent application of negotiated
> indirect cost rates, and articulates the conditions under which a Federal awarding
> agency may use a different rate.  These conditions include approval of the Federal
> awarding agency head (as delegated per standard delegations of authority) based
> on documented justification, the public availability of established policies for
> determinations to use other than negotiated rates, the inclusion of notice of such a
> decision in the announcement of funding opportunity, as well as in any pre-
> announcement outreach, and notification to OMB of the decision.

78 Fed. Reg. at 78,600.

Additionally, reading Section (c)(3) to require a sequence of events has the benefit of

affording meaning to Section (c)(4), which otherwise would seem to have little relevance as it,

again on its plain terms, is aimed at providing notice to IHEs of the DOE's indirect cost

reimbursement policies before the IHEs even decide to bid on the grant opportunity.  Section

(c)(4) requires the awarding agency to "include, in the notice of funding opportunity, the policies

relating to indirect cost rate reimbursement."  2 C.F.R. § 200.414(c)(4).  As discussed <u>supra</u>,

NOFOs are the precursors to federal awards, which are followed by IHE applications for the

funding which must include the IHE's current NICRA.  The awards, once granted, are required

by Appendix III to use the NICRAs in effect at the time of the award, unless that award is

exempt under Section (c)(1).  2 C.F.R. pt. 200, app. III(C)(7) ("Except as provided in paragraph

(c)(1) of § 200.414, Federal agencies must use the negotiated rates in effect at the time of the

initial award throughout the life of the Federal award." ).  In other words, in the normal course,

all agencies are subject to the same consistent policy, publicly mandated by Appendix III, which

requires that the NOA use the current NICRA, and all IHEs responding to that NOFO would be

aware of that policy. Thus, unless the policies underlying an exception were expected to precede a deviation to the NICRA, it is difficult to imagine why the drafters of Section (c)(4) would have thought it necessary to provide a specific safeguard requiring the awarding agency to include "policies relating to indirect cost rate reimbursement" in a NOFO.

A concrete hypothetical is instructive. MIT negotiates its indirect cost rate with DOD, specifically the Office of Naval Research ("ONR"), its cognizant agency. [ECF No. 2-6 ¶ 10]. For fiscal year 2025, that rate is 59 percent, which would have been memorialized in a NICRA. [Id.]; [ECF No. 60 ¶ 4]. MIT conducts research under 286 direct and indirect funding awards from the DOE that are currently active for Fiscal Year 2025. [ECF No. 2-6 ¶ 9]. It would have received those grants by responding to DOE NOFOs, and each application would have included its NICRA. At the time those NOFOs were posted, the Rate Cap Policy was not in effect and the DOE grant award would have provided for a 59 percent indirect cost reimbursement rate to MIT pursuant to its NICRA with ONR. On this basis, MIT was granted and accepted awards. Enter the Rate Cap Policy. As to the awards that existed at its inception, there was no opportunity for the DOE to include that policy in the NOFO, as that part of the process is already done, and Section (c)(4) would be rendered irrelevant. For future awards, that is awards granted after the Rate Cap policy became effective, the DOE can include the 15 percent rate cap in the NOFO when it solicits an application from MIT, but the policy will have preceded the opportunity—supporting Plaintiffs' contention that Section (c) contemplates a sequence.

Further, a sequenced reading of Section (c) is also consistent with the spirit of Section (c)(2), which also appears aimed at building procedural safeguards around indirect cost rate changes. Specifically, it requires that, following approval of a deviation pursuant to Section (c)(1), the awarding agency "must notify OMB" of such deviations such that the "recipient or

subrecipient may notify OMB of any disputes."  2 C.F.R. § 200.414(c)(2).  The ability to dispute the approval with OMB would ring hollow were the deviation permitted to take effect immediately.

In sum, the Court is inclined to agree with Plaintiffs' reading of the regulation as mandating a proscribed process for changing procedures about indirect cost reimbursement. Defendants' reading of the regulations to permit a blanket approach to negotiated indirect cost rate deviations would read disorder, rather than order, into this structure by conflating or otherwise reading out numerous procedural safeguards contemplated by the regulations' plain text.  McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 168 (1st Cir. 1987) ("In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions.").  In light of the above, the Rate Cap Policy directly conflicts with the plain language of 2 C.F.R. § 200.414, by wholly disregarding existing regulations and the attendant regulatory structure.  Fox Television Stations, 556 U.S. at 515 ("An agency may not . . . simply disregard rules that are still on the books.").  As a result, the Plaintiffs are likely to succeed in claiming that the Rate Cap Policy conflicts with existing regulation.

### 4.   Impermissible Retroactivity

Plaintiffs contend that the Rate Cap Policy exceeds the DOE's statutory authority because it is impermissibly retroactive.  [ECF No. 19 at 45–46].  Specifically, they contend that "there is no indication whatsoever that DOE has the authority to make the Rate Cap Policy retroactive" and that, as to existing grants, "the reduced rate necessarily undermines project budgets that were previously approved and upsets the institutions' commitments made in reliance upon those budgets."  [Id. at 46].  Defendants do not argue that the enabling statute authorizes the DOE to

36

retroactively modify indirect cost rates; rather, they counter that this case "is unlike the cases cited by Plaintiffs, in which an agency attempted to claw back money that had already been paid out" because the Rate Cap Policy "proposes no such thing; it simply announces an intent to take subsequent actions that will terminate certain grants moving forward.  That is a prospective action."  [ECF No. 47 at 33].

Defendants' argument is unavailing.  While the DOE might not be attempting to claw back money, this is not necessary to bring the Rate Cap Policy within "the ban on retrospective legislation[, which] embrace[s] all statutes [that] though operating only from their passage, affect vested rights and past transactions."  Landgraf v. USI Film Prods., 511 U.S. 244, 268–69 (1994) (quotation omitted).  The relevant inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment," and courts regularly "appl[y] the presumption against statutory retroactivity [in cases] involv[ing] new provisions affecting contractual and property rights."  Id. at 271; see also id. at 269 (noting "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective" (quoting Society for Propagation of the Gospel v. Wheeler, 22 F.Cas. 756 (No. 13,156) (CCNH 1814) (Story, J.))).

Plaintiffs are recipients of grant awards which "are both legally binding and have many of the key hallmarks of a contract," including a negotiated indirect cost rate.  2 C.F.R. § 200.1 (defining "federal award" as "[t]he instrument setting forth the terms and conditions").  For many Plaintiffs, this indirect cost rate far exceeds the proposed 15 percent cap.  See, e.g., [ECF No. 2-7 ¶ 12 (University of Michigan has an indirect cost rate of 56 percent)]; [ECF No. 2-18 ¶ 12 (University of Nevada, Reno has an indirect cost rate of 47 percent)]; [ECF No. 2-19 ¶ 4

(Tufts University has an indirect cost rate of 58 percent)].  Thus, if the Rate Cap Policy were to take effect, it "would impair the rights that the institution possessed when accepting the Notice of Award" by "impos[ing] a new, lower rate, [and] displacing the institutions' right to the previously negotiated—and legally binding—" indirect cost rate upon which they have operated and relied since accepting the award.  NIH, 2025 WL 702163, at *27; see also Landgraf, 511 U.S. at 270 (in assessing retroactivity, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance").

Thus, at least as to current grants, Plaintiffs are likely to succeed on the merits of their claim that the Rate Cap Policy is impermissibly retroactive.

5. Other Claims

Plaintiffs make a series of additional statutory and regulatory claims, including that the Rate Cap Policy violates the authorizing statute (42 U.S.C. § 4708) and runs afoul of regulations governing termination of existing grants and cost recovery.  [Compl. ¶¶ 75–81 (alleging violations of regulations governing grant termination); ¶¶ 82–89 (alleging violation of regulations governing cost recovery); ¶¶ 1–6[6] (alleging violation of authorizing statute)].  Without commenting on the substance, the Court finds its unnecessary to address those claims at this stage of the litigation, as the likelihood of success on the merits on each claim addressed above is independently sufficient to support the issuance of a preliminary injunction.  The parties are free to re-raise these claims and any opposition thereto at a later stage.

---

[6] These allegations are misnumbered.  The Court is referencing the factual allegations which appear in "Count V."

### B.    Irreparable Harm

"Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm," Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991), rather than mere "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  That said, a movant "need not demonstrate that the denial of injunctive relief will be fatal to its business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996); see also P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 507 (1st Cir. 2005) ("These injuries are not irreparable because later-issued damages can properly compensate any wrong committed.").  The alleged harm must be "to the movant[,] rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted).

Additionally, courts in the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown.'" Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42–43 (1st Cir. 2010) (cleaned up).

Defendants make three main arguments regarding indirect harm.  First, they contend that Plaintiffs' "primary claimed injury . . . is that they will not receive the full amount of money to

which they claim to be entitled under negotiated indirect cost rates," which "can easily be redressed if Plaintiffs succeed in this litigation." [ECF No. 47 at 35]. Second, Defendants assert that "many of Plaintiffs' claimed harms categorically do not qualify as irreparable harm" because they are not harms to Plaintiff; rather, they are generalized concerns, such as "that a reduction in indirect cost rates will harm the economy and the United States' competitiveness on a global scale," which "properly belong to the democratically elected President and his Administration." [Id. at 36]. Third, they contend that Plaintiffs' allegations of irreparable harm are speculative and remote. [Id. at 36–37].

The Court agrees with Defendants that if this case concerned only indirect cost reimbursements, Plaintiffs would be unable to show irreparable harm given that the lost reimbursement could be made up. But a temporary loss of funding is not the only harm Plaintiffs have alleged and might in fact be the least of it. Rather, Plaintiffs have alleged that, without the predetermined indirect cost reimbursements to support their DOE direct grants, the research they are conducting pursuant to those grants will be inordinately delayed in some instances and entirely abandoned in others. [ECF No. 2-1 ¶¶ 9,13–14, 18]; [ECF No. 2-2 ¶¶ 9, 10]; [ECF No. 2-3 ¶¶ 11–12, 15–17, 24]; [ECF No. 2-4 ¶¶ 17–18]; [ECF No. 2-5 ¶¶ 7–8, 14]; [ECF No. 2-6 ¶¶ 17–21]; [ECF No. 2-7 ¶¶ 6, 8]; [ECF No. 2-8 ¶¶ 7, 13–14]; [ECF No. 2-9 ¶¶ 13–16, 18, 26]; [ECF No. 2-10 ¶¶ 6, 13]; [ECF No. 2-11 ¶ 14]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 8, 11]; [ECF No. 2-14 ¶¶ 17–18]; [ECF No. 2-15 ¶¶ 6, 8, 14]; [ECF No. 2-16 ¶¶ 5–6, 13]; [ECF No. 2-17 ¶¶ 5, 8, 13]; [ECF No. 2-18 ¶ 6–8, 14]; [ECF No. 2-19 ¶¶ 7–8, 12]; [ECF No. 25 ¶ 11, 13, 15]. Without those studies, and in absence of other funding to support staff, the universities run a likely and imminent risk that they will, at best, struggle to reallocate and train the next generation of scientists in their programs and, at worst, need to lay off or otherwise be unable to

hire the brilliant minds that make up their world-renowned programs, including the undergraduate, doctoral, and post-graduate researchers, administrative professionals, and faculty members.  [ECF No. 2-1 ¶¶ 10, 13]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 15]; [ECF No. 2-4 ¶¶ 18–19]; [ECF No. 2-5 ¶¶ 8, 14]; [ECF No. 2-6 ¶¶ 16, 20]; [ECF No. 2-8 ¶ 14]; [ECF No. 2-9 ¶¶ 21, 26]; [ECF No. 2-10 ¶ 13]; [ECF No. 2-12 ¶ 14]; [ECF No. 2-14 ¶¶ 11, 17]; [ECF No. 2-15 ¶ 14]; [ECF No. 2-16 ¶ 13]; [ECF No.2-17 ¶ 14]; [ECF No. 2-18 ¶14].  As the people go, so do the Nobel Prizes, the universities' acclaim, their pipelines to students and postdoctoral researchers, and their ability to build and maintain unique facilities that, in some instances, exist nowhere else in the world.  [ECF No. 2-1 ¶ 13]; [ECF No. 2-6 ¶¶ 17, 22]; [ECF No. 2-7 ¶ 15]; [ECF No. 2-9 ¶ 27]; [ECF No. 2-12 ¶¶ 14, 17]; [ECF No. 2-13 ¶11]; [ECF No. 2-14 ¶ 21]; [ECF No. 2-15 ¶¶ 8, 16]; [ECF No. 2-16 ¶ 8]; [ECF No. 2-17 ¶¶ 8, 14]; [ECF No. 2-18 ¶ 16]; [ECF No. 25 ¶ 12].  In other words, the harm is the massive disruption and its collateral effects, rather than issues around reimbursement.  While Plaintiffs may someday be able to obtain reimbursement for those indirect costs, the harm will have been long done, as the reimbursements would be earmarked for studies and programs already irreparably compromised and that perhaps no longer exist or involve researchers and research no longer based in the United States.

The Court also disagrees that these harms are downstream or speculative.  Absent the injunction, the Rate Cap Policy would have gone into effect, as evidenced by both the conditional termination letter in the record and the text of the Rate Cap Policy, which clearly states that "the Department is undertaking action to terminate all grant awards to IHEs that do not conform with this updated policy."  [ECF No. 2 at 3].  Faced with the 15 percent rate cap,

Plaintiffs will immediately have to make the difficult choices, described in their affidavits, including whether and how to curtail research, freeze hiring, and lay off staff.

Defendants further contend that the harms identified exist only as to current grants, rather than future grants, and thus any injunction should be appropriately limited to current grants. [ECF No. 47 at 38]. Specifically, Defendants assert that that to hold otherwise would lead to a slippery slope as "there is no stopping point to this argument: If a plaintiff's desire for a future government grant or contract, or a future government grant or contract with more advantageous terms, qualifies as irreparable harm, the irreparable harm element would be automatically met in every case involving a potential future government grant or contract." [Id.] In essence, they contend that Plaintiffs cannot establish irreparable harm in speculative future grants.

This argument has some initial intuitive appeal. If future grants are speculative, so too must be the harm that could befall Plaintiffs if those grants include a 15 percent indirect cost rate cap. On further examination, however, the underlying premise that IHEs have nothing but a speculative interest in future DOE grants that would incorporate indirect costs is divorced from reality. The DOE and IHEs co-exist in a symbiotic, mutually beneficial relationship, fostered over decades, which is built on the DOE's need for cutting edge research and the IHEs' ability to provide it. As a result of this relationship, each IHE has a reasonable, non-speculative assumption that it will obtain future grants because, through the past grants and its own investment, it has built the highly technical, often one-of-a-kind infrastructure needed to conduct the research with the assistance of those future grants, as well as assembled a team of specially trained, uniquely qualified researchers and support staff needed to operate and maintain that equipment. These grants are forthcoming to IHEs because, unless the DOE intends to stop funding this type of research, they must be. The Rate Cap Policy itself manifests an intent on the

42

DOE's part to continue funding IHEs; all that has changed is that the DOE now wants IHEs to foot more of the bill, without regard to the individual circumstances and overhead costs of each IHE, which Plaintiffs have adequately established they cannot do.  [ECF No. 2-1 ¶¶ 19–21]; [ECF No. 2-2 ¶¶ 15–17]; [ECF No. 2-3 ¶¶ 20–23]; [ECF No. 2-4 ¶¶ 22–24]; [ECF No. 2-5 ¶¶ 18–19]; [ECF No. 2-6 ¶¶ 29–31]; [ECF No. 2-8 ¶¶ 19–20[7]]; [ECF No. 2-9 ¶¶ 32–33]; [ECF No. 2-10 ¶ 18]; [ECF No. 2-11 ¶ 16]; [ECF No. 2-12 ¶ 20]; [ECF No. 2-13 ¶¶ 17–18]; [ECF No. 2-14 ¶¶ 12–16]; [ECF No. 2-15 ¶¶ 19–20].

Further, Plaintiffs have sufficiently alleged not only that the Rate Cap Policy will result in immediate harms but also that its "long-term impacts . . . are both cumulative and cascading." [ECF No. 2-7 ¶ 15]; [ECF No. 2-8 ¶ 16]; [ECF No. 2-9 ¶ 29]; [ECF No. 2-12 ¶ 17]; [ECF No. 2-13 ¶ 14]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶ 16]; [ECF No. 2-19 ¶ 14]; see also [ECF No. 2-2 ¶ 9].  These projects, once stopped, cannot simply be restarted later:  The loss of human capital, cumulative knowledge and sometimes the degradation of physical infrastructure, is simply too great.  [ECF No. 2-1 ¶ 10]; [ECF No. 2-2 ¶ 10]; [ECF No. 2-3 ¶ 12]; [ECF No. 2-4 ¶ 18]; [ECF No. 2-5 ¶¶ 8, 9]; [ECF No. 2-6 ¶¶ 17, 21]; [ECF No. 2-7 ¶¶ 8, 15]; [ECF No. 2-8 ¶¶ 6, 16]; [ECF No. 2-9 ¶¶ 19, 21, 27]; [ECF No. 2-10 ¶¶ 6–7]; [ECF No. 2-12 ¶¶ 6, 8, 14]; [ECF No. 2-13 ¶¶ 7, 11]; [ECF No. 2-15 ¶ 16]; [ECF No. 2-17 ¶ 14]; [ECF No. 2-18 ¶¶ 8, 14, 16].

Plaintiffs have demonstrated that because their collective harm "is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Ross-Simons, 102 F.3d at 19.  "Even though, as established above, the likelihood of success on

---

[7] The final two paragraphs of Exhibit 2-8 are both enumerated as paragraph 19.  The Court assumes the second paragraph 19 was inadvertent and refers to it as paragraph 20.

the merits is great, which would allow a movant to show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." NIH, 2025 WL 702163, at *31 (cleaned up).  The Court is more than convinced that the harms to Plaintiffs' programs cannot be remedied by a later monetary award and may well be irreparable in the truest sense of the word.

### C.    Balance of Equities and Public Interest

The Court also finds that the balance of the equities and the public interest favor granting Plaintiffs their requested relief.  Plaintiffs have sufficiently established that the Rate Cap Policy's impact on their programs will have a swift and deleterious effect on the public interest.  Perhaps most concerning, several Plaintiffs have noted that "[f]unding disruptions would compromise crucial safety protocols for handling hazardous materials, high-voltage equipment, and radiation sources, potentially leading to accidents."  [ECF No. 2-7 ¶ 15]; see also [ECF No. 2-8 ¶ 13 ("This reduction will have deeply damaging effects on MSU's ability to conduct DOE-funded research from day one, leaving unfunded . . . [l]ow-level radioactive waste removal[ and] [c]ritical environmental health and safety oversight."); [ECF No. 2-19 ¶ 14 ("These cuts not only endanger the health and well-being of researchers, staff, and students, but also increase the risk of regulatory noncompliance, accidents, and hazardous material exposure—threatening both the continuity and credibility of the institution's research enterprise.")].  Beyond the obvious danger of unattended radioactive materials and other byproducts of nuclear research, Plaintiffs' programs also have a profound impact on their local economies, both by employing the local community and through the power of innovation that sparks further development and spending, which would be impacted by interruption to those programs.  See, e.g., [ECF No. 2-5 ¶ 16 ("The University [of Illinois Urbana-Champaign] employs thousands of Illinois residents and

collaborates with state and local partners to help solve regional challenges through joint research and innovation.  The University's research also fuels spending in the regional economy, including by driving discoveries that launch new ventures, attract private investment, and make a positive social impact.")]; [ECF No. 2-6 ¶ 6 ("MIT's research also translates into innovation that helps drive the U.S. economy."); id. ¶ 24 ("MIT employs nearly 14,000 Massachusetts residents, including more than 2,300 Cambridge residents.  Spending from students, staff, and faculty support the local economy.")]; [ECF No. 2-16 ¶ 15 ("For example, as recently reported by Northstar Analytics, LLC, UW-Madison affiliated organizations and startups collectively contribute $30.8B per year to the Wisconsin economy, this economic activity supports more than 232,000 jobs and generates $1 billion in state and local taxes.")].

Fundamentally, the Rate Cap Policy will harm the public interest by significantly compromising the ability of the DOE and IHEs to continue their federal research partnerships, which, by their nature, seek to advance the country's energy, economic, and national security interests, as well as impacting basic quality of life considerations, as the affidavits in this case amply reflect.  Cornell alone, in partnership with the DOE, performs work "on: plasma physics research to control fusion and maintain safety and security of nuclear weapons; conversion of cheap carbon dioxide or methane to produce chemical fuels for economic competitiveness in the United States chemical industry; circuit design for artificial intelligence, high performance computing, and quantum technology; better materials for stealth and camouflage technologies; recovery/extraction of rare earth minerals; development of biodegradable plastics that disappear from the environment; simulation tools to make fusion energy a practical reality; clarifying drought risks impacting agriculture in the Western United States; and the contribution of urban land-use development and changes to flood risks in Philadelphia, and the extent to which zoning

or other urban development policies can exacerbate or ameliorate these risks." [ECF No. 2-4 ¶ 10]. And Cornell is just one of nine Plaintiffs in this action and one of the many IHEs that partner with the DOE, all of whom perform vital research in similarly cutting-edge arenas. It is beyond dispute that the advancements these universities make can and often do benefit the public in critically important ways, and any setback to that progress is to the detriment of the country as a whole.

### D.      Scope of the Injunction

Having concluded that Plaintiffs have met their burden under the preliminary injunction standard, the Court must determine the scope of that injunction. Plaintiffs urge the Court to preliminarily enjoin Defendants from taking any further steps to implement the Rate Cap Policy in its entirety as to all grant recipients. [ECF No. 53 at 25]. Defendants urge that the Court instead "limit any remedy to those plaintiff institutions, or institutions represented by plaintiff associations, that the Court concludes have shown irreparable harm warranting injunctive relief." [ECF No. 47 at 40]. They contend that "universal injunctive relief is an improper exercise of judicial authority." [ECF No. 47 at 39].

On this front and under the facts of this case, the Court agrees with its sister session in NIH that, despite awareness that some members of the Supreme Court have expressed concerns about the use of nationwide or "universal" injunctions, as the law currently stands, a nationwide injunction is a reasonable and appropriate remedy in this action. Such an injunction is necessary "to protect similarly situated nonparties, [and] to avoid the 'chaos and confusion' of a patchwork of injunctions . . . where the plaintiffs are dispersed throughout the United States." NIH, 2025 WL 702163, at *33 (quoting Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1281–82 (11th Cir. 2021)). This is further supported by the nature of the action, given that "[t]he normal

46

remedy for a successful APA challenge is vacatur of the rule and its applicability to all who

would have been subject to it." Id. at *34. "It would be anathema to reasonable jurisprudence

that only the named Plaintiffs should be protected from the irreparable harms of an unlawful

regulation." Id.

###    E.    Stay Pending Appeal/Bond

Defendants additionally request a stay pending appeal and ask that this Court order

Plaintiffs to post bond.

Regarding the stay, "[t]he party requesting a stay bears the burden of showing that the

circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433–34

(2009). The decision is "an exercise of judicial discretion," which involves "consideration of

four factors: '(1) whether the stay applicant has made a strong showing that he is likely to

succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

whether issuance of the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies.'" Id. (first quoting Virginian Ry. Co. v.

United States, 272 U.S. 658, 672, (1926); and then quoting Hilton v. Braunskill, 481 U.S. 770,

776 (1987)). Defendants offer no argument as to their basis for the stay, nor do they articulate

what irreparable harm will result from this Court's refusal to grant one. Per the analysis supra,

the Court finds it unlikely that Defendants will succeed on the merits of their appeal, and the

substantial public interests involved warrant maintaining the status quo. As such, Defendants'

request for a stay pending appeal is **DENIED**.

As to bond, pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a

TRO or preliminary injunction "only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). That said, Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," P.J.E.S. ex rel. Escobar Francisco v. Wolf, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting Simms v. District of Columbia, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). Further, a number of cases have found that a bond is "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." Nat. Res. Def. Council, Inc. v. Morton, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Plaintiffs here are seeking an injunction against the Rate Cap Policy because of the irreparable harm that would result if they cannot access or use funds beyond the 15 percent cap to support ongoing and future research. Requiring them to post that difference as bond would necessarily have the same financial effect and thus lead to the same harms. As such, the Court declines to require bond. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 25-cv-00239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm. That is especially so when Defendants—OMB and its director—will personally face no monetary injury from the injunction.").

## VI.    CONCLUSION

Accordingly, for the reasons sets forth above, Plaintiffs' motion for a preliminary injunction is **<u>GRANTED</u>**. Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or

giving effect to the Rate Cap Policy in any form with respect to IHEs nationwide until a further

order is issued by this Court.

**SO ORDERED.**

May 15, 2025                                              _/s/ Allison D. Burroughs_
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE