UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>AMERICORPS, A.K.A. THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, et al.,<br><br>        Defendants. | Case No.  25-cv-02425-EMC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Docket No. 18-1 |

## I.      <u>INTRODUCTION</u>

Plaintiffs, the San Francisco Unified School District ("SFUSD") and the City of Santa Fe ("Santa Fe"), were awarded grants from Defendant Corporation for National and Community Service ("AmeriCorps").  In response to new grant conditions imposed by AmeriCorps during the course of the grant periods, conditions which conflict with prior grant criteria and conditions, Plaintiffs filed this suit against AmeriCorps and its Interim Agency Head Jennifer Bastress Tahmasebi in her official capacity, seeking declaratory and injunctive relief.  The complaint challenges, in particular, AmeriCorps' imposition of grant conditions in its February 13, 2025 "Executive Order Compliance Instructions," including a condition that certain grant recipients certify that their programs "do[] not include any activities that promote DEI activities."  Dkt. 18-2 at 10.  The complaint alleges that Defendants, in imposing these new grant conditions, violated the Administrative Procedure Act ("APA") and the Spending Clause of the United States Constitution. On March 31, 2025, the Court granted Plaintiffs' motion for a temporary restraining order ("TRO") to enjoin Defendants from imposing and enforcing new conditions on Plaintiffs' AmeriCorps grants.  For the reasons below, Plaintiffs' motion for a preliminary injunction is

1  **GRANTED**.

2                                    **II.      BACKGROUND**

3  **A.      Factual Background**

4          **1.      Overview of the AmeriCorps Programs and Requirements**

5                  **a.      Statutory Purpose**

6          Congress created AmeriCorps, "a Corporation for National Service," in the National and

7  Community Service Trust Act of 1993 (PL 103–82, September 21, 1993, 107 Stat 785).  As stated

8  in the statute, AmeriCorps' purpose is to:

> (1) meet the unmet human, educational, environmental, and public safety needs of the United States, without displacing existing workers;
> (2) renew the ethic of civic responsibility and the spirit of community and service throughout the **varied and diverse communities of the United States**; . . .
> (4) encourage citizens of the United States, **regardless of age, income, geographic location, or disability,** to engage in full-time or part-time national service; . . .
> (11) increase service opportunities for the Nation's retiring professionals, including such opportunities for those retiring from the science, technical, engineering, and mathematics professions, to improve the education of the Nation's youth and keep America competitive in the global knowledge economy, and to further utilize the **experience, knowledge, and skills of older individuals**; . . .
> (13) **encourage individuals age 55 or older** to partake of service opportunities; [and]
> (14) focus national service on the areas of national need such service has the capacity to address, such as improving education, increasing energy conservation, improving the health status of **economically disadvantaged individuals**, and improving economic opportunity for **economically disadvantaged individuals**; . . . .

22  42 U.S.C. § 12501(b) (emphasis added).  To advance these goals, AmeriCorps can "make grants

23  to States [and] subdivisions of States . . . to carry out full- or part-time national service programs."

24  42 U.S.C. § 4950(a).   These grants are "designed to help **the poor, the disadvantaged, the**

25  **vulnerable, and the elderly**."  *Id.* § 4950(b) (emphasis added).  Such activities continue "the

26  long-standing importance of volunteerism throughout American history," reflected by Congress'

27  stated policy to foster the tradition of volunteerism through greater involvement on the part of

28  individuals of all ages and backgrounds.  *Id.* § 4950(a).  Further, "in selecting persons for the

                                              2

national service program ["Members"], the [AmeriCorps] Director shall endeavor to ensure that participants are from **economically, geographically, and ethnically diverse backgrounds**." 42 U.S.C. § 12613(c) (emphasis added).

AmeriCorps grant recipients are tasked with "addressing[ing] unmet needs." 42 U.S.C. § 12572(a). Regarding education, AmeriCorps programs aim to improve "student engagement" and "academic achievement" through "tutoring," "mentoring students, including adult or peer mentoring," and "assisting **economically disadvantaged students** in navigating the college admissions process," among other activities. *Id.* § 12572(a)(1) (emphasis added). Regarding health, AmeriCorps' Healthy Futures Corps implements activities to "assist[] **economically disadvantaged individuals** in navigating the health services system" and "assist[] in health promotion interventions that improve health status, and help[] people adopt and maintain healthy lifestyles and habits to improve health status." *Id.* § 12572(a)(2) (emphasis added). Regarding economic opportunity, AmeriCorps' Opportunity Corps seeks to improve "economic opportunity for **economically disadvantaged individuals within communities**, through activities such as" "providing financial literacy education to economically disadvantaged individuals," among numerous other program activities. *Id.* § 12572(a)(5) (emphasis added). All told, these grants are designed to support programs that "meet[] unmet health, veteran, and other human, educational, environmental, or public safety needs and **promote[] greater community unity through the use of organized teams of participants of varied social and economic backgrounds, skill levels, physical and developmental capabilities, ages, ethnic backgrounds, or genders**." 42 U.S.C. § 12572(c)(1)(A) (emphasis added).

AmeriCorps' Notice of Funding Opportunity for Fiscal Year 2024 grants, under which Plaintiffs sought and received funding, further reflects the aims of the program. AmeriCorps' funding priorities included "[p]artnering] with communities to **alleviate poverty and advance racial equity**" and supporting "[o]rganizations leading service in communities with **concentrated poverty**, **rural communities**, **tribal communities**, and those organizations serving **historically underrepresented and underserved individuals, including but not limited to communities of color, immigrants and refugees, people with disabilities, people who identify as part of the**

3

United States District Court
Northern District of California

1  **LGBTQIA+ community, people with arrest and/or conviction records, and religious**

2  **minorities**.”  Compl. Ex. 6 at 5-6 (emphasis added).  Grant applicants received points in their

3  applications for discussing the “[c]haracteristics of the beneficiary population, including evidence

4  of **current or historic inequities facing the population**” and for verifying their “**Commitment**

5  **to Diversity, Equity, Inclusion, and Accessibility**.”  *Id.* at 24-26 (emphasis added).

6        **b.**    <u>**Plaintiffs’ History of Participation in AmeriCorps**</u>

7        Both SFUSD and Santa Fe have received AmeriCorps grants for decades.  They sought

8  and used these grants to develop programs and activities to support disadvantaged individuals and

9  communities, including those from diverse ethnic backgrounds and communities, immigrants,

10  people with disabilities, and members of the LGBTQ+ community.  SFUSD has received

11  AmeriCorps grant funding for ten years to operate its Healthy Choices AmeriCorps program.

12  Compl. ¶ 24.  Santa Fe has been an AmeriCorps grant recipient for twenty-five years.  *Id.* ¶ 37.  In

13  particular, AmeriCorps funding has allowed Santa Fe to operate the Foster Grandparent Program,

14  the Senior Companion Program, and the Retired & Senior Volunteer Program (“RSVP”) for

15  twenty-five years each.  *Id.* ¶¶ 41, 45, 49.

16        **2.**    <u>**Plaintiffs’ Specific Grant-Funded Programs**</u>

17        To obtain their current AmeriCorps funding, Plaintiffs fashioned their grant applications

18  and programs to be responsive to AmeriCorps’ Notice of Funding Opportunity for 2024.  Among

19  other things, Plaintiffs verified their “Commitment to Diversity, Equity, Inclusion, and

20  Accessibility” (“DEIA”), which was given express weight in the review process, as illustrated

21  below:

22

23

24

25

26

27

28

4

| Categories/Subcategories | Percentage |
|---|---|
| **Executive Summary** | **0** |
| **Program Design** | **50** |
| • **Community and Logic Model** | 24 |
| • **Evidence Tier** | 12 |
| • **Evidence Quality** | 8 |
| • **Notice Priority** | 0 |
| • **Member Experience** | 6 |
| **Organizational Capability** | **25** |
| • **Organizational Background and Staffing** | 15 |
| • **Member Supervision** | 6 |
| • **Commitment to Diversity, Equity, Inclusion, and Accessibility** | 4 |
| **Cost-Effectiveness and Budget Adequacy** | **25** |
| • **Member Recruitment** | 7 |
| • **Member Retention** | 8 |
| • **Data Collection** | 7 |
| • **Budget Alignment to Program Design** | 3 |

Dkt. 18-2 at 46 (AmeriCorps' Notice of Funding Opportunity for 2024 Grants) (highlighting added).

### a.    SFUSD's Healthy Choices AmeriCorps Program

SFUSD's Healthy Choices AmeriCorps Program ("Healthy Choices") "provides mentoring services to vulnerable students across dozens of SFUSD schools…to increase these students' school attendance and wellbeing."  Compl. ¶ 24.  On August 23, 2024, SFUSD received a $667,194 AmeriCorps grant to run Healthy Choices for the 2024-25 academic year, representing half of the entire program's budget.  Compl. at 25; Vargas-Zeuschner Decl. ¶ 17 (SFUSD Wellness Counselor & District Coordinator for Healthy Choices; hereafter "Vargas Decl.").  The grant (covering July 1, 2024-December 31, 2025) provides funding for forty-four Members to mentor, counsel, and manage cases for at-risk students.  Compl. Ex. 1 at 6 (SFUSD Healthy Choices Grant Agreement).[1]  These Members serve thirty-eight schools in San Francisco, specifically targeting youth with high rates of truancy and low rates of academic engagement.  *Id.* at 5.

The Healthy Choices program seeks to improve the educational attainment and lives of

---

[1] Exhibit page numbers reference the ECF page numbers.

United States District Court
Northern District of California

SFUSD students, so the program is fundamentally designed to serve SFUSD's diverse student population. "Eighty-seven percent of SFUSD students are students of color: they are Latino, Asian, Black, Filipino, Pacific Islander, multi-racial, and more." Compl. ¶ 20; Su Decl. ¶ 3 (SFUSD Superintendent). "80% of students in the mentoring program lived below the Federal Poverty line" in the 2022-23 academic year. Compl. Ex. 1 at 23. Almost 30% of students in the Healthy Choices' Mentoring For Success program live with a disability. *Id.* Furthermore, "74% of participants in the mentoring program live in neighborhoods where the highest levels of violence, structural racism, income inequality, poverty, and health disparities exist." *Id.*

According to the SFUSD, these structural barriers negatively impact the learning and social development of SFUSD students of color, students with disabilities, low-income students, students in foster care, and English language learner students. Compl. ¶ 21. For instance, "nearly 50% of Black SFUSD students (compared to 34% of White SFUSD students) do not feel safe at school, and 35% of Black SFUSD students (compared to 20% of White SFUSD students) do not feel a sense of belonging." *Id.* Student disengagement leads to chronic absenteeism, lower test scores, and reduced social-emotional skills. *Id.*

Recognizing these root structural issues, SFUSD expressly built a mentorship program model centered on "racial equity and inclusion." *Id.* ¶ 14 (regarding SFUSD's Mentoring for Success program); Mot. at 3. The AmeriCorps-funded Members organize the "Mentoring for Success" program which pairs "vulnerable students—most of whom are economically disadvantaged, live in low-income neighborhoods, and are students of color—" with adult mentors. Compl. ¶ 27. To support its students' wellbeing, SFUSD pairs "students with mentors…that look like and reflect the values of the student, which often means matching students and mentors of the same racial or ethnic background, gender identity, or sexual orientation." Vargas Decl. ¶ 27. Students can also receive more tailored, individual mentoring from Members who specialize in counseling and social work. *Id.* ¶ 28; *see also* Vargas Decl. ¶¶ 9-13 (describing the three tiers of support and mentorship offered to students, ranging from school-wide to one-on-one).

Members also facilitate school-wide activities and student clubs, such as heritage month

United States District Court
Northern District of California

celebrations or clubs related to students' identities. *Id.* ¶ 29.  For example, to provide students "a refuge" and "actively improve their wellbeing," SFUSD's AmeriCorps members "provide primary support for groups known as 'Rainbow' or Gender and Sexuality Alliance (GSA) clubs" for "students of all backgrounds to learn about LGBTQ+ identities," for "students who are themselves LGBTQ+, come from families with LGBTQ+ members, or who want to support LBGTQ+ people to find community." *Id.* ¶ 27.

Further, to provide the most effective support possible, Members are trained "in evidence-based practices that consider the impact of trauma on students' lives and development," including discussions of "race, structural racism, and racial equity."  Vargas Decl. ¶ 14; *see also* Gonzalez Decl. ¶ 6 (Former Healthy Choices Member) (describing receiving trainings on respecting "diversity, equity, and inclusion, restorative principles, and gender identities" to "connect with students" and be "an effective mentor").  "SFUSD provides trainings for Members two to three times per month specifically on racial equity," and Members use these skills to improve and personalize mentoring. *Id.*  These trainings allow Mentors to more comfortably speak with students on a range of issues that might be impacting educational outcomes, such as "students' socio-economic backgrounds, exposure to direct and systemic racism, neighborhood violence, or family circumstances." *Id.*

SFUSD's Healthy Choices program has benefitted hundreds of students.  In the 2022-2023 academic year alone, "twenty-two Members provided 2,438 services (like mentoring) to 381 students across twenty SFUSD schools."  Compl. ¶ 31.  84% of secondary school students who participated in the mentoring program felt that their mentor helped them to perform better in school. *Id.* ¶ 32.  Research compiled in the Healthy Choices Grant Agreement links programs like Healthy Choices to "improvements in the perceived safety of schools; improved academics; improved social-emotional functioning; increased prosocial behaviors; significantly fewer suspensions; and reduced bullying."  Compl. Ex. 1 at 26.

### b.    Santa Fe's Senior and Child Programs

The City of Santa Fe runs three programs funded by AmeriCorps: the Foster Grandparent Program, the Senior Companion Program, and the Retired & Senior Volunteer Program

United States District Court
Northern District of California

("RSVP"). These grants support programming "related to elder care, child mentoring and development, retiree community-building, and overall community wellbeing." Compl. ¶ 37. To enable its volunteers to best support their clients, Santa Fe "train[s] [its volunteers on] topics such as trauma-informed care, social-emotional learning, and cultural competency." Hammond Decl. ¶ 30.

For the Foster Grandparent Program, Santa Fe received a $38,013 grant beginning on July 1, 2024, and going until June 30, 2025. Compl. ¶ 38. This program places senior volunteers in school classrooms, Head Start programs, and daycares to serve children or offer support to students with special needs. Mot. at 3; Compl. Ex. 2 at 2 (Santa Fe Foster Grandparent Program Grant Agreement). Many of the children are "Latino, Native American, bilingual learners, or come from economically disadvantaged backgrounds." Hammond Decl. ¶ 27. Volunteers assist children with learning reading and mathematics and provide "one-on-one tutoring and mentoring[] to maintain or improve the children's health status and psychosocial functioning." Compl. Ex. 2 at 2. This program aims to support at-risk youth's development of self-confidence and self-value. Compl. ¶ 41.

Santa Fe received $2,500 for the Senior Companion Program to operate from July 1, 2024, to June 30, 2025. Compl. Ex. 3 at 6. This program serves senior citizen clients by assisting clients with everyday tasks, such as tracking finances, grocery shopping, and healthcare planning. Compl. ¶ 44. The program prioritizes "clients facing systemic barriers to care," such as adults with physical and/or mental health limitations. Hammond Decl. ¶ 29; Compl. Ex. 3 at 2. By offering this support, seniors can be independent for longer and family caregivers can rest. Compl. ¶¶ 43-45. Both Foster Grandparents and Senior Companions "must be 55 and older, with limited income, and must pass a background check to qualify as volunteers." *Id.* ¶ 46.

Lastly, Santa Fe received $52,500 from AmeriCorps for the Retired & Senior Volunteer Program for April 1, 2024, to March 31, 2025. Compl. ¶ 49. This program "pairs approximately 300 volunteers ages 55 and older with community organizations across Santa Fe." *Id.* ¶ 50. These senior volunteers "help others by sharing their experience, knowledge and efforts." Compl. Ex. 4 at 2. More specifically, RSVP volunteers "support culturally inclusive initiatives" such as "food

security programs, literacy projects, and community engagement initiatives tailored to meet the needs of underrepresented groups." Hammond Decl. ¶ 28. To best support the beneficiary population, RSVP offers "bilingual outreach, cultural competency training, and targeted services." *Id.*

### 3. Executive Orders and the February 13, 2025 "AmeriCorps Directive"

#### a. Relevant Executive Orders

In January 2025, in the midst of the grant periods for SFUSD and Santa Fe, President Donald Trump issued three Executive Orders relevant here: (1) "Ending Radical And Wasteful Government DEI Programs And Preferencing"; (2) "Ending Illegal Discrimination And Restoring Merit-Based Opportunity"; (3) "Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government"; and (4) "Unleashing American Energy." *Id.* at 10-11.[2]

- Executive Order 14151, "**Ending Radical And Wasteful Government DEI Programs And Preferencing**," orders the termination of "all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Exec. Order No. 14151 (2025). This includes ending "all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." *Id.*

- Executive Order 14173, "**Ending Illegal Discrimination And Restoring Merit-Based Opportunity**" seeks to uphold race, color, religion, sex, and national origin anti-discrimination and civil rights laws by ending "[i]llegal DEI and DEIA policies[, which] . . . undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and

United States District Court
Northern District of California

---

[2] The first three of these executive orders are possibly relevant to SFUSD and Santa Fe's grants. The fourth is likely not, and will not be discussed here, because it deals exclusively with energy policy, which the SFUSD and Santa Fe's grants do not concern.

United States District Court
Northern District of California

1    pernicious identity-based spoils system."  Exec. Order No. 14173 (2025).

2    Specifically, among other things, all grant awards must include:

> (A)  A term requiring the . . .  grant recipient to agree that its
> compliance in all respects with all applicable Federal anti-
> discrimination laws is material to the government's payment
> decisions for purposes of section 3729(b)(4) of title 31, United
> States Code; and
> (B)  A term requiring such . . .  recipient to certify that it does not
> operate any programs promoting DEI that violate any applicable
> Federal anti-discrimination laws.

*Id.*  Furthermore, all grants must "[e]xcise references to DEI and DEIA principles, under whatever name they may appear."  *Id.*  Other portions of EO 14173, not referencing grants, call for "[t]erminat[ing] all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities"; and ending contractors from "promoting 'diversity' . . . [and] 'affirmative action'" and "consider[ing] race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws."

- Executive Order 14168, "**Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government**," seeks to "defend women's rights . . . by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male."  Exec. Order No. 14168 (2025). It states: "These sexes are not changeable."  *Id.*  Among other terms, it provides definitions of "sex," "gender identity," and "gender ideology."  According to the executive order, "sex" is an individual's immutable biological classification as either male or female;  "gender ideology" is "the idea that there is a vast spectrum of genders that are disconnected from one's sex;" and "gender identity" is "a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."  *Id.*  This executive order directs federal agencies to adopt its definitions of sex, gender ideology, and gender identity,

and to "use the term 'sex' and not 'gender.'"  *Id.*  Any messages "that promote or otherwise inculcate gender ideology" must be removed.  *Id.*  Lastly, "[f]ederal funds shall not be used to promote gender ideology."  *Id.*

### b.   The AmeriCorps Directive

On February 11, 2025, AmeriCorps informed grantees that it was reviewing "all applicable executive orders, memoranda and corresponding guidance issued since January 20, 2025, by President Trump, the Office of Management and Budget and the Office of Personnel Management."  Compl. Ex. 5 at 3.  Then, on February 13, 2025, AmeriCorps released "Executive Order Compliance Instructions," ("AmeriCorps Directive") providing guidance on how AmeriCorps was "reviewing all current AmeriCorps awards to ensure compliance with these directives and administration priorities."  *Id.*

The Directive imposes more expansive requirements on grantees than the Executive Orders.  First, the Directive is not limited to termination programs which violate existing federal anti-discrimination laws.  It requires that funding recipients certify that their programs "compl[y] with all administration Executive Orders and do[] not include any activities that promote DEI activities."  *Id.* at 7.  The Directive does not require that the banned DEI activities violated existing anti-discrimination laws.   Second, the Directive advises that grantees can comply with its mandate by changing aspects of their programs that "may" (as opposed to actually do) conflict with the executive orders.  *Id.* at 6.  Specifically, the Directive instructs that amendment "may require changes to staff roles and activities, member or volunteer roles and activities, trainings, service sites, performance measures, budget and any other components of a program that **may conflict** with the executive orders."  *Id.* at 6 (emphasis added).

The AmeriCorps Directive applies to:

> All aspects of AmeriCorps grants/awards . . . including, but not limited to:
> • Grant applications for AmeriCorps resources
> • Activities performed by AmeriCorps members/volunteers
> • Training provided to members/volunteers
> • Program materials, such as volunteer/member applications, enrollment forms, service
> opportunity listings, and handbooks

• Social media and website posts about your AmeriCorps award

*Id.* at 3-4.  The AmeriCorps Directive applied to sub-applicants as well direct grantees.  *Id.* at 7.

The AmeriCorps Directive gave grant recipients three choices: (1) self-certify that their award is compliant; (2) amend the grant "to move [the] program into compliance with the executive orders; or (3) relinquish the grant.  *Id.*

☐   I certify that [Program Name], [Application ID] complies with all administration Executive Orders and does not include any activities that promote DEI activities **OR**

☐   The sub application is currently **noncompliant** within the scope of approved grant activities and requires an amendment to ensure compliance. The commission will inform the PM and initiate the amendment **OR**

☐   This sub application must be relinquished. The commission will initiate this process.

Dkt. 18-2 at 12 (AmeriCorps Directive, State Commission Instructions for sub applicants).[3]  No matter which option was chosen, the deadline for making this choice and, if applicable, submitting all amendments to come into "full compliance" was just days later on February 19, 2025.  *Id.* at 3.  AmeriCorps did not provide any interactive process to determine whether certain activities comply with the Directive.  There is no further communication from AmeriCorps which define the terms of the Directive.  Incumbent grant recipients had to choose among the three options without any additional guidance from AmeriCorps.  In fact, the Directive's "Frequently Asked Questions" section states that AmeriCorps staff would not be available to review individual grant agreements and that "grantees are responsible for ensuring that their application and program complies with President Trump's executive orders" ("Executive Orders").  *Id.* at 8.

### 4.    **Plaintiffs' Subsequent Actions**

Plaintiffs received AmeriCorps "Executive Order Compliance Instructions" on February 13, 2025.  Their responses were due just one week later on February 19, 2025.  This quick turnaround included making any mandated amendments to their grants.  Without individualized

---

[3] While this excerpt is under the State Commission Instructions for sub applicants, AmeriCorps provided direct recipients with the same three options.

1    guidance from AmeriCorps on how to comply, Plaintiffs were forced to interpret the executive

2    orders above and speculate on how to apply them to their grants, or risk losing funding altogether.

3                    **a.    <u>SFUSD</u>**

4              Pursuant to the "Executive Order Compliance Instructions," California Volunteers, the

5    state government office that administers AmeriCorps funds in California, notified SFUSD that its

6    Healthy Choices grant had been flagged because of "use of the words 'diversity,' 'equity,' and

7    'racial equity,' in its grant narrative." Compl. ¶ 68. This February 19, 2025, email from

8    California Volunteers to SFUSD reiterated the February 20, 2025, deadline to make the choice

9    whether to self-certify compliance, amend the grant, or relinquish the funding. *See* Vargas Decl.

10   Ex. B. Faced with this difficult decision on such short notice, SFUSD requested a one-day

11   extension to respond. Compl. ¶ 73.

12            SFUSD decided to submit a grant amendment; "on February 21, 2025, SFUSD selected the

13   second option . . . [and] initiat[ed] the grant amendment process under duress and in protest." *Id.* ¶

14   74; *Id.* Ex. 7 (email from SFUSD to California Volunteers confirming receipt of instructions and

15   voicing "protest and duress"). Without clear guidance and facing the quick turnaround time,

16   SFUSD was forced to amend in its grant "any 'activities that' might be considered to 'promote

17   DEI activities.'" *Id.* ¶ 75. Even after submitting an amended grant to California Volunteers and

18   AmeriCorps, "SFUSD is unclear how it can implement the Healthy Choices program to serve

19   students without running afoul of the AmeriCorps Directive's instructions given the ambiguity of

20   'DEI activities.'" *Id.*; *Id.* Ex. 8 (email from SFUSD to California Volunteers confirming

21   submission of amendment). Indeed, SFUSD is still awaiting a response to its grant amendment–

22   when it may be pressured to sign the grant amendment or face losing over $600,000 in crucial

23   funding. *Id.* ¶ 76; *see also* Su Decl. ¶¶4-5 (explaining that SFUSD is facing a $113 million deficit,

24   so "losing around $667,000—which is being used to fund 44AmeriCorps members to provide

25   services, including one-on-one mentoring to vulnerable students—would be a significant

26   hardship"). Throughout this process, SFUSD had to "interpret" the vague AmeriCorps directive

27   and executive orders and "guess[]" how they would be enforced. *Id.* ¶ 77.

28            SFUSD Wellness Counselor Laurie Vargas-Zeuschner describes the "impossible" task of

United States District Court
Northern District of California

13

trying to "comply with AmeriCorps' new requirements." Vargas Decl. ¶¶ 22-23. Vargas-Zeuschner learned that "grant recipients, including SFUSD, were provided with a spreadsheet showing terms AmeriCorps found to be problematic in grantees' original grant applications, including 'racial justice,' 'diversity,' 'equity,' 'DEI,' 'clean energy,' 'climate change,' 'environmental justice,' 'gender expression,' 'gender identity,' 'gender nonconforming,' and 'nonbinary.'" Vargas Decl. ¶ 23. Based on this, "SFUSD changed references in [their] grant agreement about 'positive school climate' to say 'positive school culture.'" *Id.* Vargas-Zeuschner and her colleagues "delete[d] any practices that might 'promote DEI activities,' even though [her] colleagues and [her] did not really understand what that means and still don't." *Id.*

Beyond the grant amendment itself, the practical reality of changing the program is daunting and unclear. Even anticipating what the AmeriCorps Directive would prohibit, "it may be difficult for Members to disaggregate their training in racial equity, structural racism, [social-emotional learning], and restorative practices when performing their work." *Id.* Former Healthy Choices AmeriCorps Member Bianca Gonzalez feels that the "new conditions imposed by AmeriCorps suggest that many of the conversations [she] had with students—which often touched on their backgrounds and identities—may now be prohibited." Gonzalez Decl. ¶ 8. Each Member would be forced to self-interpret and self-enforce the new conditions–all with the effect of limiting the mentorship and support that the Members offer students by possibly foreclosing discussions of the students' identities. *See id.* Additionally, Member "[t]rainings occur once per week and usually involve principles of diversity, equity, and inclusion, either directly or indirectly . . . Having to remove all 'noncompliant' materials from our trainings will meaningfully diminish SFUSD's ability" and cost SFUSD to expend significant resources and time. Vargas Decl. ¶ 26. In fact, SFUSD has "already been forced to spend time and resources to remove diversity, equity, and inclusion-related materials from our trainings, including one that occurred on Monday, March 10, 2025." *Id.*

SFUSD is already making programmatic changes that undermine the success, structure, and goals of the Healthy Choices program. A consideration for mentorship pairings between Members and students used to be "matching students and mentors of the same racial or ethnic

United States District Court
Northern District of California

United States District Court
Northern District of California

background, gender identity, or sexual orientation," and removing this practice would reduce the success of the mentorship services. *Id.* ¶ 27. AmeriCorps Members also assist with the Gender and Sexuality Alliances at many SFUSD schools, which provide "a safe space" for LGBTQ+ students and allies. Removing Members from these groups would mean shutting down the Alliance at certain schools and reduced support at other schools. Without Members supporting these groups, "students would be deprived of meaningful support for their social development and learning outcomes." *Id.* ¶ 28. "As another example, SFUSD would have to stop a variety of school-wide [] services that Members help provide, including for events for Black history month, Lunar New Year, Pride, and Latino Heritage Month, all of which could be interpreted to 'promote DEI activities.'" *Id.* ¶ 29. In the mentorship setting, forbidding conversations about race, which frequently arises in discussions of "community violence, racism, poverty, and drug use," would have the result of "risk[ing] student success and safety." *Id.* ¶ 30. The chilling effect of the AmeriCorps Directive is already being felt by the SFUSD Members: "Members and SFUSD employees worry that their conversations, questions, good intentions, and attempts to help students may jeopardize the entire Healthy Choices program. As Members start to censor themselves or end conversations with students about these important topics, our students are left underserved." *Id.* ¶ 32. The AmeriCorps Directive has created tremendous confusion and uncertainty for SFUSD Healthy Choices and has already resulted in undoing the successful programming created over the past ten years.

**b.    Santa Fe**

The City of Santa Fe received notice about the AmeriCorps Directive on February 14, 2025, giving Santa Fe the same February 19, 2025, deadline to decide whether to self-certify compliance, amend its grants, or relinquish the funds. Compl. ¶ 78. After requesting an extension to March 12, 2025, AmeriCorps extended the deadline to February 24, 2025, before moving the deadline to February 21, 2025. *Id.* ¶¶ 79-84. On February 21, 2025, Santa Fe submitted amendments for all three of its grants, voicing "profound disagreement with what Santa Fe understood to be the intent, philosophy and legal authority of this Executive Order." *Id.* ¶ 85, Ex. 9. Santa Fe chose this option for its grants rather than risk losing "at least $93,013 in federal

United States District Court
Northern District of California

1    funding . . . [for] vital services." Hammond-Paul Decl. ¶ 23 (Santa Fe Director of Community

2    Health and Safety). Notwithstanding submission of the grant amendments, Santa Fe continues to

3    be faced with uncertainty.

4         Similar to SFUSD, the vague AmeriCorps Directive and lack of guidance has created

5    confusion for Santa Fe and its three grants surrounding which aspects of the programs, if any,

6    need to be changed. Santa Fe's grants are specifically designed to serve "seniors and children . . .

7    [with] city-run mentorship and support programs." Compl. ¶ 101. For example, many of the

8    children in the Foster Grandparent Program "are Latino, Native American, or bilingual learners,

9    while others come from economically disadvantaged backgrounds." *Id.* ¶ 103. The Retired &

10    Senior Volunteer Program "support[s] culturally inclusive initiatives . . . . include[ing] food

11    security programs, literacy projects, and community engagement initiatives tailored to meet the

12    needs of underrepresented groups." *Id.* ¶ 104. Furthermore, the "Senior Companions [program]

13    provide[s] care for homebound individuals, many of whom belong to historically underserved

14    populations." *Id.* ¶ 105.

15         Hammond-Paul similarly describes a "chilling effect" that has already occurred throughout

16    the funded programs, stating that "[t]he new restrictions have created a chilling effect on the

17    programs by threatening their long-term stability, which has impacted the City's ability to recruit

18    potential volunteers and build or maintain partnerships that are crucial to the success of the

19    programs." Hammond-Paul Decl. ¶ 24. AmeriCorps-funded volunteers also received training on

20    "topics such as trauma-informed care, social-emotional learning, and cultural competency," which

21    might be at risk of being considered "DEI." *Id.* ¶¶ 25, 30. If the AmeriCorps Directive were to be

22    enforced against Santa Fe by cutting funding or programming, "the City may be forced to reduce

23    mentorship opportunities for at-risk youth; cut culturally responsive training for volunteers; and/or

24    scale back initiatives that target historically underserved populations. All of these changes would

25    fundamentally alter the nature of the services provided and threaten the long-term sustainability of

26    the programs." *Id.* ¶ 31. Even beyond "administrative impacts" and costs, the uncertainty and

27    threatened cuts "threatens longstanding programs that have demonstrably improved lives in [the]

28    community." *Id.* ¶ 35.

And critically, most recently, on March 10, 2025, AmeriCorps contacted Santa Fe about remaining compliance concerns "the use of terms such as 'diversity,' 'equity,' and 'gender identity'" in the Retired & Senior Volunteer Program application. Id. ¶¶ 37-38 Ex. G. Santa Fe, again, must choose whether to self-certify compliance, submit another amendment by interpreting the AmeriCorps Directive, or relinquish the funds. The City of Santa Fe is threatened by the imminent reduction in services offered to seniors and children caused by the uncertainty of the AmeriCorps Directive, undercutting twenty-five years of developing these three programs. Santa Fe has not decided how to respond to this correspondence. Hammond Decl. ¶ 40.

**B.** **Procedural Background**

On March 10, 2025, Plaintiffs filed a complaint against Defendants, challenging the AmeriCorps Directive. Dkt. 1. The next day, on March 11, 2025, Plaintiffs filed a motion for a temporary restraining order ("TRO") to prevent AmeriCorps from enforcing the AmeriCorps Directive. Dkt. 18.

On March 31, 2025, this Court granted Plaintiffs' motion for a TRO. The Court found it likely had jurisdiction over Plaintiffs' claims. It also found that Plaintiffs had shown a likelihood of irreparable harm from AmeriCorps' new grant conditions. Dkt. 33. The order restrained AmeriCorps from enforcing or imposing new grant conditions based on President Trump's executive orders described above. Specifically, the TRO restrained and enjoined AmeriCorps from pausing, freezing, canceling, or terminating AmeriCorps funding based on a failure to certify compliance with the executive orders or for a failure to certify that their programs do not include activities that 'promote DEI activities;' from modifying or requiring modification of their existing grant agreements to include the grant conditions at issue, and from requiring certifications or representations regarding their compliance with the enjoined grant conditions.

On April 23, 2024, this Court issued an explanatory order on its jurisdiction to hear Plaintiffs' claims. Dkt. 48. The Court found that Plaintiffs' claims arise under federal question jurisdiction (28 U.S.C. § 1331); sovereign immunity was waived under the APA (5 U.S.C. § 702); the APA's exception for agency actions 'committed to agency discretion by law' (5 U.S.C. § 701(a)(2)) did not apply because the APA expressly permits judicial review of Plaintiffs' claims

1    and there are meaningful standards to review the action at issue; and the Tucker Act did not bar its

2    jurisdiction as Plaintiffs seek equitable relief (not monetary damages) and their claims sound in

3    statutes and the Constitution (and not in contract).  Thus, the Court found that it has jurisdiction

4    over Plaintiffs' claims, the only challenge on the merits then asserted by Defendants.

5            The motion for preliminary injunction was subsequently briefed in full by the parties,

6    including briefing on the merits of Plaintiffs' substantive claims.

7                            III.    **LEGAL STANDARD**

8            A preliminary injunction is a matter of equitable discretion and "an extraordinary remedy

9    that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*

10   *v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Its "purpose…is to preserve the status

11   quo and the rights of the parties until a final judgment issues in the cause."  *U.S. Philips Corp. v.*

12   *KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

13           A party seeking a preliminary injunction must meet one of two variants of the same

14   standard.  The traditional *Winter* standard requires the movant to show "that he is likely to succeed

15   on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

16   the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*,

17   555 U.S. at 20.  Under the "sliding scale" variant of the same standard, "if a plaintiff can only

18   show that there are 'serious questions going to the merits'—a lesser showing than likelihood of

19   success on the merits—then a preliminary injunction may still issue if the 'balance of hardships

20   tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *All. for the*

21   *Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis in original) (quoting *Shell*

22   *Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013)).  In other words,

23   irrespective of the robustness of the showing on the merits required, a plaintiff must demonstrate

24   he or she is likely to suffer irreparable injury in the absence of preliminary relief.

25                            IV.    **DISCUSSION**

26   **A.    Irreparable Harm**

27           In its order granting Plaintiffs' motion for a TRO, the Court already found that Plaintiffs

28   had made an adequate showing that they would likely suffer irreparable harm absent preliminary

1    relief.  TRO at 5 (Dkt. 33).  The Court so determined on three bases: "1) current and ongoing

2    harm, 2) harm from loss of funding for non-compliance, and 3) a constitutional violation."  *Id.*

3    Because there are no substantive changes to the factual record, the Court's findings from the TRO

4    remain unchanged.  Defendants' arguments to the contrary are unpersuasive.

5        First, Defendants assert that Plaintiffs fail to show any "substantive programmatic

6    changes."  Opp'n at 18.  To the extent any changes exist, Defendants characterize them as "interim

7    modifications that [may] ultimately [be] reinstated after this case is litigated."  *Id.*  As the Court

8    previously recognized, SFUSD has made actual changes such as "revamping training materials

9    and reworking its method of mentor pairing."  Reply at 16; *see* Vargas Decl. ¶¶ 26-28 (Dkt. 18-3

10   at 8-9).  Further, as the Court underscored in its earlier order, Santa Fe "face[s] the impossible

11   choice of amending its awards or losing 'at least $93,013 in federal funding…[for] vital services.'"

12   TRO at 8 (citing Hammond-Paul Decl. ¶ 23, Dkt. 18-6 at 5).  Both parties have demonstrated that

13   irreparable harm is likely absent preliminary relief.  TRO at 5.

14       Second, Defendants argue that because Plaintiffs "ultimately [allege] economic loss of

15   federal funds," this harm is not irreparable.  Opp'n at 19.  Further, Defendants assert that any loss

16   of funding is not irreparable because "Plaintiffs cannot show an entitlement (statutory or

17   constitutional) to AmeriCorps' discretionary funding."  *Id.* at 20.  Plaintiffs rightly counter that

18   damages cannot adequately remedy these injuries.  Reply at 18.  As the Court held in granting the

19   TRO, the harm from the threat of loss of funding for non-compliance constitutes irreparable harm

20   "because 'very real penalty attaches to [Plaintiffs] regardless of how they proceed.'"  TRO at 7-8

21   (citing *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir.

22   2009)).  Specifically, the "Hobson's choice of cutting certain services to minimize the risk of

23   being found in non-compliance or continuing to provide current services and programs [which

24   could severely compromise the effectiveness of SFUSD's program and services] and run the

25   substantial risk of losing all funding" would "'disrupt and change the whole nature of its business

26   in ways that most likely cannot be compensated with damages alone.'"  *Id.*  Regarding

27   Defendants' argument that Plaintiffs have not shown an entitlement to the funding, Plaintiffs and

28   AmeriCorps have grant agreements governing their funding in place.  *See* SFUSD Healthy

United States District Court
Northern District of California

1    Choices Grant Agreement (Dkt. 1-1 at 6); Santa Fe's AmeriCorps Grant Agreements (Dkts. 1-2, 1-

2    3, 1-4). These grant agreements evidence Plaintiffs' entitlement to their current AmeriCorps

3    funding. Moreover, as Plaintiffs note, there is no requirement of a statutory or constitutional

4    entitlement to federal funding to demonstrate irreparable harm stemming from the imposition of

5    new intervening conditions which place Plaintiffs in a Catch-22.

6        Third, Defendants maintain that Plaintiffs' alleged harm from any uncertainty is

7    "overstate[ed]." Opp'n at 19. Specifically, Defendants assert that Plaintiffs believe "they could

8    continue to operate their respective programs in compliance" with the Executive Orders because

9    Plaintiffs "submitted grant amendment requests to bring their AmeriCorps funded activities into

10   compliance." *Id.* Plaintiffs respond that "despite submitting grant amendments, Plaintiffs still do

11   not know what compliance requires." Reply at 18. Again, the Court already found that confusion

12   regarding how to comply with the Directive harms Plaintiffs. TRO at 8. The Court specifically

13   found that "Plaintiffs' amendments to their awards illustrate the total confusion" because they

14   responded to the Directive without understanding the Directive's new conditions. *See* Vargas

15   Decl. ¶ 23 (Dkt. 18-3 at 7). Thus, the uncertainty and confusion regarding the meaning of the new

16   conditions harm Plaintiffs regardless of whether they submitted amendments. And Plaintiffs have

17   demonstrated the effectiveness of their current programs is threatened.

18       Fourth, Defendants maintain that Plaintiffs' Spending Clause claim does not show

19   irreparable harm because the Spending Clause power does not grant Plaintiffs a constitutional

20   right. Opp'n at 20. Rather, Defendants argue, the Spending Clause grants Congress a power. *Id.*

21   However, the Court held that a Spending Clause constrains not only Congress but federal agencies

22   to which responsibility has been placed in implementing authorized spending and that a Spending

23   Clause violation may constitute an injury in the context of the case at bar. TRO at 10. *See*

24   *Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022) (finding cognizable injury related to potential

25   violation of Spending Clause because plaintiff would face "serious consequences" from being held

26   to federal funding offer with "ambiguous and coercive" terms that it allegedly did not understand);

27   *see also W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149

28   (11th Cir. 2023) (affirming district court's decision that the same "ambiguous terms" of federal

United States District Court
Northern District of California

1    funding in *Arizona v. Yellen* constituted a facial violation of the Spending Clause and irreparable

2    injury warranting a grant of preliminary injunction).

3        Therefore, Plaintiffs have demonstrated a "present or imminent risk of likely irreparable

4    harm." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010).

5    **B.    Public Interest and Balance of Hardships**

6        For much of the same reason previously identified by the Court, the public interest and

7    balance of hardships tip sharply in Plaintiffs' favor. *See Drakes Bay Oyster Co. v. Jewell*, 747

8    F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two factors merge").

9    Plaintiffs' hardship in dismantling or rewriting the very program elements that AmeriCorps

10    previously prioritized in evaluating their grant applications – consideration of DEI – overshadows

11    any alleged hardship Defendants face. "To comply with AmeriCorps' new requirements, SFUSD

12    had to revise its previously accepted grant applications" by "delet[ing] any practices that might

13    'promote DEI activities,' even though [they] did not really understand what that means and still

14    don't." Vargas Decl. ¶ 23.[4]  Accordingly, SFUSD has "already been forced to spend time and

15    resources to remove diversity, equity, and inclusion-related materials from [their] trainings,

16    including one that occurred on Monday, March 10, 2025." Vargas Decl. ¶ 26.  Similarly, Santa Fe

17    states that "under the new restrictions, [Santa Fe's activities] may need to be removed or

18    rewritten." Hammond Decl. ¶ 30.  For example, "RSVP volunteers support culturally inclusive

19    initiatives," but the "new AmeriCorps restrictions could require the elimination of bilingual

20    outreach, cultural competency training, and targeted services." *Id.* ¶ 28.  In addition, Santa Fe

21    trains its volunteers on "topics such as trauma-informed care, social-emotional learning, and

22    cultural competency" to "equip volunteers to serve their communities effectively." *Id.* ¶ 30.

23    These topics "may [now] need to be removed." *Id.*  Finally, to attempt to safeguard its funding,

24    Santa Fe had to "submit[] amended grant applications for all three grants," although the City

25    "profound[ly] disagree[d] with what [it] underst[ood] to be the intent, philosophy and legal

26

27    [4] "A spreadsheet showing terms AmeriCorps found to be problematic in [its] original grant
      application" included 'racial justice,' 'diversity,' 'equity,' 'DEI,' 'clean energy,' 'climate change,'
28    'environmental justice,' 'gender expression,' 'gender identity,' 'gender nonconforming,' and
      'nonbinary.'" *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

authority of this Executive Order." *Id.* ¶ 22; Ex. E to Hammond Decl. (Dkt. 18-6 at 81). In designing their programs, training their staff and volunteers, and investing in program infrastructure, Plaintiffs relied on AmeriCorps' priorities at the time they applied for their grants. Plaintiffs' hardship in not only attempting to decipher the meaning of the new conditions in AmeriCorps' Directive, but also redesigning their programs mid-stream and during the school year for SFUSD cannot be overstated. And as noted above, the vagueness of the Directive leaves Plaintiffs without meaningful guidance as to the permissible parameters of their programming.

Plaintiffs' hardship outweighs any hardship faced by Defendants. As the Court previously held, "while the federal government has an interest in being able to enforce a chosen policy, that interest is eviscerated if the policy is not lawful, the very issue before this Court." TRO at 10. Moreover, while the Government has a compelling interest in banning unconstitutional conduct, here the Directive Goes beyond banning *e.g.* racial preferences. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 230–31 (2023) (prohibiting only racial preferencing but explicitly permitting "discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise" in college applications).[5] As stated above, the Directive goes beyond enforcement of existing anti-discrimination law. The Government's interest in banning all diversity, equity, inclusion, and accessibility or equity or equity-related programs – even where those programs do not violate existing anti-discrimination law – is difficult to discern from the record herein. AmeriCorps has provided no evidence of its interest in such a sweeping ban.

Further, the public interest in permitting Plaintiffs' programs to continue outweighs the interest in protecting Defendants' ability to retrieve federal funding because Plaintiffs' programs serve communities in need, as envisioned by AmeriCorps. 42 U.S.C. § 12501(b) (AmeriCorps exists to "meet unmet human…needs" and supporting "diverse communities."). As the Court

---

[5] As written, the Directive's anti-DEI condition bans activities beyond that prohibited by existing anti-discrimination law and would ban conduct expressly permitted by the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023). The Directive's breadth only highlights the weakness of the Government's interest in enforcing the Directive and the new grant conditions.

highlighted:

> SFUSD's Healthy Choices program supports youth with high rates of truancy and low rates of academic engagement across 38 schools in San Francisco. Santa Fe's Senior Companion program supports homebound elderly who often have physical and/or mental health limitations with everyday tasks such as grocery shopping and healthcare planning.

TRO at 11 (citing Dkts. 1-1 at 5 (SFUSD Healthy Choices Grant Agreement); 1 at 11 (¶ 44); 1-3 at 2 (Santa Fe Senior Companion Grant Agreement)).

Therefore, the public interest and the balance of equities tip sharply in Plaintiffs' favor. Plaintiffs therefore need only establish serious questions are raised on the merits. *Peña*, 865 F.3d at 1217. For the reasons discussed below, Plaintiffs have established not only serious questions, but a likelihood of success on the merits.

**C.    Likelihood of Success on the Merits**

   **1.    APA Claims**

Plaintiffs are likely to succeed on the merits of their APA claims.

      **a.    Final Agency Action**

First, Plaintiffs are likely to succeed in demonstrating that the Directive is a final agency action.

> "[T]wo conditions must be satisfied for agency action to be 'final':"
>
> First, the action must mark the 'consummation" of the agency's decisionmaking process…—it must not be of a merely tentative or interlocutory nature.
>
> And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 113 (1948) and *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (spacing added).

      **i.    Consummation**

Where an agency establishes conditions on grant eligibility, the agency has taken action

United States District Court
Northern District of California

that "mark[s] the 'consummation" of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177–78. *See City & Cnty. of S.F. v. Trump*, 2025 WL 1282637, at *35 (N.D. Cal. May 3, 2025) (finding "the Bondi Directive's instruction to freeze the distribution of all DOJ funds to implement President Trump's directive to defund 'sanctuary' jurisdictions'…clearly 'mark[s] the consummation of' the DOJ's 'decision-making process' that so-called 'sanctuary' jurisdictions are ineligible for federal funding") (citing *Bennett*, 520 U.S. at 177–78); *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018) ("By imposing the certification condition, the federal government has articulated that certain funds, namely the COPS grants and the Byrne JAG Program grants, will require adherence to the certification condition. It has rendered its final word, satisfying the first prong of the *Bennett* test.").

Here, AmeriCorps articulated and imposed certain conditions on grant eligibility. The AmeriCorps Directive states: "All aspects of AmeriCorps grants/awards must comply with President Trump's executive orders…" Dkt. 18-2 at 8 (AmeriCorps Directive, Overview). Accordingly, the Directive requires that grant recipients seeking to maintain their funding certify that their program "does not include any activities that promote DEI activities" or submit amendments to their grant applications to come into compliance. *Id.* at 10. Further, AmeriCorps did not make available pre-submission review of amendments or indicate that there would be an interactive process to determine compliance. The Directive stated that, "[d]ue to the short timeline" between the Directive's publication on February 13, 2025 and the deadline to respond to the Directive on February 19, 2025, "regional office staff…[would] not be able to review individual grant narratives" before the deadline to submit amendments on February 19, 2025. Dkt. 18-2 at 13. Accordingly, AmeriCorps instructed: "Grantees are responsible for ensuring that their application and program complies with President Trump's executive orders." *Id.* Like the Attorney General's directive to "freeze the distribution of all DOJ funds to implement President Trump's directive to defund 'sanctuary' jurisdictions," the AmeriCorps Directive to certify that grant recipients' programs do not 'promote DEI' to implement President Trump's anti-DEI directives marks AmeriCorps' consummation of its decision-making process that 'activities that promote DEI activities' are ineligible for federal funding. *City & Cnty. of S.F. v. Trump*, 2025

1   WL 1282637, at *35; *see* Dkt. 18-2 at 8-10.  Thus, the Directive meets the first requirement to

2   constitute a final agency action.

3                              ii.    <u>**Legal Consequences**</u>

4          Further, "legal consequences will flow" from the Directive because AmeriCorps can

5   terminate grants if they do not comply with the new requirement that grant recipients seeking to

6   retain their funding certify that their programs do not 'promote DEI.'  *Bennett*, 520 U.S. at 177–

7   78.  As noted above, the Directive requires that grantees respond in one of three ways:

8       1)  Self-certify compliance by submitting a completed statement: "I certify that [Program

9           Name], [application ID] complies with all administration Executive Orders and does not

10          include any activities that promote DEI activities."  Dkt. 18-2 at 10.

11      2)  Amend awards to "move into full compliance."  *Id.* at 11.  Those amending "must cease"

12          all "noncompliant activities…immediately, initiate an amendment," and "remove or update

13          any language related to out of compliance activities."  *Id.* at 9.

14      3)  Relinquish awards, should grantees' projects conduct "noncompliant activities."  *Id.*

15  In other words, to maintain their funding (*i.e*, not 'relinquish awards'), recipients must certify

16  compliance or amend their awards to come into compliance with the condition that their programs

17  "not include any activities that promote DEI activities."  *Id.* at 10.

18          Further, Defendants confirmed that legal consequences would flow from non-compliance

19  with these conditions.  In the TRO hearing, the Court asked whether noncompliance with the

20  Directive's conditions "would preclude disbursement" of AmeriCorps funding.  Dkt. 41 at 58

21  (TRO Hearing Trs. at 58:17-21) (Court asks "[I]s there a risk that for the next disbursement

22  period, if AmeriCorps were to find that the District or the City were in violation of—Santa Fe

23  were in violation of the [D]irective, that that could be used to preclude disbursement?").

24  Defendants responded: "If the Agency determined that…there was a violation of the conditions."

25  *Id.* (TRO Hearing Trs. at 58:22-23).  Thus, Defendants concede that legal consequences will flow

26  from noncompliance with the Directive.

27          Defendants' only case offered to prove that the Directive is not a final agency action is

28  easily distinguishable.  In *Advanced Integrative Med. Sci. Inst., PLLC et al v. Garland et al*, 24

United States District Court
Northern District of California

F.4th 1249 (9th Cir. 2022), the Ninth Circuit held that a letter from the Drug Enforcement Administration ("DEA") responding to a medical clinic's letter seeking advice and guidance on how a physician could administer psilocybin to terminally ill patients without facing liability under the Controlled Substances Act ("CSA") was not a final agency action subject to judicial review. *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1260 (9th Cir. 2022) ("[I]t is an informational letter of the sort that does not constitute final agency action under *Bennett*."). *Advanced* held that the DEA's response did not 'mark the consummation of a decision-making process' because the DEA's letter was a "'workaday advice letter that agencies prepare countless times per year in dealing with the regulated community.'" *Id.* (citing *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004)). That is, the letter "provided straightforward guidance about the interaction of the [Right to Try Act] [("RTT Act")] and the CSA," and "did no more than point to the plain language of existing law." *Id.* at 1261.

In contrast, the AmeriCorps Directive does not provide mere "straightforward guidance" on "existing law." *Id.* Rather, the Directive imposes new grant conditions, such as certification that grantees' programs not "promote DEI." Further, *Advanced* held that the DEA's "straightforward statements…do not impose legal consequences on [the physician]." *Id.* Instead, any "risk of civil and criminal liability" stemmed from "the CSA" and "was not created by [the DEA's] letter." *Id.* In contrast, Defendants herein have confirmed that AmeriCorps could stop disbursing grants if Plaintiffs violate the Directive's conditions. Dkt. 41 at 58 (TRO Hearing Trs. at 58:22-23). Therefore, the Directive imposes legal consequences on grantees, consequences not attendant to the advice letter in *Advanced*.

Thus, Plaintiffs are likely to succeed in establishing that the Directive is a reviewable final agency action under the APA.

### b.    <u>Violation of the APA</u>

Next, Plaintiffs are likely to succeed on their claims that the Directive violates the APA because it likely exceeds AmeriCorps' statutory authority, is likely contrary to a constitutional power, and is likely arbitrary and capricious.

APA § 706 provides, in part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;

5 U.S.C. § 706.

i. **Statutory Authority**

The APA's scope of review recites that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B). Plaintiffs are likely to succeed in demonstrating that the AmeriCorps Directive and the new grant conditions are in excess of AmeriCorps' statutory authority because AmeriCorps does not have the authority to impose anti-DEI grant conditions that are antithetical to its statutory purposes of AmeriCorps, purposes which are infused with the stated goal of addressing economic, racial and other equities. Nor does AmeriCorps have statutory authority to ban what the governing statutes expressly permit and even encourages.

At bottom, consideration of diversity, equity, and inclusion are not incidental, but integral to AmeriCorps' statutory authority. AmeriCorps' enabling statutes provide for the disbursement of funds to help "diverse communities" and those with "unmet human…needs." 42 U.S.C. § 12501(b). AmeriCorps is statutorily authorized to, *inter alia*:

- "[P]romote greater community unity through the use of organized teams of participants of **varied social and economic backgrounds, skill levels, physical and developmental capabilities, ages, ethnic backgrounds, or genders**," *id.* § 12572(c)(1)(A) (emphasis added);

- "[E]nsure that participants are from **economically, geographically, and ethnically diverse backgrounds**," *id* § 12613(c) (emphasis added);

- "[S]trengthen and supplement efforts to meet a broad range of needs, particularly those related to poverty, by encouraging and enabling persons from **all walks of life** and from all age groups to perform meaningful and constructive volunteer service in agencies, institutions, and organizations where the application of human talent and dedication may help to meet such needs," *id*. § 4991 (emphasis added);

- "[R]enew the ethic of civic responsibility and the spirit of community and service throughout **the varied and diverse communities of the United States**," *id.* § 12501(b)(2) (emphasis added);

- "[T]ake appropriate steps to insure that special efforts are made to recruit, select, and assign qualified **individuals age 55 years or older from minority populations** to serve as volunteers," *id.* § 5023 (emphasis added), and

- "[E]duc[ate] economically disadvantaged individuals" **in areas "for which socioeconomic, geographic, and racial and ethnic health disparities exist**," *id.* § 12572(a)(2)(B)(iii) (emphasis added).

Among other obligations, AmeriCorps is statutorily required to:

- Make "special efforts" to recruit older individuals "from **minority populations** to serve as volunteers," *id.* § 5023 (AmeriCorps "shall take appropriate steps to insure…");

- Make grants to support programs that "**increase participation of members of ethnic groups who have limited English proficiency**," *id.* § 5025(b)(13) (AmeriCorps "shall make grants…") (emphasis added);

- Evaluate programs' "effectiveness in…recruiting and enrolling **diverse participants**" based on "**economic background, race, ethnicity, age, marital status, education levels, and disability**," *id.* § 12639(g)(1) (AmeriCorps "shall ensure that programs that receive assistance…") (emphasis added); and

- Require that applicants provide "assurances about the applicant's efforts to…ensure that students of **different ages, races, sexes, ethnic groups, disabilities, and economic backgrounds** have opportunities to serve together," *id.*

28

§ 12525(a)(2)(C)(i) ("An applicant…shall include…assurances…") (emphasis added).

AmeriCorps' enabling statutes demonstrate that Congress made principles of diversity, equity, and inclusion integral to AmeriCorps.[6] Further, AmeriCorps' own rubric to review grant applications demonstrates the central importance of grantees' commitment to these principles. Specifically, when Plaintiffs were applying for their AmeriCorps funding, they were required to verify their "Commitment to Diversity, Equity, Inclusion, and Accessibility" ("DEIA"), which was given explicit weight in the review process.

By awarding points for DEIA commitment, AmeriCorps incentivized grant applicants to highlight how their organization advanced the very principles it now seeks to prohibit. Accordingly, both the statutes prescribing AmeriCorps' priorities and authorized activities and AmeriCorps' scoring criteria for grant proposals illustrate the centrality of diversity, equity, inclusion, and accessibility in AmeriCorps-funded programs. AmeriCorps' Directive and new conditions squarely conflict with these explicit statutory provisions and inconsistent with the core values of AmeriCorps. The Directive now bars what was expressly required or explicitly authorized.

That not every AmeriCorps enabling statute makes reference to DEIA-type matters (as Defendants point out) does not negate that these DEIA and equity principles are core values of the agency, and that Congress expressly embedded these principles throughout AmeriCorps' enabling statutes.

Thus, Plaintiffs are likely to succeed in demonstrating that the Directive's new anti-DEI condition conflicts with AmeriCorps' enabling statutes, and thus exceeds its statutory authority.

---

[6] Numerous other provisions illustrate AmeriCorps' DEIA principles encompass dimensions of socioeconomic status, age, and ability. *See id.* § 12526(b) ("[P]riorit[ize]…programs targeting low-income areas or serving economically disadvantaged youth"); *id.* § 4950 ("[F]oster and expand voluntary citizen service in communities throughout the Nation in activities designed to help the poor, the disadvantaged, the vulnerable, and the elderly"); *id.* § 12501(b)(9) ("improve the education of children and youth"); *id.* § 12501(b)(11) ("utilize the experience, knowledge, and skills of older individuals"); *id.* § 12501(b)(13) ("encourage individuals age 55 or older to partake of service opportunities").

### ii.    Contrary to the Constitution

The APA's scope of review recites that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  Plaintiffs are likely to succeed on their claim that AmeriCorps' Directive and new grant conditions violate the APA because they are contrary to the Constitution.  Specifically, Plaintiffs are likely to succeed in demonstrating that Defendants violated the Spending Clause of the Constitution.

The "Spending Clause of the Constitution" provides Congress with "broad power…to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

As a threshold issue, contrary to Defendants' argument, the Spending Clause applies not only to Congress, but the agencies implementing spending legislation.  "An agency may not confer power upon itself." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). Accordingly, "an agency literally has no power to act…unless and until Congress confers power upon it." *Id.*  Furthermore, an agency cannot violate constitutional limitations on Congress's disbursement of federal funds simply because it is a delegate of Congress.  The Ninth Circuit has held that the Spending Clause "appl[ies] to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019).  As the court noted, there is "no reason why the addition of an agency middleman either expands or contracts Congress's power to provide for the … general Welfare." *Id.*[7]

In 42 U.S.C. § 12571(a), Congress conferred grantmaking power on AmeriCorps.

---

[7] *Barr*'s specific holding is distinguishable for at least two reasons.  *Barr* held that "the applicable Spending Clause principles do not readily apply to an allocation of grant funds through a competitive grant process, such as the program in this case," where (1) applicants were "free to choose one of many focus areas" and (2) the federal agency had "reasonably determined that [the grant condition] further[ed]" the "'main purposes for which' the grant [was] intended." *Id.* at 1176 (citing *South Dakota v. Dole*, 483 U.S. 203, 208 (1987)).  Unlike in *Barr*, AmeriCorps' new anti-DEI condition severely restricts all grant recipients, leaving them with no choices in respect to the matters barred by the Directive, and, as described below, it is unlikely that AmeriCorps has "reasonably determined" that the anti-DEI conditions further the core purpose of AmeriCorps' grant-making as specified by Congress.

Congress conferred on AmeriCorps the authority to provide assistance and approved national service positions, giving AmeriCorps the power to make grants.  It provides:

> Subject to the availability of appropriations for this purpose, the Corporation for National and Community Service [("AmeriCorps")] **may make grants** to States, subdivisions of States, territories, Indian tribes, public or private nonprofit organizations, and institutions of higher education for the purpose of assisting the recipients of the grants--
>
> (1) **to carry out** full- or part-time **national service programs**, including summer programs, described in subsection (a), (b), or (c) of section 12572 of this title; and
>
> (2) **to make grants in support of other national service programs** described in subsection (a), (b), or (c) of section 12572 of this title that are **carried out by other entities**.

42 U.S.C.A. § 12571(a).

With that delegation, AmeriCorps' implements Congress spending authority, and as noted above, its authority cannot exceed limits on Congress imposed by the Spending Clause. Therefore, Plaintiffs may assert constitutional claim under the Spending Clause directly against AmeriCorps.

Moving to the substantive constitutional claim, Plaintiffs are likely to succeed in establishing that the AmeriCorps' Directive and the new grant conditions violate the Spending Clause because the conditions are insurmountably ambiguous.  Nor do they relate sufficiently to AmeriCorps' purpose.

### (a)      <u>Ambiguity</u>

The Directive and its new conditions are highly ambiguous and likely violate the Spending Clause.  "[L]egislation enacted pursuant to the spending power is" akin to "a contract" in that "in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Accordingly, the "legitimacy of Congress' power to legislate under the spending power…rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"  *Id.*  Knowing acceptance requires awareness of the conditions or an ability to "ascertain what is expected of it."  *Id.*  In other words, Congress

United States District Court
Northern District of California

must enable States to enter into such agreements "cognizant of the consequences of their participation." *Id.* Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so **unambiguously**." *Id.* (emphasis added). When determining the ambiguity of conditions on federal grants, the Court evaluates "whether [a recipient]…would clearly understand…the obligations of the [conditions]." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Beginning with the executive orders themselves, the relevant provisions of the underlying executive orders incorporated into the Directive are highly ambiguous. First, the termination provision of Anti-DEI EO 1 ("Ending Radical and Wasteful Government DEI Programs and Preferencing") provides, in relevant part:

> Each agency…shall…within sixty days of this order…**terminate**, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); **all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts;** and all DEI or DEIA performance requirements for employees, contractors, or grantees.

Anti-DEI EO 1 § 2(b)(i) (emphasis added).[8] This term requires, in part, "terminat[ion of]…all 'equity-related' grants or contracts." *Id.* As is relevant here, the executive order fails to define the terms: "DEI", "DEIA", "equity", and "equity-related." During the hearing, Defendants failed to provide a definition of these terms despite repeated queries by the Court. *See* Hearing Trs. 15:2-16:11 (Dkt. 57) (Court: "What's the definition of 'equity' and 'equity-related'? What does that mean?," Defendants: "I can't speak to the definition in the executive order."). Nor has either the Executive or AmeriCorps provided any clarifying guidance defining more precisely what is meant by these terms. As noted below, these terms are rife with vagueness and ambiguity, leaving grantees to speculate what is proscribed and what is permitted. Accordingly, the Directive which incorporates this underlying executive order mandating termination of, *inter alia*, all "equity-

---

[8] *See* Executive Order on "Ending Radical and Wasteful Government DEI Programs and Preferencing"; https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

related" grants or contracts is fatally ambiguous because it fails to "clarify what conduct is proscribed." *City & Cnty. of San Francisco*, 372 F. Supp. 3d at 950. Plaintiffs cannot ascertain how to comply with the executive order. Anti-DEI EO 1 § 2(b)(i).

Second, the Directive's certification provision of Anti-DEI EO 2 ("Ending Illegal Discrimination And Restoring Merit-Based Opportunity") is also highly ambiguous. Anti-DEI EO 2 provides, in part:

> The head of each agency shall include in every contract or grant award…[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

Anti-DEI EO 2 § 3(b)(B). The Directive is more expansive than Anti-DEI EO 2 because it prohibits programs that "promote DEI activities" and omits the limitation confining prohibited DEI activities to those which violate "applicable Federal anti-discrimination laws." In other words, the Directive is completely unmoored to existing law, leaving grantees to guess what conduct "promotes DEI activities" irrespective of whether it violates existing applicable law. While Defendants argue that the Directive was not intended to be broader than Anti-DEI EO 2, it fails to explain the omission of this key limitation, nor has there been any official communication from AmeriCorps negating the obvious inference from and effect of the omission. *Cf. Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*).") The ill-defined scope of the Directive is made even more problematic by AmeriCorps' supplemental statements. The Directive imposes the following condition: "AmeriCorps Grantee/Sponsors awards must comply with all executive orders." Dkt. 30-7 at 3.[9] As noted above, in the Frequently Asked Questions section of the Directive, AmeriCorps states that "to come into

---

[9] Extrapolating even further, AmeriCorps states that "[g]rantees and sponsors must also ensure all sub applicants, volunteer stations, operating sites, and host sites are compliant with executive orders." *Id.*

United States District Court
Northern District of California

compliance," "[g]rantees are encouraged to make all necessary changes," which:

> may require changing staff roles and activities, member or volunteer roles and activities, trainings, service sites, performance measures, and any other components of a program that **may conflict** with the executive orders.

Dkt. 18-2 at 13 (emphasis added).  AmeriCorps' guidance that grantees can come into compliance by "changing" aspects that "may" conflict with the executive orders is, by definition, even broader than that required by the related executive order.  The Directive imposes a broad chilling effect upon grantees given its wide ranging penumbra.

The confusion engendered by the ill-defined terms of the Directive has real world consequences.  The Director of Santa Fe's Community Health and Safety department states, "Santa Fe is…uncertain about what compliance with the new terms and conditions means."  Dkt. 18-6 at 5 (Hammond-Paul Decl. ¶ 25).[10]  Does 'promoting DEI' include Foster Grandparents' "one-on-one mentorship" of children who are "Latino, Native American, bilingual learners, or come from economically disadvantaged backgrounds") either because of the children's backgrounds or because the program seeks to "close opportunity gaps in education"?  *Id.* (¶ 27).  Does 'promoting DEI' include RSVP's "bilingual outreach, cultural competency training, and targeted services"?  *Id.* (¶ 28).  Does it include Senior Companions, which provides "care for homebound individuals," because its activities are "tailored to [a] specific demographic[]?"  *Id.* (¶ 29).  Does compliance require that Sante Fe eliminate these initiatives?  Dkt. 18-2 at 10.

SFUSD faces the same confusion regarding the meaning of 'promoting DEI activities' and the implications of certifying that its activities do not 'promote DEI.'  SFUSD's District Coordinator for the Healthy Choices AmeriCorps program states, "[u]ncertainty around the meaning of the new federal requirements for AmeriCorps—particularly, what it means for activities to 'promote DEI activities' or what violates the new executive orders—has contributed to confusion at SFUSD."  Dkt. 18-3 at 10 (Vargas Decl. ¶ 32).[11]  Does compliance with this

---

[10] Henri Hammond-Paul is the Director of Community Health and Safety of the City of Santa Fe. *See* Dkt. 18-6 at 2 (¶ 1).
[11] Lauri Vargas-Zeuschner is the District Coordinator for SFUSD's Healthy Choices AmeriCorps program.  *See* Dkt. 18-3 at 2 (¶ 1).

United States District Court
Northern District of California

condition require removing training materials on "trauma-informed care, Youth Mental Health First-Aid, or social-emotional learning"? *Id.* (¶ 26). Does compliance require eliminating matching students with "mentors that look like and reflect the values of the student" as this might mean "matching students and mentors of the same racial or ethnic background, gender identity, or sexual orientation"? *Id.* (¶ 27). Does it include prohibiting Gender and Sexuality Alliance clubs from meeting? *Id.* (¶ 28). Under this condition, must students abstain from seeking counsel from mentors on experiences related to "community violence, racism, poverty, and drug use"? *Id.* (¶ 30).

During the hearing, Defendants were unable to answer whether Plaintiffs' specific activities violated the Directive's condition because they 'promoted DEI activities.' When asked whether aspects of Plaintiffs' programs such as "restorative justice circles, identity-based student clubs, [and] cultural heritage celebrations" like "Black History Month, Lunar New Year, [or] Pride" violated the Directive's anti-DEI condition, the Government responded: "I don't have a specific response to that." Hearing Trs. 19:3-17. AmeriCorps fails to provide any instruction on whether Plaintiffs' programs violate the Directive. The following illustrates that broad range of programmatic activity which cannot be answered by the vague conditions imposed by the new Directive:

1. Does instructing staff and volunteers to introduce themselves with, and consistently use, individuals' self-identified pronouns constitute "promoting DEI"? *See* Vargas Decl. ¶ 26.

2. Does providing regular trainings on structural racism, racial equity, or implicit-bias mitigation constitute "promoting DEI"? *See id. ¶* 14.

3. Does implementing social-emotional learning curricula that highlight inclusion, empathy, and cultural responsiveness constitute "promoting DEI"? *See id. ¶* 15.

4. Does training members to view student trauma in the context of racism or other systemic inequities constitute "promoting DEI"? *See id. ¶* 14.

5. Does sponsoring or staffing LGBTQ+ student clubs constitute "promoting DEI"? *See id. ¶* 28.

6. Does facilitating lunchtime activities or clubs related to student identities constitute "promoting DEI"? *See id. ¶* 10.

35

7. Does allowing or encouraging mentees to have open conversations about race, ethnicity, or gender/sexual-identity experiences constitute "promoting DEI"?  *See id.* ¶ 31.

8. Do age- (55+) and income-based eligibility rules—and the stipends and mileage/meal reimbursements offered only to low-income seniors—count as DEI promotion? *See Hammond Decl.* ¶ 31.

9. Does requiring volunteers to complete cultural-competency modules constitute "promoting DEI"?  *See id.* ¶ 30.

10. Does teaching volunteers trauma-informed or social-emotional practices that reference equity constitute "promoting DEI"?  *See id.*

11. Does simply using the words such as 'diversity,' 'equity,' or 'gender identity' in a grant narrative constitute "promoting DEI"? *See id.* ¶ 38.

12. Does emphasizing in hiring or recruiting materials that organizations value hiring staff at all levels that reflect the diversity and lived experiences of those [they] serve constitute "promoting DEI"?

13. Does requiring applicants to demonstrate a commitment to social-justice, anti-racism, or equity work as part of the hiring process constitute "promoting DEI"?

14. Does advertising opportunities through affinity groups at universities to build a more representative member cohort constitute "promoting DEI"?

15. Does targeted hiring or recruitment to attract and retain staff of color violate the orders?

16. Do equity trainings aimed at member retention constitute DEI activities?

17. Does prioritizing service sites because they enroll specific demographic groups constitute "promoting DEI"?

In sum, AmeriCorps' Directive is subject to "various interpretations," none of which are "self-evident."  *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 272-73 (6th Cir. 2009) (finding provision of the No Child Left Behind Act of 2001 ("NCLB") ambiguous because it failed to enable relevant school districts and education associations to "clearly understand" their responsibilities under NCLB).  The conditions fail to "clarify what conduct is proscribed." *City & Cnty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 950 (N.D. Cal. 2019) (finding nondisclosure condition on Byrne Judge Advocate General funding ambiguous due to "the breadth of the condition's scope"), *vacated on other grounds by City & Cnty. of San*

1   *Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022).

2           Our sister courts concur that analogous anti-DEI and anti-equity or equity-related

3   conditions related to President Trump's executive orders are likely too ill-defined to be enforced.

4   In *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,* 767 F. Supp. 3d 243 (D. Md. 2025),

5   the court held that "current grant recipients and contractual counterparts…have no reasonable way

6   to know what, if anything, they can do to bring their grants into compliance such that they are not

7   considered 'equity-related.'"  767 F. Supp. 3d 243, 279 (D. Md. 2025), opinion clarified, No. 25-

8   CV-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025).  Highlighting the ambiguity of the

9   'equity-related' term, *Nat'l Ass'n* asked:

10

11          If an elementary school receives Department of Education funding
            for technology access, and a teacher uses a computer to teach the
12          history of Jim Crow laws, does that risk the grant being deemed
            "equity-related" and the school being stripped of funding? If a road-
13          construction grant is used to fill potholes in a low-income
            neighborhood instead of a wealthy neighborhood, does that render it
14          "equity-related"? If a university grant helps fund the salary of a staff
            person who then helps teach college students about sexual
15          harassment and the language of consent, would the funding for that
            person's salary be stripped as "equity-related"? If a business with a
16          grant from the Small Business Administration conducts a recruiting
            session at a historically Black college or university, could the
17          business be stripped of the grant on that basis?

18  *Id.* ("The possibilities are almost endless, and many are pernicious.").  In *San Francisco A.I.D.S.*

19  *Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025), the court

20  held:

21          [I]t is hard to imagine an Executive Order vaguer in its command
            (providing that agencies *shall* terminate any grant or contract for
22          being "equity-related") or broader in its facial scope (applying to *all*
            federal grants and contracts).

23  2025 WL 1621636, at *21 (N.D. Cal. June 9, 2025) (emphasis in original).  In *Nat'l Educ. Ass'n v.*

24  *United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025), the

25  court echoed:

26

27          DEI as a concept is broad: one can imagine a wide range of
            viewpoints on what the values of diversity, equity, and inclusion
28          mean when describing a program or practice… [The directive]
            seems to sweep within its scope lessons that require students to

analyze or discuss themes of race or those that discuss how race and attitudes toward race have shaped American history.

2025 WL 1188160, at *21 (D.N.H. Apr. 24, 2025). In *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025), the court held that the relevant directives enforcing the anti-DEI condition "fail to provide an actionable definition of what constitutes "DEI" or a "DEI" practice, or delineate between a lawful DEI practice and an unlawful one." 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025). There, the court asked:

> [I]s the decision to host events featuring black scholars (open to all students) an impermissible advantaging of black students over students of other races?...Would courses taught by professors who promote the view that systemic racism exists, and that race can be central to one's experiences and identity, be unlawful? Does a school's Black Pre-law Student Union, open to all students, nonetheless treat black students differently on the basis of race? The challenged documents provide no answers to those questions and no clear "boundaries of the forbidden areas" to guide schools' compliance with the certification or to limit the Department's enforcement actions.

*Id.* at *6 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). We have no answers.

Because "condition[s] on the grant of federal moneys" must be "unambiguous[]" such that recipients can "ascertain what is expected" of them, and Plaintiffs are unable to "ascertain" the meaning of AmeriCorps new conditions regarding 'compliance with the executive orders' and activities that 'promote DEI activities,' those conditions are likely unconstitutionally ambiguous under the Spending Clause. *Pennhurst,* 451 U.S. at 17.[12] Therefore, Plaintiffs are likely to prevail on their claim that the new conditions imposed by the Directive are unconstitutionally ambiguous in violation of the Spending Clause.

---

[12] Concerns of due process violations from vague conditions are particularly grave in the First Amendment context where "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal citation omitted)(" It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). Here, Plaintiffs face the threat of governmental sanctions in the form of termination of previously awarded grants for failure to comply with vague conditions.

1

### (b)    <u>Relation to Purpose</u>

2    Finally, Plaintiffs are likely to succeed in demonstrating that the Directive and the new

3    grant conditions violate the Spending Clause because they conflict with AmeriCorps' overall

4    statutory purpose, which as demonstrated above bakes into its core principles of diversity, equity,

5    inclusion, and accessibility.

6    Conditions on the receipt of federal funds "must…bear some relationship to the purpose of

7    the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (finding that

8    "conditions imposed [were] reasonably related to the purpose of the expenditure"). Here,

9    Congress authorized and, in some instances, required AmeriCorps to disburse funds for activities

10   that involve considerations of diversity, equity, inclusion, and accessibility. *See* § IV.A.1.b.i.

11   As noted above, the Directives conflicts with the statutory objectives of the AmeriCorps

12   statute and bars that which is required or at least permitted and encouraged by the enabling

13   statutes. Plaintiffs are likely to succeed in demonstrating that the AmeriCorps conditions do not

14   "bear [a] relationship to the purpose of the federal spending." *New York*, 505 U.S. at 167. *Cf.*

15   *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017) (holding that an

16   executive order imposing a condition that Departments of Justice and Homeland Security grants

17   comply with a now unconstitutional statute (8 U.S.C.A. § 1373) failed the 'nexus' test because the

18   condition had no relationship "to immigration enforcement at all"); *Sessions*, 349 F. Supp. 3d at

19   961 (holding that access and notice conditions on Byrne JAG funding regarding immigration

20   enforcement failed the 'nexus' test because the conditions "lack[ed] any relationship to (and in

21   fact interfere[d] with) the criminal justice priorities…[of] the Byrne JAG statute").

22   Defendants argue that because AmeriCorps can "decide[] [how] to allocate or reprioritize

23   grant funding within [its various statutory] purposes," "AmeriCorps' grant condition of executive

24   order compliance…relate[s] to the federal interest in [funding its] community service programs."

25   Opp'n at 10-11. But this ignores the square conflict between the reach (and indeed central focus)

26   of the Directive and the core of the statutory provisions establishing and governing AmeriCorps.

27   It also ignores the fact that the Directive now appears to bar what the governing statutes expressly

28   authorize and permit.

To demonstrate that the Directive has a nexus to the purpose of the federal funding, Defendants list a number of statutory provisions that permit AmeriCorps to make grants "(1) 'to help retired individuals and working older individuals to share their experiences, abilities, and skills to improve their communities and themselves through service in their communities,'…; (2) 'providing opportunities for low-income persons age 55 or over to provide supportive person-to-person services in health, education, welfare, and related settings to children having special or exceptional needs or circumstances identified as limiting their academic, social, or emotional development,'…; and (3) 'providing opportunities for low-income persons age 55 or older to serve as 'senior companions' to persons with exceptional needs.'" Opp'n at 10-11 (citing 42 U.S.C. §§ 5001(a), 5011(a), 5013(a)). Thus, it appears that Defendants believe that these provisions do not 'promote DEI,' even they focus on specific age brackets ("age 55 or over"), target "low-income persons," and provide for services for those with "exceptional needs," such as "children having special or exceptional needs or circumstances" that "limit[] their academic, social, or emotional development." *Id.* But even if this were accurate, the fact that some programmatic matters previously authorized remain permissible does not obviate the conflict with all the other statutory provisions discussed above – barring activities that were expressly permitted. Moreover, the line now drawn by Defendants underscores the ill-defined nature of the Directive. Why aren't the services Defendants cite deemed "equity" or "equity-related"? Why doesn't a program focusing on children with special or exceptional needs promote "DEIA"? What is the defining principle/criteria which separates these programs from others? How is a grant recipient to ascertain the line which separates the permissible from the impermissible?

Plaintiffs are likely to prevail on their claim that the new conditions violate the Spending Clause because they lack an adequate nexus to the purposes of AmeriCorps' funding program.

### iii.    <u>Arbitrary and Capricious</u>

Plaintiffs also demonstrate a likelihood of succeeding on their claim that the AmeriCorps Directive and the new grant conditions violate the APA because they are arbitrary and capricious because AmeriCorps failed to provide a justification for its reversal of policy, and in so doing ignored significant reliance interests. It also failed to consider alternatives to imposing such an

1    expansive and ill-defined ban on programmatic activity.

2          "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and

3    reasonably explained.'"  *Ohio*, 603 U.S. at 292 (quoting *FCC v. Prometheus Radio Project*, 592

4    U.S. 414, 423 (2021)).  Determining whether an agency action is "reasonable and reasonably

5    explained" entails evaluating whether "the agency has offered 'a satisfactory explanation for its

6    action[,] including a rational connection between the facts found and the choice made.'"  *Id.*

7    (*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S.

8    29, 43 (1983)).  An action fails this test if the agency ignore[s] "'an important aspect of the

9    problem.'"  *Id.*

10         Here, AmeriCorps faces a heightened burden to justify its action because it reversed an

11   extant policy as noted above, banning activities and considerations which were required or at least

12   were permitted and encouraged.  When an agency reverses policy, the level of justification is more

13   exacting than if the agency had not acted in the first place.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

14   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983).  Specifically:

15                [T]he revocation of an extant regulation is substantially different
16           than a failure to act.  Revocation constitutes a reversal of the
             agency's former views as to the proper course.  A "settled course of
17           behavior embodies the agency's informed judgment that, by
             pursuing that course, it will carry out the policies committed to it by
18           Congress.  There is, then, at least a presumption that those policies
             will be carried out best if the settled rule is adhered to."
19           Accordingly, an agency changing its course by rescinding a rule is
             obligated to supply a reasoned analysis for the change beyond that
20           which may be required when an agency does not act in the first
             instance.

21   *Id.* (citing *Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807–808 (1973)).

22   There can be no doubt that AmeriCorps has dramatically changed course here, and thus *Motor*

23   *Vehicle* applies.

24         Plaintiffs are likely to succeed in demonstrating that AmeriCorps failed to meet this burden

25   because it did not "supply a reasoned analysis for the change."  *Motor Vehicle,* 463 U.S. at 41-42.

26   In fact, Defendants' only explanation for the new Directive is that "as part of the Executive branch

27   of government, [AmeriCorps'] funding [is] subject to the executive order priorities."  Opp'n at 13.

28   However, Defendants fail to provide any analysis for the reversal.  They have not provided any

41

1    other explanation for imposing on grant recipients the condition that programs not *e.g.* "promote

2    DEI activities" or "equity," particularly where the programs do not violate any applicable federal

3    anti-discrimination law.

4         Moreover, there is nothing in the record showing that AmeriCorps considered the

5    significant reliance interests of grant recipients like the Plaintiffs herein who fashioned programs

6    based on prior grant conditions. *See* Dkt. 18-1 at 19.  Plaintiffs "were already awarded funds for

7    their programs (including to fund the now 'noncompliant' aspects)." *Id.* at 20.  "When an agency

8    changes course, it must 'be cognizant that longstanding policies may have 'engendered serious

9    reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the*

10   *Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*,

11   579 U.S. 211, 212 (2016) (internal citation omitted)).  It is "arbitrary and capricious to ignore such

12   matters." *Id.*

13        SFUSD expressly built a program model based on "racial equity and inclusion."  Vargas

14   Decl. ¶ 14 (regarding SFUSD's Mentoring for Success program).  Now, SFUSD must "review and

15   revamp its entire suite of training materials for Members" such that they exclude "principles of

16   diversity, equity, and inclusion, either directly or indirectly" because "the federal government may

17   believe it violates the President's [Executive Orders]." *Id.* ¶ 26.  Further, originally, SFUSD

18   paired "students with mentors…that look like and reflect the values of the student, which often

19   means matching students and mentors of the same racial or ethnic background, gender identity, or

20   sexual orientation." *Id.* ¶ 27.  Now, "[t]o comply with [the Directive's] new conditions," SFUSD

21   "would have to stop implementing this important best practice" as it "would likely be considered

22   to violate the new conditions imposed on SFUSD's grant." *Id.*  Moreover, to provide students "a

23   refuge" and "actively improve their wellbeing," SFUSD's AmeriCorps members "provide primary

24   support for groups known as 'Rainbow' or Gender and Sexuality Alliance (GSA) clubs" for

25   "students of all backgrounds to learn about LGBTQ+ identities," for "students who are themselves

26   LGBTQ+, come from families with LGBTQ+ members, or who want to support LBGTQ+ people

27   to find community." *Id.* ¶ 27.  Now, "these programs may need to stop meeting completely." *Id.*

28        Similarly, AmeriCorps' prior consideration of diversity, equity, inclusion, and accessibility

United States District Court
Northern District of California

42

as grant conditions created significant reliance interests for Santa Fe.  For instance, Santa Fe's "Foster Grandparents support diverse student populations," many of whom are "children" who are "Latino, Native American, bilingual learners, or come from economically disadvantaged backgrounds."  Hammond Decl. ¶ 27.  Now, Santa Fe may have to cease the "one-on-one mentorship provided by Foster Grandparents…to close opportunity gaps in education" because AmeriCorps may "interpret[] [it] as a DEI-related effort."  *Id.*  Originally, Santa Fe's RSVP volunteers "support culturally inclusive initiatives" such as "food security programs, literacy projects, and community engagement initiatives tailored to meet the needs of underrepresented groups."  *Id.* ¶ 28.  Now, "new AmeriCorps restrictions could require the elimination of bilingual outreach, cultural competency training, and targeted services."  *Id.*  Likewise, Santa Fe's "Senior Companions provide care for homebound individuals, many of whom belong to historically underserved populations."  *Id.* ¶ 29.  However, "[i]f the new AmeriCorps restrictions prohibit services tailored to specific demographics, the program may no longer be able to prioritize clients facing systemic barriers to care."  *Id.*  Finally, originally, "training for volunteers by Sant[a] Fe includes topics such as trauma-informed care, social-emotional learning, and cultural competency."  *Id.* ¶ 30.  However, "under the new restrictions, they may need to be removed or rewritten."  *Id.*

Consideration of such "reliance interests…must be undertaken by the agency in the first instance."  *Regents*, 140 S. Ct. 1891, 1913.  However, Defendants do not argue that there was any such consideration.  *Id.* at 1914.  Thus, Plaintiffs have demonstrated a likelihood that AmeriCorps action was "arbitrary and capricious" for failure to consider such "an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

Further, nothing in the records demonstrates that AmeriCorps evaluated alternatives to the new Directive conditions.  While there is no "broad[] require[ment that] an agency…consider all policy alternatives in reaching [a] decision," *State Farm*, 463 U.S. at 51, agencies should evaluate "alternative[s] within the ambit of the existing standard."  *State Farm*, 463 U.S. at 51.  Here, Defendants provide no evidence or argument that they evaluated and rejected alternatives to imposing the new conditions.  Opp'n 13-15.  For example, AmeriCorps could have implemented

43

an express bar on racial preferences. *See Students for Fair Admissions,* 600 U.S. at 230–31. Instead, AmeriCorps imposed a wholesale prohibition of programs that "promote DEI" or "equity." *See* Anti-DEI EO 1 § 2(b)(i) ("Each agency…shall… terminate, to the maximum extent allowed by law, all DEI, DEIA… offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees").

At bottom, AmeriCorps offers no substantive reasons justifying its radical change of course other than its rote recitation of the need to implement the Executive Orders.

Thus, Plaintiffs are likely to succeed in demonstrating that the AmeriCorps Directive was arbitrary and capricious.

### 2. <u>Spending Clause Claim</u>

As explained, Plaintiffs have demonstrated a likelihood of prevailing on their claim that the AmeriCorps' Directive and its new grant conditions violate the Spending Clause of the Constitution.

### D. <u>Stay or Bond</u>

Finally, Defendants request either a stay of any injunctive relief or that any such relief be "administratively stayed for…seven days to allow Defendants to seek an emergency, expedited stay from the Ninth Circuit if an appeal is authorized." Opp'n at 21. Further, Defendants request that Plaintiffs post a bond worth "the sum of the grant awards for which agency action is enjoined" because "any preliminary relief" may "mandate that AmeriCorps spend money that" cannot "be recouped from Plaintiffs if Defendants are found to have been wrongfully enjoined." *Id.*

First, regarding the bond, Federal Rule of Civil Procedure 65(c) states:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65. The "district court is afforded wide discretion in setting the amount of the

44

United States District Court
Northern District of California

1 | bond…and the bond amount may be zero if there is no evidence the party will suffer damages

2 | from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d

3 | 878, 882 (9th Cir. 2003) (citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999)

4 | and *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)).  Here, Defendants claim there is no

5 | threat to terminate Plaintiffs' grants, which indicates that Defendants will not suffer any costs or

6 | damages from being enjoined from terminating their grant agreements.  *See* Mot. for TRO Hearing

7 | Trs. at 57:3-58:3 (Dkt. 41) (Defendants state that there has "been no threat" of cutting Plaintiffs'

8 | funding if Plaintiffs engage in activities that "would be deemed in violation of the Directive").

9 | Moreover, the court may waive the bond requirement if "there is a high probability of success that

10 | equity compels waiving the bond, the balance of the equities overwhelmingly favors the

11 | movant…or the requirement of a bond would negatively impact the movant's constitutional

12 | rights." *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389 CW, 2014 WL 3749984, at *6 (N.D.

13 | Cal. July 29, 2014).  Those factor weight against requiring a bond in the instant case.  The Court

14 | finds that a bond is unwarranted.

15 |       Second, regarding the stay, the "party requesting a stay bears the burden of showing that

16 | the circumstances justify an exercise of…[judicial] discretion" to issue a stay.  *Nken v. Holder*,

17 | 556 U.S. 418, 433–34 (2009).  The four relevant factors are: "'(1) whether the stay applicant has

18 | made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

19 | irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other

20 | parties interested in the proceeding; and (4) where the public interest lies.'"  *Id.* at 434 (citing

21 | *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  Defendants provide no caselaw supporting a stay.

22 | Opp'n at 21.  Conversely, Plaintiffs have demonstrated that a stay would irreparably harm

23 | Plaintiffs because, *inter alia*, "[i]n seven days, the federal government could re-impose the new

24 | conditions, identify some purported violation by Plaintiffs, [or] terminate Plaintiffs' grants

25 | entirely."  Reply at 20.  As noted above in applying the standard for preliminary injunction, all the

26 | factors considered in evaluating a request for stay counsel in favor of the grant of preliminary

27 | injunction overlap with the four stay factors.  Thus, the same reasons the Court grants the

28 | preliminary injunction counsel in favor of denying a stay.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### V.    CONCLUSION

For the reasons above, Plaintiffs' motion for a preliminary injunction is granted.  The Court enters a preliminary injunction with the same substantive provisions as the TRO until this suit concludes.  Specifically:

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' continued operation, during the pendency of this lawsuit, of their AmeriCorps-funded programs as originally approved;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' failure to certify or execute new grants, during the pendency of this lawsuit, certifying compliance with executive orders issued by President Trump on or after January 20, 2025;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate existing AmeriCorps funding awards on the basis of recipients' failure, during the pendency of this lawsuit, to certify, or execute new grants certifying, that the funded programs do not include any "activities that promote DEI activities" or similar language (together with the executive order compliance condition, the "Enjoined Conditions");

- Defendants are ENJOINED during the pendency of this lawsuit from modifying, or requiring Plaintiffs to modify, the terms of any of Plaintiffs' extant federal grants and contracts to comply with the Enjoined Conditions, or adding, or requiring Plaintiffs to add, any terms to forthcoming grants and contracts predicated on the Enjoined Conditions or similar language;

- Defendants are ENJOINED during the pendency of this lawsuit from requiring Plaintiffs to make any "certification" or other representation related to compliance with the Enjoined Conditions; and

- Defendants, and other persons who are in active concert or participation with

46

Defendant, are ENJOINED, during the pendency of this lawsuit, from initiating any investigations of Plaintiffs under the authority of the Enjoined Conditions, and specifically from publishing or making any list of Plaintiffs as targets of investigation as mandated by Executive Order 14173.

**IT IS SO ORDERED**.

Dated: June 18, 2025

_____
EDWARD M. CHEN
United States District Judge